**JOHNSON FISTEL, PLLP**
Frank J. Johnson (SBN 174882)
FrankJ@johnsonfistel.com
Brett M. Middleton (SBN 199427)
BrettM@johnsonfistel.com
Jonathan M. Scott, Esq. (SBN 323322)
JonathanS@johnsonfistel.com
501 West Broadway, Suite 800
San Diego, CA 92101
Telephone: (619) 230-0063

*Counsel for Plaintiff Balraj Paul*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BALRAJ PAUL, MONTINI FAMILY TRUST, and DOROTHY KETO, Derivatively on Behalf of THE WALT DISNEY COMPANY,<br><br>Plaintiffs,<br><br>v.<br><br>ROBERT A. IGER, ROBERT A. CHAPEK, CHRISTINE M. MCCARTHY, KAREEM DANIEL, SUSAN E. ARNOLD, MARY T. BARRA, SAFRA A. CATZ, AMY L. CHANG, FRANCIS A. DESOUZA, CAROLYN N. EVERSON, MICHAEL B.G. FROMAN, MARIA ELENA LAGOMASINO, CALVIN R. MCDONALD, MARK G. PARKER, and DERICA W. RICE,<br><br>Defendants,<br><br>and<br><br>THE WALT DISNEY COMPANY, a Delaware Corporation,<br>Nominal Defendant | Case No. 2:25-cv-10975<br><br>**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**<br><br>[REDACTED VERSION OF COMPLAINT PROPOSED TO BE FILED UNDER SEAL]<br><br>**DEMAND FOR JURY TRIAL** |

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

## TABLE OF CONTENTS

I.      NATURE AND SUMMARY OF THE ACTION ......................................... 1

II.     JURISDICTION AND VENUE ................................................................. 3

III.    PARTIES ................................................................................................... 4

IV.     SUBSTANTIVE ALLEGATIONS ........................................................... 10

        A.      Company Background and Business Model ..................................... 10

        B.      The Disney+ Scheme ...................................................................... 17

                1.      The Unrealistic Target to Chase Netflix ................................. 18

                2.      Consolidation into DMED ...................................................... 21

                3.      Deliberately Steering Content to Disney+ to Chase
                        Subscribers Over Profit .......................................................... 22

                4.      The Content Spending Spree ................................................... 26

                5.      Amortization and Cost Shifting Conceal Disney+ Losses ....... 30

                6.      Costly Promotions and Discounted Subscriptions .................. 32

                7.      Seeking Subscribers in Unprofitable Markets ........................ 34

                8.      Continued Focus on Growth Metrics ...................................... 38

                9.      High Churn Woes ................................................................... 40

                10.     Defendant Chapek's CEO Contract Extension ........................ 42

        C.      The Individual Defendants Caused the Company to Issue
                Materially Misleading Statements ................................................... 45

                1.      Disney's 2020 Investor Day and Related Statements .............. 45

                2.      The 2021 Proxy Statement ...................................................... 49

                3.      Goldman Sachs Communacopia Conference and Related
                        Misrepresentations ................................................................. 52

                4.      3Q'21 Financials and Related Statements ............................... 53

                5.      Fiscal Year 2021 and 4Q'21 Financials and Related
                        Statements .............................................................................. 54

                6.      The 2022 Proxy Statement ...................................................... 55

                7.      1Q'22 Financials and Related Statements ............................... 57

                8.      2Q'22 Financials and Related Statements ............................... 57

ii

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

| | | | |
|---|---|---|---|
| | 9. | 3Q'22 Financials and Related Statements | 58 |
| | 10. | The 2023 Proxy Statement | 59 |
| | 11. | The Board Authorizes a Series of Stock Repurchases | 61 |
| | 12. | The Truth Gradually Emerges | 65 |
| V. | INSIDER TRADING | | 70 |
| VI. | DAMAGES TO THE COMPANY | | 72 |
| VII. | DUTIES OF THE INDIVIDUAL DEFENDANTS | | 75 |
| | A. | Fiduciary Duties | 75 |
| | B. | Disney's Code of Business and Ethics for Directors | 78 |
| | C. | Disney's Standards of Business Conduct | 79 |
| | D. | Disney's Corporate Governance Guidelines | 81 |
| | E. | Audit Committee Duties | 82 |
| VIII. | CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION | | 84 |
| IX. | DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS | | 85 |
| | A. | Demand Is Excused as to Defendant Iger Because of His Employment at Disney | 86 |
| | B. | Demand Is Excused as to Defendants Barra, Chang, Froman, Lagomasino, McDonald, and Rice for Unanimously Voting to Extend Defendant Chapek's CEO Contract | 87 |
| | C. | Demand Is Excused as to Defendants Barra, Chang, Everson, Froman, Iger, Lagomasino, McDonald, and Rice Because They Solicited Re-Election to the Board on the Basis of Materially False Statements and Omissions in the 2023 Proxy Statement | 90 |
| | D. | Demand Is Excused as to Defendants Rice and McDonald as Members of the Audit Committee | 92 |
| | E. | Demand Is Excused as to Defendants Barra, Chang, Everson, Froman, Iger, Lagomasino, McDonald, and Rice for Failing to Correct the Defalcations of Their Co-Fiduciaries | 93 |
| X. | CLAIMS FOR RELIEF | | 94 |
| XI. | PRAYER FOR RELIEF | | 106 |
| | JURY TRIAL DEMANDED | | 108 |

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiffs Balraj Paul, Montini Family Trust, and Dorothy Keto ("Plaintiffs"), by and through their undersigned attorneys, bring this Verified Stockholder Derivative Complaint for the benefit of nominal defendant, The Walt Disney Company ("Disney" or the "Company"), against certain current and former members of its Board of Directors (the "Board") and certain of its current and former executive officers seeking to remedy Defendants' violations of Sections 14(a), 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 (the "Exchange Act") from December 10, 2020 through the present (the "Relevant Period"). Plaintiffs' allegations are based upon their personal knowledge, as to themselves and their own acts, and upon information and belief developed from the investigation and analysis by Plaintiffs' counsel, including without limitation: (i) review and analysis of public filings with the United States Securities and Exchange Commission ("SEC"); (ii) review and analysis of filings in federal court, including pleadings, in the related securities fraud class action captioned *Local 272 Labor-Management Pension Fund v. The Walt Disney Company, et al.*, No. 2:23-cv-03661-CBM-AS (the "Securities Class Action"), pending in this District; (iii) inspection of Disney's non-public, confidential documents produced pursuant to 8. Del. C. § 220 ("Section 220"); and (iv) review and analysis of press releases, news reports, analyst reports, industry reports, investor conference call transcripts and slides, and other information available in the public domain.

## I.     <u>NATURE AND SUMMARY OF THE ACTION</u>

1.     Since its inception in 1923, Disney has evolved into the global leader in the entertainment industry. Generally, the Company, along with its various subsidiaries, is engaged in the production and distribution of film and episodic content through a multitude of television networks. In addition to the Company's legacy distribution platforms, the Company has recently turned to offering Direct-to-Consumer ("DTC") services through platforms like Disney+, ESPN+, and Hulu.

2.     Publicly, Disney+ was touted as a serious threat to beat Netflix's dominance in the DTC streaming market, and its rapidly growing number of

1

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

subscribers was growing with the production of more content to consume. Unbeknownst to investors, Disney+'s subscriber growth was slowing down, it was failing to retain subscribers, and it was scraping the bottom of the barrel for new subscribers, resulting in decelerating growth that adversely affected the financial condition of the entire Company. Disney's growth at all costs strategy had simply ignored profitability. Making matters worse, *The Wall Street Journal* reported the Company was surreptitiously shifting costs to hide certain expenses that should have been attributed to Disney+ so that the streaming service would appear closer to profitability than in fact was the case. Under these circumstances, Disney's positive statements about the Company's business, operations, and prospects were materially false and/or misleading and/or lacked a reasonable basis.

3. These revelations forced the Company to defend itself in the Securities Class Action alleging that Disney and several of its officers defrauded investors as to the Company's true financial condition and business prospects, which is now pending in this District. On February 19, 2025, the Honorable Consuelo B. Marshall denied the defendants' motion to dismiss the Securities Class Action, finding allegations that the defendants "engaged in deceptive conduct beyond simply making misstatements, as required for scheme liability under Rule 10b-5(a) and (c)," were sufficiently pleaded.

4. Making matters worse, from December 2020 through November 2022, the Director Defendants (as defined herein) caused the Company to repurchase $78.7 million of its own stock while Disney stocks were trading at artificially high prices, causing overpayment of more than $30 million. This was done while the Director Defendants privately knew that the Company's streaming services were struggling and the Company's stock price was artificially inflated.

5. Despite their knowledge of the facts and information that was having an adverse impact on the Company's business, operations, and outlook and that the Company's SEC filings did not reflect the aforementioned adverse facts and information, and knowing that Disney stock was trading at an artificially inflated price

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

as a result, several of the Individual Defendants (as defined herein), utilizing their knowledge of facts not publicly known, also sold significant amounts of their personally held shares of Disney stock.

6.    Defendants here now face liability to the Company for, *inter alia*: (i) affirmatively making, allowing to be made, and/or failing to correct improper statements in SEC filings relating to the Company's business, operations, and prospects; (ii) failing to maintain adequate controls regarding the Company's financial reporting; (iii) trading in the stock of the Company based on their knowledge of the events described herein; and (iv) such other and further actions described herein.

7.    Plaintiffs have not made a litigation demand prior to filing this action because such demand would have been futile based upon the composition of the Board and the actions taken by the Board.  Due to the Disney Board's knowledge and involvement in the wrongdoing, its blatant failure to act, its members' lack of independence, and the substantial likelihood of liability its members face, any demand upon the Board to rectify this wrongdoing would be a wasteful and useless act. Accordingly, Plaintiffs bring this action to remedy the harm to Disney caused by Defendants' faithless actions.

## II.    <u>JURISDICTION AND VENUE</u>

8.    Pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa), this Court has jurisdiction over the claims asserted herein for violations of Sections 14(a), 20(a), and 20A of the Exchange Act.  This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

9.    Venue is proper in this District under 28 U.S.C. §§ 1391 and 1401, as well as pursuant to §27 of the Exchange Act, because: (i) a substantial portion of the transactions and wrongs complained of herein occurred in this District; (ii) Disney is incorporated in this District; (iii) one or more of the Defendants either resides in or

maintains executive offices in this District; and (iv) the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## III.  PARTIES

**Plaintiffs**

10.    Plaintiff Balraj Paul has held shares in Disney since at least June 2020 and has continually owned stock therefrom.  On February 5, 2024, Plaintiff Paul demanded inspection of the Company's documents pursuant to 8 Del. C. § 220, (a copy of which is attached hereto as **Exhibit A**) to which Disney produced 7,967 pages of documents (the "220 Documents").

11.    Plaintiff Montini Family Trust has held shares in Disney since at least September 2018 and has continually owned stock therefrom.  On March 3, 2025, Plaintiff Montini Family Trust demanded inspection of the Company's documents pursuant to 8 Del. C. § 220, (a copy of which is attached hereto as **Exhibit B**) to which Disney produced the 220 Documents.

12.    Plaintiff Dorothy Keto has held shares in Disney since at least December 2014 and has continually owned stock therefrom.  On March 10, 2025, Plaintiff Keto demanded inspection of the Company's documents pursuant to 8 Del. C. § 220, (a copy of which is attached hereto as **Exhibit C**) to which Disney produced the 220 Documents.

**Nominal Defendant**

13.    Disney is a Delaware corporation with its headquarters at 500 South Buena Vista Street, Burbank, CA, 91521-0001.  Disney's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "DIS."  Disney has 1.81 billion outstanding shares.

**Defendants**

14.    Defendant Robert A. Iger ("Iger") was Disney's Chief Executive Officer ("CEO") from March 2005 until February 2020.  Defendant Iger stepped down as

4

Disney's CEO on February 25, 2020, but retained strategic and oversight control of the Company. Defendant Iger created a new position for himself, Executive Chairman of the Company, which he occupied until December 2021. Defendant Iger also continued to serve on Disney's Board as its Chairman until December 2021. In November 2022, Defendant Iger returned to his role as CEO when the Board fired his successor, Defendant Robert A. Chapek.

15. Defendant Iger received compensation of $41,114,015 in 2024, $31,587,166 in 2023, $14,998,299 in 2022, $45,899,796 in 2021, and $21,031,389 in 2020, for total compensation of $123,043,499 during the Relevant Period.

16. Defendant Robert A. Chapek ("Chapek") succeeded Iger as CEO in February 2020 and served in that role until Disney's Board fired him in November 2022. Before that time, Chapek had served in a variety of roles since joining the Company in 1993, including as Chairman of Disney Parks, Experiences and Products, Chairman of Walt Disney Parks and Resorts, President of Disney Consumer Products, and President of Distribution for Walt Disney Studios. When becoming CEO, Chapek also became a Director of the Company and served on the Board's Executive Committee until he was fired in November 2022.

17. Despite his termination in November 2022, Defendant Chapek received compensation of $9,940,392 in 2023, $24,183,003 in 2022, $32,464,293 in 2021, and $14,163,936 in 2020 for total compensation of $80,751,624 during the Relevant Period.

18. Defendant Christine M. McCarthy ("McCarthy") began serving as Disney's Chief Financial Officer ("CFO") in 2015 and stepped down from that role in June 2023. Before becoming CFO, McCarthy served in various other roles at Disney, including Executive Vice President, Corporate Real Estate and Alliances and as Treasurer of the Company. Before joining the Company in 2000, she worked in the banking industry and held various positions at Imperial Bancorp and First Interstate Bancorp.

19.    Defendant McCarthy received compensation of $18,134,339 in 2023, $20,235,669 in 2022, $21,729,215 in 2021, and $10,997,005 in 2020, for total compensation of $71,096,228 during the Relevant Period.

20.    Defendant Kareem Daniel ("Daniel") was selected by Defendant Chapek to serve as Chairman of the newly created Disney Media and Entertainment Distribution segment in October 2020.  In that role, Daniel acted as Chapek's "right-hand man and was in charge of Disney's streaming services and television networks, in addition to profit and loss management, and all distribution, operations, sales, and advertising for all Disney content."  Daniel began working at Disney full time in 2007 and held numerous positions, including Director of Corporate Strategy, Vice President of Distribution Strategy at Walt Disney Studios, and Executive Vice President of Global Business Operations at Walt Disney Imagineering.

21.    Defendant Susan E. Arnold ("Arnold") sat on Disney's Board from 2007 through 2023, serving as Chair of the Governance and Nominating Committee ("G&NC") and Chair of the Executive Committee at the time.  Defendant Arnold received compensation of $298,797 in 2023, $571,981 in 2022, $436,922 in 2021, and $364,710 in 2020, for total compensation of $1,672,410 during the Relevant Period

22.    Defendant Mary T. Barra ("Barra") currently sits on Disney's Board and has done so since 2017.  Barra is currently a member of the Compensation Committee. Defendant Barra received compensation of $387,715 in 2024, $365,767 in 2023, $361,657 in 2022, $364,607 in 2021, and $319,702 in 2020, for total compensation of $1,799,448 during the Relevant Period.  Defendant Barra also serves as President, Chair, and CEO of General Motors and has done so since 2016.

23.    Defendant Safra A. Catz ("Catz") sat on Disney's Board from 2018 through 2024, where she served as Chair of the Audit Committee.  Defendant Catz received compensation of $293,102 in 2024, $379,668 in 2023, $439,143 in 2022, $389,822 in 2021, and $283,591 in 2020, for total compensation of $1,785,326 during the Relevant Period.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

24.    Defendant Amy L. Chang ("Chang") currently sits on Disney's Board and has done so since 2021.  Chang is a member of the G&NC.  Defendant Chang received compensation of $398,677 in 2024, $419,828 in 2023, $403,177 in 2022, and $122,685 in 2021, for total compensation of $1,344,357 during the Relevant Period.

25.    Defendant Francis A. deSouza ("deSouza") sat on Disney's Board from 2018 through 2024, where he served on the Audit Committee.  Defendant deSouza received compensation of $216,056 in 2024, $382,041 in 2023, $366,953 in 2022, $324,607 in 2021, and $300,720 in 2020, for total compensation of $1,590,377 during the Relevant Period.  Defendant deSouza is also President and CEO of Illumia, Inc.

26.    Defendant Carolyn N. Everson ("Everson") currently sits on Disney's Board and has done so since 2022.  Everson is a member of the Compensation Committee.  Defendant Everson received compensation of $384,732 in 2024 and $319,719 in 2023, for total compensation of $704,451 during the Relevant Period.

27.    Defendant Michael B.G. Froman ("Froman") currently sits on Disney's Board and has done so since 2018.  Froman currently serves as the G&NC Chair.  Defendant Froman received compensation of $418,417 in 2024, $379,161 in 2023, $433,625 in 2022, $383,942 in 2021, and $291,837 in 2020, for total compensation of $1,906,982 during the Relevant Period.   Defendant Froman also serves as Vice Chairman and President, Strategic Growth, for Mastercard Incorporated and has done so since 2018.

28.    Defendant Maria Elena Lagomasino ("Lagomasino") currently sits on Disney's Board and has done so since 2015.  Lagomasino currently serves as the Compensation Committee Chair and is a member of the G&NC.  Defendant Lagomasino received compensation of $406,833 in 2024, $408,670 in 2023, $396,730 in 2022, $354,855 in 2021, and $298,771 in 2020, for total compensation of $1,865,909 during the Relevant Period.

29.    Defendant Calvin R. McDonald ("McDonald") currently sits on Disney's Board and has done so since 2021.  McDonald is also a member of the Audit Committee.

Defendant McDonald received compensation of $368,866 in 2024, $379,419 in 2023, $361,657 in 2022, and $107,685 in 2021, for total compensation of $1,217,627 during the Relevant Period.  Defendant McDonald is also the CEO of Lululemon Athletica, Inc.

30.     Defendant Mark G. Parker ("Parker") sat on Disney's Board from 2016 through 2024, where he served on the Compensation Committee.  Defendant Parker received compensation of $580,955 in 2024, $452,159 in 2023, $361,657 in 2022, $314,607 in 2021, and $267,455 in 2020, for total compensation of $1,976,823 during the Relevant Period.  Parker departed the board in January 2025 after nine years of service.  Defendant Parker was also concurrently the Executive Chairman of Nike, Inc.

31.     Defendant Derica W. Rice ("Rice") currently sits on Disney's Board and has done so since 2019.   Rice currently serves as the Audit Committee Chair. Defendant Rice received compensation of $418,173 in 2024, $408,590 in 2023, $431,657 in 2022, $364,683 in 2021, and $334,703 in 2020, for total compensation of $1,957,806 during the Relevant Period.

**Non-Defendant Directors**

32.     Non-Defendant Director James P. Gorman ("Gorman") was elected to the Board in 2024 and was named Chairman of the Board as of January 2, 2025.

33.     Non-Defendant Director G. Jeremy Darroch ("Darroch") was elected to the Board in 2024 and serves as a member of the Audit Committee.

34.     Together, Defendants Iger, Barra, Chang, Everson, Froman, Lagomasino, McDonald, and Rice, and Non-Defendants Gorman and Darroch make up the "Board."

**Disney Board Committee Membership**

35.     In 2022, the Board members who served on each committee were as follows:

| Name | Committee |
| --- | --- |
| Susan E. Arnold | G&NC (Chair), Executive Chair |
| Mary T. Barra | Compensation |

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

| | |
|---|---|
| Safra A. Catz | Audit (Chair) |
| Amy L. Chang | G&NC |
| Robert A. Chapek | Executive |
| Francis A. deSouza | Audit |
| Michael B.G. Froman | G&NC |
| Maria E. Lagomasino | G&NC, Compensation (Chair) |
| Calvin R. McDonald | Compensation |
| Mark G. Parker | Compensation |
| Derica W. Rice | Audit |

36.    In 2023, the Board members who served on each committee were as follows:

| Name | Committee |
|---|---|
| Mary T. Barra | Compensation |
| Safra A. Catz | Audit (Chair) |
| Amy L. Chang | G&NC |
| Robert A. Iger | Executive |
| Francis A. deSouza | Audit |
| Carolyn N. Everson | Compensation |
| Michael B.G. Froman | G&NC |
| Maria E. Lagomasino | Compensation (Chair), G&NC |
| Calvin R. McDonald | Compensation |
| Mark G. Parker | Compensation |
| Derica W. Rice | Audit |

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

37.     Defendants Arnold, Barra, Catz, Chang, Chapek, Daniel, deSouza, Everson, Froman, Iger, Lagomasino, McCarthy, McDonald, Parker, and Rice are collectively referred to herein as the "Individual Defendants." Defendants Chapek, Iger, Daniel, and McCarthy are collectively referred to herein as the "Officer Defendants."     Defendants Arnold, Barra, Catz, Chang, Chapek, deSouza, Everson, Froman, Iger, Lagomasino, McDonald, Parker, and Rice are collectively referred to herein as the "Director Defendants." Defendants Catz, deSouza, McDonald, and Rice are collectively referred to herein as the "Audit Committee Defendants." Defendants Iger, McCarthy, and Arnold are collectively referred to herein as the "Insider Selling Defendants."

## IV.     **SUBSTANTIVE ALLEGATIONS**

### A.     **Company Background and Business Model**

38.     Founded in 1923, Disney originally developed animated films, including classics like *Snow White and the Seven Dwarfs*, *Pinocchio*, *Fantasia*, and *Dumbo*, among many others.  Since its inception, Disney has grown into the world's largest entertainment group, crossing over into theme parks, the travel industry, and use of its vast intellectual property to create and license legions of branded consumer products.

39.     Disney's primary focus is now on media, where it produces television programs for distribution through its own network and others, creates films through several studios, including Walt Disney Pictures, 20th Century Studios, Marvel, Lucasfilm, Pixar, and Searchlight Pictures.  In connection with its primary focus on media, Disney sold and licensed film and television content to third-party television and subscription video-on-demand ("SVOD") services.  Now Disney offers DTC (or "Disney Streaming") streaming services through Disney+, Disney+ Hotstar, ESPN+, Hulu, and Star+.

40.     Disney had long enjoyed a sterling reputation for consistently exceeding market expectations and delivering strong returns to its investors.  This track record of outperformance had instilled a deep sense of trust and reliability among stockholders.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Throughout the Company's history, investors viewed Disney as a dependable and consistent entity, capable of fulfilling its promises. As highlighted in a 2019 article published by *The Motley Fool*, titled "12 Reasons to Buy Disney Stock and Never Sell," Disney possessed a "great history of rewarding shareholders" and had delivered a "total return of more than 20,600% since 1980."

41. Defendant Iger, Disney's CEO from 2005 to 2020, was frequently described as a "legendary" figure, setting the "gold standard" for legacy media and entertainment executives, and achieving "one of the most celebrated tenures in corporate history". He capitalized on this legacy of success and reliability, combined with his own considerable celebrity status and charismatic leadership, to consolidate an almost unparalleled level of control over the vast entertainment conglomerate he had been instrumental in building. By 2019, his influence extended beyond the CEO role, as he also served as Chairman of Disney's Board. Moreover, he had personally selected every other member of the Board, many of whom were his close personal friends, thereby minimizing any potential resistance to his strategic initiatives and ensuring a high degree of alignment with his vision.

42. When Defendant Iger assumed the role of CEO in 2005, the primary mode of consumer access to Disney's media content was through the Disney Channel, which was distributed through various cable television systems, such as Comcast and AT&T. This traditional, linear broadcast model involved scheduled programming, with Disney content being aired at specific times throughout the day. However, the broadcast landscape underwent a seismic shift in 2007 with the launch of Netflix's SVOD service. This innovative platform allowed subscribers to access and stream programs instantaneously, at their own convenience. The enhanced flexibility and convenience of SVOD services rapidly gained popularity among consumers, attracting a wave of new competitors. Netflix's early success prompted the entry of other major players into the streaming market, including Hulu (2007), Amazon Video (2008), and HBO GO (2010). Despite the increasing competition, Netflix maintained its dominant

position by leveraging its first-mover advantage, its extensive subscriber base, and its diverse library of content. A comprehensive 2018 analysis revealed that Netflix controlled an impressive 68% of consumer demand for streaming services. Netflix further demonstrated an unparalleled track record of exponential subscriber growth, surpassing the milestone of 200 million subscribers in 2020, underscoring its continued dominance in the rapidly evolving streaming industry.

43.    From 2007, advances in computer technology and heightened online activity led to a big data and media consumption revolution, leaving traditional media companies like Disney with the option of embracing streaming or losing relevance. Disney chose the former.

44.    Despite licensing Disney content to Netflix in addition to more traditional media distribution, Defendant Iger realized that by 2017 these approaches were quickly becoming obsolete, with increasingly diminishing upside, because there was no way for the Company to control how consumers engaged with its media.

45.    On August 8, 2017, Defendant Iger made a surprise announcement that Disney would not renew its licensing contract with Netflix and would instead launch its own streaming service in 2019, called Disney+. At the time, Defendant Iger described Disney's pivot toward DTC services as "an entirely new growth strategy for the company, one that takes advantage of the incredible opportunity that changing technology provides us to leverage the strength of our great brands." Defendant Iger knew that successfully launching the streaming platform was critical to Disney's future, as DTC put Disney "on the precipice of trying to figure out how to go from being a legacy media company of yesteryear into a legacy media company of tomorrow." The launch was also personally important to Defendant Iger, who *The New York Times* reported had "staked his legacy on the success of Disney Plus." In other words, Disney+ was "a make-or-break attempt by Defendant Iger to reposition Disney for growth—its traditional cable businesses are in decline—and compete with the tech giants that are aggressively moving into Hollywood."

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

46.    Leading up to the launch, Defendant Iger told investors that "[b]uilding our direct to-consumer business remains one of our top priorities as a company." Defendant McCarthy reiterated this point, telling investors: "Our direct-to-consumer strategy and the successful launch of Disney+ are top priorities for our company," and assuring them: "[w]e will be aggressive in our efforts" and "believe we can succeed." With respect to Disney+'s launch, Defendant Iger promised investors that Disney+ would have between 60 million to 90 million subscribers worldwide by 2024.

47.    Disney then launched an unprecedented, company-wide synergy campaign for Disney+.  Leading up to the launch, all Disney-affiliated entities promoted Disney+, as described by *The New York Times* in October 2019.  This "kingdom-wide advertising offensive" included heavy promotion on ABC and ESPN, Disney World advertisements on buses and trams, Disney+ show screenings on cruise ships, "pep rallies" at Disney stores, hotel room advertisements, and social media promotion to over a billion followers.

48.    On November 12, 2019, Disney+ launched, achieving 10 million subscribers on its first day and 3.2 million app downloads.  This successful launch boosted Disney's market capitalization by $18 billion, increased its share price by 7.5%, and enhanced Defendant Iger's reputation.

49.    Analysts, who had only projected 10-18 million first-year subscribers, were impressed by Disney+'s rapid growth.  A November 13, 2019 JP Morgan report, "What Streams are Made of," acknowledged that the 10 million first-day subscribers exceeded expectations.  The report predicted Disney's digital transition would increase stock value, reflecting confidence in long-term success and profitability.

50.    By February 4, 2020, Disney+ had 26.5 million subscribers, positioning it to easily meet Iger's 2024 target of 60-90 million.  Analysts, including UBS, Credit Suisse, and BMO, praised the subscriber growth, with UBS noting it was "half way to the target in 3 months."  Disney's stock price rose nearly $7 per share in a single day following the announcement.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

51.    Only a few weeks later, on February 25, 2020, Defendant Iger made another shocking announcement—he was stepping down as Disney's CEO. Although Defendant Iger had been contemplating retirement previously, he had postponed his retirement four times since 2013, stating that it was finally the right time to step away from his role as Disney's CEO.

52.    In conjunction with stepping down from his role as CEO, Defendant Iger also announced his reportedly hand-picked replacement for Disney's CEO, Defendant Chapek—effective immediately. Despite being a longtime leader at Disney, Defendant Chapek was formerly the Chairman of Disney's Parks, Experiences, and Products and had no experience in streaming or even media content production.

53.    Another unusual aspect of Defendant Chapek's appointment as Disney's CEO was that his CEO contract was particularly short, expiring at the close of 2022, giving him less than a two-year window to prove to the Board and investors that he could shine bright enough through Defendant Iger's shadow. As a foreshadowing of what was to come, Defendant Chapek's executive compensation agreement also set him to be compensated in significant part upon "the value of the Company's common stock." While Defendant Iger publicly resigned from his longtime role as Disney CEO in February 2020, privately, he had no interest in actually stepping away from the Company. According to the CNBC article published September 6, 2023 titled "Disney's Wildest Ride: Iger, Chapek, and the Making of an Epic Succession Mess" Defendant Iger and the Board had agreed upon a succession plan that appointed Defendant Iger as Executive Chairman, a self-created position that allowed him to "retain control of movie and TV content and operations."[1] Defendant Iger would remain in the role of Executive Chairman through the end of 2021—"[a]cting almost

_____

[1] Alex Sherman, *Disney's wildest ride: Iger, Chapek, and the making of an epic succession mess*, CNBC, https://www.cnbc.com/2023/09/06/disney-succession-mess-iger-chapek.html (Sept. 6, 2023, updated Oct. 19, 2023), last visited Oct. 28, 2025.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

as a shadow CEO" throughout the first 22 months of Defendant Chapek's tenure as CEO. [2]   As a result, Defendant Iger's plan allowed him to stay very involved with operations and it was reported in the CNBC article that Defendant Iger had "pegged [Defendant] Chapek as someone who would accept his somewhat unusual succession plan, in which [Defendant] Chapek would serve both as CEO and CEO-in-training while [Defendant] Iger remained his boss."  This allowed Defendant Iger to effectively rule over the Disney kingdom as Chairman of the Board through the end of 2021.

[2] "Bob Iger vs. Bob Chapek: Inside the Disney Coup" *The Wall Street Journal* (Dec. 17, 2022).

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

55.     Within a matter of weeks from when Defendant Chapek stepped into the CEO role, the Coronavirus disease 2019 (COVID-19) pandemic forced Disney to shutter its theme parks, resorts, and cruise lines, as well as halting production on its movie distribution channel.  Even worse, live sports were virtually eliminated from Disney's TV networks like ESPN and ABC.  In short, the pandemic proved to be disastrous for Disney in all of its traditional lines of business.

56.     The pandemic's closures devastated Disney's finances.  Initial distress surfaced in March 2020 with a $6 billion debt security sale, insufficient to offset estimated daily losses exceeding $30 million by April of that year.  To conserve cash, Disney suspended its semi-annual dividend a month later.  As the pandemic persisted, Disney reported its first quarterly loss in 19 years in August 2020 and its first annual loss in over 40 years by November.

57.     The pandemic severely challenged Chapek's leadership.  Despite assurances of leniency due to "extraordinary circumstances," his performance was heavily scrutinized.  Disney's stock plummeted from $133 to $79 per share within three weeks of his CEO appointment.  To achieve contractual performance-based compensation and contract renewal, Defendant Chapek needed to rapidly recover the Company's stock price.  The promising Disney+ launch was the spark that would reignite Disney's growth.

16

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

<table>
<tr><td>1</td><td></td></tr>
</table>

**B.    The Disney+ Scheme**

59.    Despite Disney's stock price collapsing at the outset of the pandemic, Disney+ propelled Disney's stock price upward, month after month.  As Disney+'s number of subscribers grew, the Company's stock price appeared to climb in lockstep.

60.    Disney's stock price had risen to $115 per share by August 4, 2020, and it appeared that the pandemic was actually driving subscriber growth while much of the country was shut down.  Defendant Chapek reminded investors that "[d]espite the ongoing challenges of the pandemic, we've continued to build the incredible success of Disney+ as we grow our global direct-to-consumer business."  That same day, Evercore acknowledged what had now been true for months: "the more investors focus on streaming the better it is for the stock."  BMO further drove this message home the following day, remarking: "CEO Chapek put his first stamp on DIS by doing exactly what long term holders crave: pushing faster to streaming."

61.    On August 5, 2020, the day after Disney's Q3 2020 earnings call, the Company's stock price rose again, this time by more than six dollars, from $115 per share on August 4, 2020 to $123 per share on August 5, 2020, teasing the $133 break-even price when Defendant Chapek first took over.

62.    Defendant Chapek's initial six months as Disney's CEO were a trial by fire, revealing a stark reality: his future was inextricably linked to Disney+.  To maintain stock value, secure his contract renewal, and forge his own Disney legacy, he had to ride the wave of Disney+'s growth.  Defendant Chapek recognized Wall Street's continued fascination with the streaming platform, even a year after launch.  However, the pandemic's surge in viewership was waning, as people returned to pre-pandemic activities.  Faced with this challenge, Defendant Chapek devised a carefully crafted scheme to sustain Wall Street's enthusiasm and, ultimately, bolster Disney's stock price.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1

## 1.    The Unrealistic Target to Chase Netflix

2    63.    First, Defendant Chapek, along with the help of Defendants Daniel and

3    McCarthy, put the hype train into motion by intentionally setting an unrealistically high

4    Disney+ subscriber target.  On December 10, 2020, Defendant Chapek and others

5    announced that Disney was ***quadrupling*** the Disney+ subscriber targets that Defendant

6    Iger had announced just twelve months earlier, when the platform launched.  The new

7    target of 230-260 million global subscribers was supposed to surpass Netflix, the

8    industry leader in streaming, which had just surpassed 200 million subscribers.  The

9    target of 230-260 million subscribers was set for one purpose—surpassing Netflix to

10    take the limelight in streaming services, and had little, if any relation to how that would

11    affect the health of Disney's business.

12    64.    The choice of a Netflix-esque subscriber goal was no mere coincidence.

13    Insiders revealed Defendants Chapek and Daniel's "literal obsession" with the Disney+

14    versus Netflix narrative.  They understood that a target mirroring Netflix's success

15    would laser-focus Wall Street on Disney+, effectively diverting attention from the

16    Company's still-recovering sectors.  Throughout Investor Day 2020, the message was

17    unequivocal: amidst pandemic-induced struggles in traditional divisions and the shift

18    to streaming, Disney was placing its full weight behind growing Disney+.

19    ████████████████████████████████

20    ██████████████████████████████████████

21    ████████████████

22

23

24

25

26

27

28

18



67.    However, Defendant Chapek's ambition extended beyond a fleeting spike; he needed sustained elevation through mid-2022, when his contract would be up for renewal.  Defendant Chapek's bold projection of 230-260 million subscribers was designed to create a solid foundation for Disney's stock.  Defendant Chapek knew that

19

consistent, even if modest, quarterly subscriber gains would reassure investors that the goal was within reach. By setting a distant 2024 target, he bought himself time, ensuring each quarterly report would reinforce the narrative of progress. And should any doubts arise, Defendants Chapek and McCarthy were prepared to reiterate, quarter after quarter, that Disney was firmly on track.



VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

### 2.   Consolidation into DMED

72.   Second, Defendant Chapek consolidated his control over Disney+ by reorganizing the Company, combining all content production, distribution, and finance units into a new media segment called Disney Media and Entertainment Distribution ("DMED"). Defendant Chapek then appointed Defendant Daniel to run DMED despite the fact that Defendant Daniel had never demonstrated an understanding of the streaming business or the underlying technology. Defendant Daniel was appointed to lead DMED not based on merit but because of his loyalty to Defendant Chapek.[4]

73.   Publicly, DMED was described as a rational move to streamline distribution decisions to better monetize Disney's content in order to maximize profitability, and Defendant Chapek had purportedly received "100% buy-in" regarding the new structure from executives across the Company. Defendant Chapek explained in an interview with CNBC that the restructuring was formulated to "accelerate our transition to a real direct-to-consumer priority company," elaborating that, "[w]e believe that we've got the opportunity to build upon the success of Disney+, which by almost any measure has been far and above anybody's expectations and really use this to catalyze our growth and increase shareholder wealth."

74.   In addition, the Company issued a press release on October 12, 2020, which echoed Defendant Chapek's sentiment, stating:

> In light of the tremendous success achieved to date in the Company's direct-to consumer business and to further accelerate its DTC strategy, [Disney] today announced a strategic reorganization of its media and entertainment businesses. Under the new structure, Disney's world-class creative engines will focus on developing and producing original content for the Company's streaming services, as well as for legacy platforms, while distribution and commercialization activities will be centralized into a single, global Media and Entertainment Distribution organization. ***The new Media and Entertainment Distribution group will be responsible for all monetization of content—both distribution and ad sales—and will oversee operations of the Company's streaming services. It will also have sole P&L accountability for Disney's media and entertainment businesses***.

---

[4] "The Palace Coup at the Magic Kingdom," *The New York Times*; (Sept. 4, 2024).

1

2

3

4

5

6

7

8

9



10    77.    Behind the scenes, the consolidation of groups under DMED allowed the

11  Individual Defendants to tear Disney content distribution away from Disney studio

12  executives as a means to chase Disney+ subscriber growth.  Predictably, this created a

13  divide within Disney, where even Defendant Iger admitted that Defendant Chapek's

14  DMED reorganization "created a huge divide" within the Company, and "it was very,

15  very apparent . . . that [the reorganization] was a mistake."[5]

16    **3.    Deliberately Steering Content to Disney+ to Chase Subscribers**

17          **Over Profit**

18    78.    Third, DMED was utilized to steer feature films to Disney+, bypassing

19  lucrative theatrical releases and pay-per-view windows for the purpose of chasing more

20  Disney+ subscribers.  The effect of overriding studio executives and steering films

21  directly to Disney+ to boost the number of Disney+ subscribers came at the expense of

22  overall profitability.  Even when the pandemic was winding down, DMED shortened

23  the "theatrical window" to half of what it once was.  In other words, even when content

24  did not go directly to Disney+, it went to Disney+ quicker and at the expense of other

25  avenues of profit.

26  _____

27  [5] "Disney CEO Bob Iger speaks out about replacing Bob Chapek fresh off a major

28  restructure announcement saying he 'created a huge divide'", *Fortune*, (Feb. 9, 2023).

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1 ████████████████████████████████████████████████

2 ██████████████████

3    86.    While direct-to-Disney+ decisions were being touted as highly successful,

4 having positive impact on subscriber growth, and discussed in a positive light, the

5 Company never detailed how Disney+ was cannibalizing profit from theatrical releases

6 of what would have historically been considered blockbusters for the Company.  Even

7 Pixar's Chief Creative Officer, Pete Docter, has since conceded that, in order to chase

8 subscribers, Disney was too eager to send films directly to streaming.    Docter

9 confirmed that this short-term growth tactic has had long-lasting, deleterious effects on

10 Disney's once lucrative movie business, and that Defendant Chapek and Daniel's

11 short-sighted distribution decisions were to blame.  Disney further admitted: "[W]e

12 were so aggressive at supporting the streaming business. In some cases, we made a lot

13 of films just for streaming. In some cases, we made films with shorter exhibition

14 windows. In almost all cases, we made films that no longer had the sell-through

15 window in it, which home video at one point, as we called it, was extremely lucrative

16 for our company."

17        **4.    The Content Spending Spree**

18 ██████████████████████████████████

19 ████████████████████████████████████████████████

20 ████████████████████████████████████████████████

21 ████████████████████████████████████████████████

22 ████████████████████████████████████████████████

23 ████████████████████████████████████████████████

24 ████████████████████████████████████████████████

25 ████████████████████████████████████████████████

26 ██████████████████████████████████

27     ██████████████████████████████████████████████

28 ████████████████████████████████████████████████

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

29

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

96.    Publicly, Disney focused on the concept that a steady stream of new Disney+ content added to the platform each quarter would equate to more and more subscriber growth.    Internally, Disney knew that much of the content was not necessarily driving subscription growth and the amortized expenses triggered a crushing $1.5 billion loss in the fourth quarter of 2022.  Starting in May 2023, Disney ended up removing more than fifty of the same shows that Defendant Chapek had publicly touted a few quarters earlier, significantly contributing to the $2.4 billion impairment charges the Company recorded that same year.

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

### 5.    Amortization and Cost Shifting Conceal Disney+ Losses

99.    Fifth, Disney manipulated its accounting to cover up runaway Disney+ content costs, shifting these costs between divisions to conceal costs and mask operating losses for Disney+.  For example, Defendants Chapek and Daniel briefly debuted Disney+ content on Disney's legacy distribution channels (linear TV networks) before making the shows available on Disney+.  This allowed Disney to artificially shift content and marketing costs for that content to the linear network division and off of the Streaming balance sheet.  According to *The Wall Street Journal*, "Ms. McCarthy was concerned about this [cost shifting] strategy."

100.    Beyond the subscriber games, the Individual Defendants orchestrated a significant accounting sleight of hand within the DMED reorganization, designed to obscure Disney+'s mounting costs and operating losses.  Prior to this restructuring, Disney's film and television studios operated with a degree of independence, selling content to Disney+ at fair market value, which included a profit margin.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT



102. However, with the studios consolidated under DMED, these inter-segment content sales vanished. Disney+ was only charged the raw production costs, eliminating the market value markup. This seemingly innocuous accounting tweak dramatically reduced Disney+'s reported content expenses and artificially inflated its perceived profitability, especially when compared against previous periods. This illusory leap towards profitability captivated investors and analysts throughout 2021.

103. For instance, in the first quarter post-reorganization, where analysts anticipated a $1.2 billion operating loss for Disney Streaming, the Company reported a mere $466 million loss. The Individual Defendants downplayed the impact of this accounting shift, vaguely attributing a portion of the favorable results to Disney+. In subsequent quarters, Disney completely omitted any mention of the accounting change, allowing analysts to mistakenly credit Disney Streaming's "improved performance" for the artificially enhanced financial figures.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

2  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

3  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

4  ▇▇▇▇▇▇▇▇▇▇▇▇

5  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

6  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

7  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

8  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

9  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

10 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

11 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

12 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

13 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

14 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

15 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

16 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

17 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

18 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

### 6.    Costly Promotions and Discounted Subscriptions

109.    Sixth, Disney increasingly relied on costly promotions and heavily discounted subscriptions to continue driving subscriptions growth. The Company would offer discounts through third-party partnerships, where another company would offer a Disney+ subscription as an incentive to use its own products or services, and then pay Disney a small portion of the regular subscription cost.

25 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

26 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

27 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

28 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1

2

3

4

5

6

7

8

9      111.    To mask the aggressive pursuit of subscriber numbers, Defendant Chapek

10   reassured investors that discounted partnerships were carefully managed, stating,

11   "we're very selective. We've got guidelines . . . to extract the benefits of those type

12   relationships."   However, reality painted a starkly different picture.   Driven by an

13   insatiable hunger for subscriber growth, Disney abandoned any pretenses of its

14   selective approach.

15      112.    A prime example surfaced in December 2021, when Disney gifted all 4.3

16   million Hulu Live subscribers with free Disney+ subscriptions, subsequently counting

17   them as full-fledged Disney+ subscribers to inflate reported growth.   Even Defendant

18   Iger later conceded, "in our zeal to go after subscribers, I think we might have gotten a

19   bit too aggressive in terms of our promotion."   Defendant Iger further admitted that the

20   "promotion to chase sub[scription]s that we've been fairly aggressive at globally wasn't

21   absolutely necessary," acknowledging Disney had prioritized quantity over quality.

22   Defendant Iger then promised a shift towards "quality sub[scription]s that are loyal,"

23   where Disney could "continue to price effectively," a clear admission that the previous

24   strategy was flawed.

25

26

27

28

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT



### 7. Seeking Subscribers in Unprofitable Markets

116. Seventh, Disney+ was launched into unprofitable international markets to pump up unsustainable levels of subscriber growth. For example, between November 2019 and November 2020, Disney+ launched in more than 50 international markets and by the first quarter of 2021, approximately 88% of Disney+'s new subscribers came from these international markets, with the international rollout on track for completion by the end of that year. Ultimately, Disney+ subscriptions slowed down, so the Individual Defendants decided at the end of 2021 to saturate Disney+'s international presence and double its presence. When Disney+ launched into dozens of countries midway through 2022, it did so into many markets where the ARPU was significantly lower, broadband access was limited, and many of Disney's programs were censored or even banned, limiting the Company's ability to operate profitably in those markets.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

35

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24



25    122.   For a time, the illusion held.  Disney+'s mid-2022 international expansion

26 sparked a surge in subscriber growth, with a staggering 99.3% of new subscribers

27 originating from these foreign markets by the third quarter.

28

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

███████████████████████████████████████████████████

████████████████████████████████

126.   As Defendant Iger later revealed during the Company's first quarter 2023 earnings call, contradicting Defendant Chapek's previous assurances, Disney had recklessly "launched Disney+ in many, many markets around the world, including many very low ARPU markets," investing heavily in marketing and local content without regard for profitability.  Defendant Iger even suggested a potential retreat from certain markets, stating "not all markets are created equal," a stark contrast to the narrative of unbridled global expansion previously peddled by Defendant Chapek.

### 8.   Continued Focus on Growth Metrics

127.   Eighth, by emphasizing Disney+'s growth, Disney maintained the façade that Defendant Chapek's growth plan to 230-260 million subscribers was actually on target.  The combination of reporting quarterly subscriber growth and assurances from Defendants Chapek and McCarthy that "we feel really great about our sub[scriptions] trajectory" and "we also remain confident in our expectation that Disney+ will achieve profitability in fiscal 2024" propped up Disney's stock price.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT



VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

133.   Even as Disney+'s growth began to sputter and shortly before he was fired, on November 8, 2022, Defendant Chapek still assured investors and the public that Disney+ was expected to achieve profitability in fiscal 2024.

**9.    High Churn Woes**

134.   Ninth, Disney+ was experiencing problems with subscriber churn as a result of chasing low quality subscribers who were more likely to cancel their subscriptions when promotions ended, or content started to lose its newness.  While outwardly Disney touted that its churn was declining or that it was seeing low churn, high churn was an ongoing and serious problem inside Disney.  This problem was so bad that Disney Streaming executives referred to Disney+ as "the leaky bucket"

1  because "[n]o matter how much water you put in, some leaks out."[6]  In fact, the

2  Individual Defendants were well aware that churn actually increased from these already

3  concerning levels, climbing 30% year-over-year from Q2 2021 to Q2 2022, according

4  to *The Wall Street Journal*.

5      135.  For example, on February 11, 2021, during Disney's Q1 2021 earnings

6  call, Defendant McCarthy stated: "[s]o in regard to the specific churn related to the

7  anniversary of the Verizon launch promotion from last November 2020, we're really

8  happy with the conversion numbers that we have seen there going from the promotion

9  to become paid subscribers."

10      136.  Defendant Chapek falsely stated that Disney+ price increases were having

11  no effect on churn and on August 12, 2021 during Disney's 3Q 2021 earnings call

12  stated: "We're really pleased with churn. We've taken some price increases over the

13  past few quarters. And what you're seeing is that our churn has declined. . . . So the

14  fact that our churn is low, our engagement is so high, our retention is so high."

15  Defendant Chapek further stated that Disney executives look at "the amount of time

16  spent, the engagement scores and then, of course, the churn, information."  And he

17  went on to state, "we've said this before in past earnings calls, but we're extraordinarily

18  pleased with the low churn that we see, particularly given the bundle. The bundle is

19  really efficient in terms of churn. And that gives us a lot of bullishness when it comes

20  to the idea of bigger offerings from Disney."

21      137.  Despite this, Disney+'s monthly churn rate increased from 3.75% to

22  4.25% between 2021 and 2022.  To provide context, in 2021, the Disney+ monthly

23  churn rate was 88% higher than Netflix's 2.0% churn rate.  *The Wall Street Journal*

24  confirmed the worsening trend, noting the U.S. churn rate for Disney+ increased almost

25  30% in Q2 2022 as compared to the prior year.

26  _____

27  [6] *Local 272 Labor-Management Pension Fund v. The Walt Disney Company et al.,* No.
   2:23-CV-03661 (C.D Cal. 2023), ECF No. 68, Consol. Comp. ¶312

28

41



139. Disney+'s churn problem stemmed from the fact it employed unsustainable growth tactics to boost subscriber growth, resulting in an increase in low-quality users who were more likely to churn off the Disney+ platform. For example, Disney frequently boosted subscribers through highly discounted (or free) promotions, including arrangements with Verizon, American Express, Amazon Music, T-Mobile, and Hulu+ Live TV. These promotional subscribers were far more likely to leave the Disney+ streaming platform after the promotion ended rather than pay full price. Despite McCarthy's assurance that Disney would be "transparent" and continue to provide investors with "key metrics that help [investors] best understand our progress," Disney concealed key churn data from investors.

**10.    Defendant Chapek's CEO Contract Extension**

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

143.   It was later reported by *The Wall Street Journal* that the Board's decision to give Defendant Chapek an extension was hotly contested, where "[t]wo directors, Mr. Parker and Mary Barra, General Motors Co. CEO, had been reluctant to go along. Others persuaded them that support of the full board would boost [Defendant] Chapek's confidence and shore up his performance."

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████

145.   In connection with Defendant Chapek's extension, Disney filed a Form 8-K that included a press release stating: "THE WALT DISNEY COMPANY BOARD OF DIRECTORS UNANIMOUSLY VOTES TO EXTEND BOB CHAPEK'S CONTRACT AS CEO FOR THREE YEARS."   In the press release, Disney's Board Chairman at the time, Defendant Arnold, was quoted: "Disney was dealt a tough hand by the pandemic, yet with Bob [Chapek] at the helm, our businesses – from parks to streaming – not only weathered the storm, but emerged in a position of strength." Defendant Arnold also stated: "In this important time of growth and transformation, the Board is committed to keeping Disney on the successful path it is on today, and Bob [Chapek]'s leadership is key to achieving that goal. Bob [Chapek] is the right leader at the right time for The Walt Disney Company, and the Board has full confidence in him and his leadership team."   The Board's outward endorsement of Defendant Chapek's plan communicated to the market that all was right, and the Company was going to stay the course.

146.   Nonetheless, according to a media report citing to a senior Disney insider: "Arnold was keenly aware things weren't going well under Chapek, the senior Disney insider said, adding that creative and business executives had been reaching out to the chair and other board members over the past few months to share their concerns."

147.  *The Hollywood Reporter* later reported on November 21, 2022, that "sources with ties to the company say discontent among some board members had been building to the point that there was discussion about replacing Chapek as far back as the directors' late June meeting in Florida.  At that time, sources say, some on the board wanted to replace Chapek and appoint one of their own."  According to *The Financial Times*, "the covert campaign to overthrow [Defendant] Chapek, which began in the summer, came after the outgoing chief executive lost the confidence of some members of his top team. . . . 'A lot of people were approaching the board, Iger loyalists who felt marginalized,' said one person with knowledge of the talks."

148.  According to *Fortune*, "almost immediately after Disney renewed the contract of embattled CEO Bob Chapek in June, a mutiny began . . . senior figures with the company's top brass including finance chief [Defendant] McCarthy started to warn boardroom directors over the summer that the entertainment giant was heading in the wrong direction and campaigned for him to go."

149.  Five months later, on November 8, 2022, the Disney+ scheme could be concealed no longer when Disney announced a shocking $1.47 billion loss, DMED would be unwound, and Defendant Chapek was fired (less than two weeks later), but he had managed to hold out long enough for a $20 million extension.  On November 21, 2022, Disney fired Defendant Daniel, only a day after Defendant Chapek was fired.

150.  One week later, on November 28, 2022, the Company disclosed that it would be required to completely upend Defendant Chapek's growth-at-any-cost model in order to re-direct Disney+ back towards profitability.  As Defendant Iger stated at a November 28, 2022 town hall meeting: "Instead of chasing subscri[bers] . . . we have to start chasing profitability."  In the following quarters, Disney "reset the whole business around economics designed to deliver significant, sustained profitability."

C.     **The Individual Defendants Caused the Company to Issue Materially Misleading Statements**

1.     **Disney's 2020 Investor Day and Related Statements**

151.   On December 10, 2020, Disney hosted its 2020 Investor Day event, broadcasting from the Company' headquarters in Burbank, California.   The presentation aimed to provide stockholders with a comprehensive update on the Company's diverse business operations, structural reorganization, and particularly its DTC initiatives.   Chapek, McCarthy, and Daniel took the stage to deliver scripted comments, with Chapek and McCarthy also participating in an analyst Q&A session. Subsequent to the event's conclusion, Disney uploaded a replay of the presentation, along with presentation slides, onto the Company's official website.

152.   At the commencement of his 2020 Investor Day remarks, Chapek triumphantly claimed that the Company had already surpassed its preliminary subscriber projections for Disney+, stating, in relevant part, the following:

> Disney+ has exceeded our wildest expectations, with 86.8 million subscribers as of December 2nd. That's quite an achievement! This success has bolstered our confidence in our continued acceleration towards a DTC-first business model, and more importantly, it's launched [Disney] into a new era of delivering consumers truly exceptional entertainment built around our world-renowned brands and franchises.

153.   Defendant Chapek then detailed how the Company's new distribution and commercialization segment (*i.e.*, DMED) would distribute Disney's content onto the platform most beneficial to consumers, explaining, in relevant part, the following:

> Our unique access to an incredible number of consumer touch points across our businesses gives us a clear advantage. Based on insights gained from this wealth of data, our distribution and commercialization team is able to better inform our creatives of consumer preferences. And the creative teams are empowered to make the high-quality branded entertainment they believe will resonate with audiences. This new organization also gives us maximum flexibility in determining when – and on which platform – content will be available. And this is especially important now given consumers' rapidly changing consumption behaviors, and the prolonged uncertainty due to the pandemic.
>
> As circumstances change, we will continue to consider these and other critical factors when determining what steps we may take to most

45

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

effectively distribute our programming. Our goal is always to serve consumers in the best way possible.

154. During the presentation, Defendant Daniels also emphasized and corroborated Defendant Chapek's previous statements that the Company would distribute Disney's content on the platform most beneficial to consumers, stating, in relevant part, the following:

> As a company, we were set up to achieve success in an increasingly dynamic environment. And as Bob mentioned, consumer behavior really does drive our decision-making. While we have always valued the data gained through our numerous consumer touch points, the rapid growth of our portfolio of DTC services provides us with an even greater opportunity to understand their preferences, and we are using these insights to help determine how to optimally engage with our audiences. In fact, our team uses all of the information available to us when determining how best to allocate our creative content budgets across all platforms, with the goal to maximize both audience engagement and commercial impact. And we share this budgetary framework and critical insights with our creative partners, as part of a truly collaborative planning process that delivers high-quality, branded entertainment, to achieve our established growth objectives for all of our platforms: from direct-to-consumer, to linear networks, to theatrical exhibition.
>
> This exchange of information is a key pillar to our organization's overall strategy, which also relies on the increased flexibility provided by our mix of distribution options, including, in no particular order:
>
> - Releasing content though traditional windows – such as theaters and linear networks before it is made available on our direct-to-consumer services, particularly recognizing the actual exhibition's ability to help establish major franchises that are at the heart of our Disney flywheel;
> - Providing our creative output simultaneously day-and-date on both traditional and DTC platforms, in concert with our [p]remier [a]ccess commercialization strategy for the DTC component;
> - And exclusively distributing our content on our streaming services, providing a constant flow of new titles for subscriber acquisition and to minimize churn.
>
> Of course, regardless of where it originates, all of our films and episodic series will inevitably end up as part of our incredibly rich and increasingly robust library of content on our DTC platforms.
>
> Since streaming has quickly become a preferred method of consumption, we are prioritizing our DTC platforms – both in terms of how we distribute our content and also through an increased investment in our original programming for Disney+, Hulu, ESPN+ and the upcoming Star-branded international general entertainment offering.

*     *     *

46

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

One of the primary benefits of our new organizational structure is our ability to quickly re-evaluate and adjust our plans in light of changes in the marketplace. And we will continue to shift and optimize our mix of window theatrical, day-and-date, and DTC exclusive offerings according to what is best for the consumer and our business.

155.    During Defendant McCarthy's presentation, she provided profitability and subscriber estimates for Disney+, along with related foreign streaming services such as Disney+ Hotstar, stating, in pertinent part, as follows:

Today, I'm going to provide guidance across our services for fiscal 2024, to be consistent with the timeframe we guided to at our last investor day. Let me start with Disney+ which, as you heard earlier today, had 86.8 million total paid subscribers as of December 2nd, approximately 30% of which were Disney+ Hotstar subscribers.

\*        \*        \*

If you recall, last year, we said that we expected Disney+ to have between 60 million and 90 million subscribers by the end of fiscal 2024. But as you know, our subscriber growth-to-date is well ahead of our original expectations – and we have an incredible and growing slate of high-quality content that will capture a broader global audience and further fuel Disney+, making it, what we believe, is an even more compelling product.

These factors along with the addition of our Star general entertainment offering in various markets, and the growth of Disney+ Hotstar, give us an even greater optimism about our future. And they enable us to significantly increase our subscriber guidance. We now expect that by the end of fiscal 2024, we will have between ***230 million and 260 million total paid Disney+ subscribers globally compared to the 60 million to 90 million we shared last year.*** I'll note that our prior outlook did not anticipate the launch of Disney+ Hotstar, which we now expect could be between 30% and 40% of our subscriber base by the end of fiscal 2024.

\*        \*        \*

Given the value of growing our subscriber base, as you've seen today, we plan to reinvest revenue generated from our better-than-expected subscriber growth back into content investment. Thus we continue to expect Disney+ to achieve profitability in fiscal 2024. Again, I'll note that this guidance includes Disney+, Star, Star+ and Disney+ Hotstar.

156.    The presentation slides utilized during the 2020 Investor Day event echoed the Company's projections that, by the close of the fiscal year 2024, Disney+ would not only be profitable but would also boast a subscriber base ranging from 230 million to 260 million paid global users. Of this subscriber base, the materials provided that 30-40% would be attributed to Disney+ Hotstar. Remarkably, these revised figures

47

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1  signified a nearly threefold increase in comparison to previous forecasts, without any

2  diminishment in the anticipated profitability for this particular business segment.

3      157.   During the 2020 Investor Day's Q&A session, in response to a question

4  from a Morgan Stanley analyst, Defendant Chapek explained the decision-making

5  process that went into determining when and on which platform or platforms Disney's

6  content would be distributed, stating, in relevant part, as follows:

> So to me, it's really about over—of the 100 titles that we announced today, 80% of them are going first to Disney+, which I think says something about our pivot over to Disney+. But at the same time, we had $13 billion of box office last year. And that's obviously not something to sneeze at. And we know as [Disney] who've got this plethora of franchises that we just showed you today, that we build those franchises through the theatrical exhibition window and we did $13 billion back in '19. So for us, it's about balance. And it's about following the consumer as they make that transition.

> And so part of why we did the reorganization that we did is to ensure that we've got an organization that's flexible to read all the cues, whether it's the cessation of COVID or it's changing consumer behavior so that we can very nimbly make decisions as we go forward. And that 80% direct-to-consumer is not just Disney+, obviously, but that includes Hulu and Star as well.

    158.   The 2020 Investor Day had an impact on the market.  Following the event, analyst reports heralded the remarkable claims of rapid and profitable Disney+ growth. For example, a Barclays analyst report proclaimed that "DTC guidance blows past consensus expectations"; a Wolfe Research report trumpeted "Expectations Blown Away"; a Morgan Stanley report cheered "To Infinity & Beyond"; and an RBC Capital Market Reports figuratively burst into song: "Disney, Disney, Disney, Can't You See? Sometimes Your Words Just Hypnotize Me."  Some analysts even predicted that Disney+ might surpass Netflix as the most widely adopted paid streaming service in the world.  The representations made at Disney's 2020 Investor Day had their intended effect, pushing the price of Disney common stock to all-time highs of over $180 per share by the end of December 2020.

    159.   Subsequent statements reiterated and emphasized the statements made at the 2020 Investor Day.  Specifically, on the Company's February 11, 2021 earnings

call for its first fiscal quarter of 2021, Defendant McCarthy confirmed that Disney+ was expected to reach profitability in fiscal 2024, stating, in pertinent part, as follows:

> Okay. Thanks, Brett. You're absolutely right. Peak losses, we expect in this fiscal year. We said at our Investor Day, which wasn't too long ago, that we expected to reach profitability in fiscal 2024. We're not going to change that at this point, although we are very pleased with the results that we just announced. But we are also – given the value of growing our sub base, we are continuing to invest in high quality content. ***We believe that content is the single biggest driver to not only acquiring subs[cribers], but retaining them***.

160.    On the Company's May 13, 2021 earnings call for its second fiscal quarter of 2021, Defendant Chapek reiterated that Disney was on track to achieve its Disney+ 2024 paid global subscriber estimate, stating, in relevant part, as follows:

> We are uniquely positioned with the most compelling brands and franchises in entertainment, and we continue to deliver the high-quality, one-of-a-kind content that consumers want. That's clearly reflected in the success of Disney+, which amassed nearly 104 million paid subscribers as of the end of the second fiscal quarter. We are on track to achieve our guidance of 230 million to 260 million subscribers by the end of fiscal 2024.

161.    During the same call, Defendant McCarthy likewise stated: "As [Defendant Chapek] mentioned earlier, we remain right on track to reach our fiscal 2024 guidance of 230 to 260 million subs, powered by the addition of 30 million paid Disney+ subs in the first half of the year."

162.    What these statements failed to reveal is that Disney was trying to reach its 260 million subscriber goal at any cost—at the expense of profitability, at the expense of its linear content, uncontrolled spending on developing content, and reaching into far flung unprofitable international markets to find more subscribers.

## 2.    The 2021 Proxy Statement

163.    On January 19, 2021, the Company filed its Schedule 14A with the SEC (the "2021 Proxy Statement").  Defendants Chapek, Arnold, Barra, Catz, deSouza, Froman, Iger, Lagomasino, Parker, and Rice caused the issuance of materially misleading written statements to stockholders that were contained in the 2021 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1 ████████████████████████████████████████████

2 ████████████████████████████████████████████

3 ████████████████████████████████████████████

4 ████████████████████████████████████████████

5 ████████████████████████████████████████████

6 ████████████████████████████████████

165.   The 2021 Proxy Statement called for Company stockholders to vote to, *inter alia*: (i) re-elect Defendants Chapek, Arnold, Barra, Catz, deSouza, Froman, Iger, Lagomasino, Parker, and Rice to the Board; (ii) ratify the appointment of PricewaterhouseCoopers LLP as the independent registered public accounting firm of the Company for the 2021 Fiscal Year; and (iii) approve, on an advisory basis, the Company's executive compensation.

166.   The 2021 Proxy Statement also discussed "The Board's Role in Risk Oversight," affirming the Board's fundamental responsibility, as stipulated in the Company's Corporate Governance Guidelines, for "assessing major risk factors" and "reviewing measures to address and mitigate such risks." This mandate covered a broad spectrum of risks, including those related to economic assumptions, business plans, growth strategies, and day-to-day operations, with specialized committees like the Audit Committee tasked with diligent review of financial reporting and legal/regulatory compliance.

167.   Despite these clear corporate governance guidelines and the Board's stated commitment to risk oversight, the Company's public statements regarding Disney+ were consistently and materially false and misleading. The 2021 Proxy Statement was materially false and misleading because it failed to disclose critical information about Disney+'s declining subscriber growth, escalating losses, and uncontrolled costs, and to reveal executives' manipulative content distribution practices that obscured the true expenses and misrepresented the company's financial health and prospects. Further, executives were manipulating content distribution,

initially releasing Disney+ intended content on legacy channels to obscure true Disney+ expenses. This cost-shifting was driven by DMED's desire to hide the true cost of Disney+'s content library, leading to distribution decisions that prioritized financial concealment over profit maximization. Critically, the 2024 global subscriber and profitability targets were unrealistic and lacked any factual basis, meaning Disney was not on track to achieve them. Finally, the Company failed to maintain adequate internal controls. Consequently, the Company's public statements were materially false and misleading, lacked a reasonable basis at all relevant times.

168.   As alleged above, in the first quarter post-reorganization, where analysts anticipated a $1.2 billion operating loss for Disney Streaming, the Company reported a mere $466 million loss as a result of Disney's new cost shifting approach.



170.   As a result of Defendants Chapek, Arnold, Barra, Catz, deSouza, Froman, Iger, Lagomasino, Parker, and Rice causing the 2021 Proxy Statement to be false and

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

misleading, Company stockholders voted, among other things, to re-elect Defendants Chapek, Arnold, Barra, Catz, deSouza, Froman, Iger, Lagomasino, Parker, and Rice to the Board, thus allowing them to continue breaching their fiduciary duties to the Company.

### 3.    Goldman    Sachs    Communacopia    Conference    and    Related Misrepresentations

171.    On September 21, 2021, the Company and Defendant Chapek gave a virtual presentation at the Goldman Sachs Communacopia Conference.  During the presentation, Defendant Chapek acknowledged that Disney+ subscriber growth had slowed in the fourth quarter of the fiscal year ended October 2, 2021, stating: "In Q4, I think what you can expect to see is that our global paid subs will increase by low single-digit millions of subscribers versus Q3."

172.    This new information concerning the number of global paid Disney+ subscribers failed to meet the market's expectations.  Prior to the market's close that day, CNBC reported the disappointing news, in pertinent part, as follows:

> Disney's CEO [Chapek] said Tuesday his company's streaming service growth has "hit some headwinds" related to coronavirus, causing shares to close lower for the day. Disney expects to add "low single-digit millions" of streaming subscribers in the fourth quarter, Chapek said. Disney shares ended the session down 4.1% after Chapek's comments at the virtual Goldman Sachs Communacopia Conference.

> Chapek said "mobilizing partners" in Latin America to push Disney's new Star+ streaming service, the Covid-related suspension of the India Premier League— whose games air on Disney's Hotstar—and production delays from the delta variant have all hurt subscriber numbers in the fourth quarter.

> "We are going to see a little bit more noise than maybe the Street projects quarter to quarter," Chapek said. "The resurgence of Covid and delta did impact some of our productions."

> Chapek's forecast is significantly lower than some analyst estimates. Deutsche Bank analyst Bryan Kraft had projected Disney+ net adds of about 13 million in the quarter.

> Global production delays will be "very short term," Chapek said. But he acknowledged there won't be as much new programming in the fourth

quarter "than we might have expected," which will affect subscriber growth.

Disney has projected 230 million to 260 million Disney+ subscribers by 2024. Disney said in August it had 116 million Disney+ subscribers.

Chapek cautioned investors that quarter-to-quarter growth "is not linear" and some choppiness is expected. Still, he remained confident in Disney's long-term growth outlook.

173.   In response to the news, the price of Disney common stock closed down $7.44 per share, or more than 4%, from the prior day's close of $178.61 per share on September 20, 2021, on an abnormally high volume of over 23 million shares traded.

174.   Despite these revelations, the price of Disney common stock remained artificially inflated because of the failure of the Company's directors and officers to disclose the full truth.  The directors and officers continued to make materially false and misleading statements which continued to artificially inflate the price of Disney common stock.  For example, during the Goldman Sachs Communacopia Conference presentation, Defendant Chapek stated: "We're very confident about our long-term sub[scriber] growth as we have been."   The statement was misleading because it maintained a facade of confidence in long-term growth while omitting the critical information that Disney+ was facing undisclosed escalating losses, uncontrolled costs, and manipulative content distribution practices designed to conceal its true financial state.

### 4.      3Q'21 Financials and Related Statements

175.   On August 12, 2021, Disney released its Fiscal Q3 2021 Form 10-Q and Defendants McCarthy and Chapek participated in an earnings call with analysts. During the conference call, Defendant Chapek reported that "Disney+ . . . performed incredibly well with 116 million" subscribers.  Defendant McCarthy stated: "As Bob mentioned earlier, we ended the third quarter with 116 million global paid subscribers to Disney+, up from approximately 104 million in the second quarter."

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1   176.   Defendant McCarthy added that "subscriber growth was also solid at our
2   core Disney+ markets, excluding Disney+ Hotstar, with total quarter-over-quarter net
3   adds in those markets consistent with net adds from Q2."  Disney's Fiscal Q3 2021
4   Form 10-Q also reported that there were 116 million paid Disney+ subscribers as of
5   Fiscal Q3 2021.   Despite the reported subscriber growth, these statements were
6   misleading because they failed to reveal the undisclosed financial burdens of Disney+,
7   including escalating losses and unchecked costs, which painted a misleadingly
8   optimistic picture of the streaming service's performance and long-term viability.

9        **5.    Fiscal Year 2021 and 4Q'21 Financials and Related Statements**

10   177.   After the market closed on November 10, 2021, Disney issued a press
11   release, which was also filed with the SEC that day as an exhibit to a Form 8-K,
12   reporting the Company's financial results for its fourth quarter and fiscal year ended
13   October 2, 2021.

14   178.   Disney posted quarterly results that missed Wall Street's already
15   diminished expectations as the Company saw a dramatic slowdown in Disney+
16   subscribers.  The Company added just 2.1 million customers during the quarter (the
17   smallest quarterly gain since the service's launch two years prior), revenue of $18.53
18   billion, and adjusted earnings per share of $0.37—all of which were below consensus
19   estimates of 119.6 million subscribers, $18.78 billion in revenues, and adjusted
20   earnings per share of $0.49, as compiled by Bloomberg.

21   179.   In response to this news, the price of Disney common stock closed down
22   $12.34 per share, or more than 7%, on November 11, 2021, on an abnormally high
23   volume of over 62 million shares traded.  Despite these revelations, the price of Disney
24   common stock remained artificially inflated because of the failure of the Company's
25   directors and officers to disclose the full truth.  In addition, the Company's directors
26   and officers continued to make materially false and misleading statements which
27   continued to artificially inflate the price of Disney common stock as detailed below.

28

180.   On the Company's earnings call after the market closed on November 10, 2021, Defendant Chapek doubled down on the Company's prior forecast that the streaming service would reach profitability and have between 230 million and 260 million paid global Disney+ subscribers by the end of fiscal 2024, stating, in pertinent part, as follows:

> I want to reiterate that we remain focused on managing our DTC business for the long term, not quarter-to-quarter, and we're confident we are on the right trajectory to achieve the guidance that we provided at last year's Investor Day – reaching between 230 million and 260 million paid Disney+ subscribers globally by the end of fiscal year 2024, and with Disney+ achieving profitability that same year.

181.   Defendant McCarthy also reiterated the Company's prior subscriber growth and profitability forecast, stating in pertinent part as follows:

> As Bob mentioned, we are increasing our overall long-term content expense for Disney+, and we are well positioned to achieve the subscriber target of 230 to 260 million by fiscal 2024 that we laid out at last year's Investor's Day, and we also remain confident in our expectation that Disney+ will achieve profitability in fiscal 2024.

182.   These statements were misleading because, despite the significant underperformance and decelerating subscriber growth, executives continued to present unrealistic profitability and subscriber targets for Disney+ without acknowledging the undisclosed financial challenges and manipulative practices that rendered these projections unattainable.

### 6.    The 2022 Proxy Statement

183.   On January 19, 2022, the Company filed its Schedule 14A with the SEC (the "2022 Proxy Statement"). Defendants Chapek, Arnold, Barra, Catz, Chang, deSouza, Froman, Lagomasino, McDonald, Parker, and Rice caused the issuance of materially misleading written statements to stockholders that were contained in the 2022 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act.

55

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1 ████████████████████████████████████████████████████████

2 ██████████████████████

3  185.  The 2022 Proxy Statement called for Company stockholders to vote to,

4 *inter alia*: (i) re-elect Defendants Chapek, Arnold, Barra, Catz, Chang, deSouza,

5 Froman, Lagomasino, McDonald, Parker, and Rice to the Board; (ii) ratify the

6 appointment of PricewaterhouseCoopers LLP as the independent registered public

7 accounting firm of the Company for the 2022 Fiscal Year; and (iii) approve, on an

8 advisory basis, the Company's executive compensation.

9  186.  The 2022 Proxy Statement also discussed "The Board's Role in Risk

10 Oversight," which was substantively identical to the same statement as the 2021 Proxy

11 Statement, mentioned above.

12 ████████████████████████████████████████████████

13 ████████████████████████████████████████████████████████

14 ████████████████████████████████████████████████████████

15 ████████████████████████████████████████████████████████

16 ████████████████████████████████████████████████████████

17 ████████████████████████████████████████████████████████

18 ████████████████████████████████████████████████████████

19 ████████████████████████████████████████████████████████

20 ████████████████████████████████████████████████████████

21 ████████████████████████████████████████████████████████

22 ████████████████████████████████████████████████████████

23 ████████████████████████████████████████████████████████

24 ████████████████████████████████████████████████████████

25 ████████████████████████████████████████████████████████

26 ████████████████████████████████████████████████████████

27 ██████████████████████████████████████

28

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1

[REDACTED]

2

3

4

5

6

7

8

9     189.  As a result of Defendants Chapek, Arnold, Barra, Catz, Chang, deSouza,

10 Froman, Lagomasino, McDonald, Parker, and Rice causing the 2022 Proxy Statement

11 to be false and misleading, Company stockholders voted, among other things, to re-

12 elect Defendants Chapek, Arnold, Barra, Catz, Chang, deSouza, Froman, Lagomasino,

13 McDonald, Parker, and Rice to the Board, thus allowing them to continue breaching

14 their fiduciary duties to the Company.

15          **7.    1Q'22 Financials and Related Statements**

16     190.  On February 9, 2022, Disney released its Fiscal Q1 2022 10-Q and

17 Defendants Chapek and McCarthy participated in an earnings call with analysts.

18 During the call, Defendant Chapek reported that "11.8 million Disney+ subscribers"

19 were added in Q1 2022.  Defendant McCarthy likewise stated, "[w]e ended the quarter

20 with nearly 130 million global paid Disney+ subscribers, reflecting over 11 million net

21 additions from Q4."  Disney's Fiscal Q1 2022 Form 10-Q also reported that there were

22 129.8 million paid Disney+ subscribers as of Fiscal Q1 2022.

23          **8.    2Q'22 Financials and Related Statements**

24     191.  On May 11, 2022, Disney released its Fiscal Q2 2022 10-Q, and

25 Defendants McCarthy and Chapek participated in an earnings call with analysts.

26 During the call, defendant Chapek informed investors that Disney ended the quarter

27 with an additional "7.9 million Disney+ subscribers, keeping us on track to reach 230

28 million to 260 million Disney+ subscribers by fiscal '24...."

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

192.   On the same call, Defendant McCarthy stated: "[w]e ended the quarter with nearly 138 million global paid Disney+ subscribers, reflecting close to 8 million net additions from Q1."  Disney's Fiscal Q2 2022 10-Q also reported that there were 137.7 million paid Disney+ subscribers as of Fiscal Q2 2022.

193.   While these statements accurately reported Disney+ subscriber numbers for Q1 and Q2 2022 and reiterated future targets, they were misleading.  They failed to disclose the true financial strain on Disney+ and instead perpetuated unrealistic profitability and subscriber projections without acknowledging the underlying operational inefficiencies and deceptive content distribution practices that made these goals unattainable.

### 9.    3Q'22 Financials and Related Statements

194.   On August 10, 2022, Disney issued a press release, which was also filed with the SEC as an exhibit to a Form 8-K, reporting the Company's results for the third fiscal quarter of 2022 ended July 2, 2022.  Disney also held an earnings call to discuss its results at that time.  During the call, Defendant McCarthy lowered the Company's 2024 guidance for Disney+ by only 15 million on both the low end and high end—still far above the actual performance of the platform—and reaffirmed the 2024 profitability estimate, stating in relevant part as follows:

> Finally, before we move to Q&A, I want to spend some time sharing a few updates on our fiscal 2024 guidance for Disney+. We are providing more detail on subscriber targets by separating our guidance into two categories: core Disney+ and Disney+ Hotstar. Excluding the impact of any significant future macro headwinds, our core Disney+ subscriber target range is 135 million to 165 million by the end of fiscal 2024 – largely consistent with previously provided guidance that non-Hotstar Disney+ subscribers in 2024 would approximate 60%–70% of the **expected 230 to 260 million total subscriber base**.

> We are, however, updating subscriber guidance for Disney+ Hotstar, to up to 80 million subscribers by the end of fiscal 2024. We intend to refine this target over time, as subscriber visibility in India will be clearer once the [International Cricket Council] and [Board of Control for Cricket in India] cricket rights sales processes are completed. As you may know, we recently made the disciplined decision to not proceed with the Indian Premier League digital rights, and [we] will evaluate these rights with that same discipline.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

As we sit here today, we remain confident that Disney+ will achieve profitability in fiscal 2024. And look forward to several upcoming catalysts including: reaching a steady state of tentpole original content releases, delivery of premium general entertainment and international local originals, and the upcoming launch of our ad supported tier, alongside the new pricing structure announced earlier today.

195.    The statements referenced in the previous paragraph were materially false and misleading because they failed to disclose material adverse facts about the Company's business, operations, and prospects.  These statements failed to disclose, among other things, that (i) Disney+'s subscriber growth was slower than projected and that content costs were crushing profitability; (ii) the Individual Defendants were pursuing a growth at all costs strategy for Disney+ at the expense of profitable legacy distribution channels, (iii) Disney's 2024 global subscriber and profitability targets had no  reasonable basis in fact, and as such, the Company would never reach those goals; and (iv) the Company was failing to maintain internal controls in connection with the DMED reorganization.

**10.    The 2023 Proxy Statement**

196.    On February 6, 2023, the Company filed its Schedule 14A with the SEC (the "2023 Proxy Statement"). Defendants Barra, Catz, Chang, deSouza, Everson, Froman, Iger, Lagomasino, McDonald, Parker, and Rice caused the issuance of materially misleading written statements to stockholders that were contained in the 2022 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

198.   The 2023 Proxy Statement called for Company stockholders to vote to, *inter alia*: (i) re-elect Defendants Barra, Catz, Chang, deSouza, Everson, Froman, Iger, Lagomasino, McDonald, Parker, and Rice to the Board; (ii) ratify the appointment of PricewaterhouseCoopers LLP as the independent registered public accounting firm of the Company for the 2023 Fiscal Year; and (iii) approve, on an advisory basis, the Company's executive compensation.

199.   The 2023 Proxy Statement also discussed "The Board's Role in Risk Oversight," which was substantively identical to the same statement as the 2022 Proxy Statement, mentioned above.

200.   The 2023 Proxy Statement also made statements concerning "Fiscal 2022 Compensation Decisions," where the Compensation Committee reviewed the annual performance-based bonus program and chose to evaluate performance on, among other things, "Collaboration on strategic priorities."  The first metric celebrated that the Company "[s]uccessfully increased subscribers at Disney+ (+39%), Hulu (+8%) and ESPN+ (+42%) during fiscal 2022, while launching DTC platforms in several key international markets, including 154 different countries and territories."

201.   These statements failed to disclose the persistent deceleration of Disney+ subscriber growth, the Company's issues with subscriber churn, and obfuscated that it had pursued low quality subscribers into unprofitable markets.  It was only two days later that the Company reported that Disney+ lost 2.4 million subscribers, and the DTC business reported an increase in operating loss from $0.5 billion to $1.1 billion due in part to a higher loss at Disney+, which reflected higher programming and production costs.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

■■■■■■■■■■

203.   As Defendant Iger later revealed to the public two days later, contradicting Defendant Chapek's previous assurances, Disney had recklessly "launched Disney+ in many, many markets around the world, including many very low ARPU markets," investing heavily in marketing and local content without regard for profitability. Defendant Iger even suggested a potential retreat from certain markets, stating "not all markets are created equal," a stark contrast to the narrative of unbridled global expansion previously peddled by Defendant Chapek

204.   Consequently, the public statements within the 2023 Proxy Statement, like its predecessors, were materially false and misleading, devoid of a reasonable basis at all relevant times.

**11.    The Board Authorizes a Series of Stock Repurchases**

205.   During the Relevant Period, the Director Defendants caused the Company to initiate repurchases of its artificially inflated common stock that substantially damaged the Company.  In total, the Company spent an aggregate amount of over $78.7 million to repurchase approximately 557,313 shares of its own common stock at artificially inflated prices from December 2020 through November 2022.

206.   According to the relevant Forms 10-Q Disney filed with the SEC, the Company was caused to have made the following repurchases while Disney's stock was truly worth only $86.75 per share, the price at closing on November 9, 2022:

| Date Range | Purchase | Shares | Avg. Price | Overpayment |
|---|---|---|---|---|
| 12/1/2020–1/2/2021 | $3,181,092 | 18,664 | $170.44 | $1,561,990 |
| 1/3/2021–1/31/2021 | $3,156,842 | 18,215 | $173.31 | $1,576,690 |
| 2/1/2021–2/28/2021 | $3,342,653 | 18,230 | $183.36 | $1,761,200 |

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

| | | | | |
|---|---|---|---|---|
| 3/1/2021–4/3/2021 | $3,638,282 | 18,820 | $193.32 | $2,005,647 |
| 4/4/2021–4/30/2021 | $3,346,898 | 17,873 | $187.26 | $1,796,415 |
| 5/1/2021–5/31/2021 | $3,336,166 | 19,292 | $172.93 | $1,662,585 |
| 6/1/2021–7/3/2021 | $3,432,180 | 19,511 | $175.91 | $1,739,601 |
| 7/4/2021–7/31/2021 | $2,872,350 | 15,923 | $180.39 | $1,491,030 |
| 8/1/2021–8/31/2021 | $2,743,719 | 15,510 | $176.90 | $1,398,227 |
| 9/1/2021–10/2/2021 | $2,781,303 | 15,493 | $179.52 | $1,437,286 |
| 10/3/2021–10/31/2021 | $2,842,413 | 16,599 | $171.24 | $1,402,450 |
| 11/1/2021–11/30/2021 | $3,625,406 | 23,036 | $157.38 | $1,627,033 |
| 12/1//2021–1/2/2022 | $4,226,047 | 28,624 | $147.64 | $1,742,915 |
| 1/2/2022–1/31/2022 | $3,649,847 | 25,595 | $142.60 | $1,429,481 |
| 2/1/2022–2/28/2022 | $3,136,377 | 20,873 | $150.26 | $1,325,644 |
| 3/1/2022–4/2/2022 | $4,211,207 | 24,942 | $168.84 | $2,047,489 |
| 4/3/2022–4/30/2022 | $2,943,271 | 23,363 | $125.98 | $916,530 |
| 5/1/2022–5/31/2022 | $4,531,178 | 42,751 | $105.99 | $822,529 |
| 6/1/2022–7/2/2022 | $3,540,775 | 36,469 | $97.09 | $377,089 |
| 7/3/2022–7/31/2022 | $3,058,878 | 30,343 | $100.81 | $426,623 |
| 8/1/2022–8/31/2022 | $2,692,576 | 22,440 | $119.99 | $745,906 |
| 9/1/2022–10/1/2022 | $2,475,968 | 23,058 | $107.38 | $475,687 |
| 10/2/2022–10/31/2022 | $2,563,449 | 25,673 | $99.85 | $336,316 |

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

| 11/1/2022–11/30/2022 | $3,385,864 | 36,016 | $94.01 | $261,476 |
|---|---|---|---|---|

207.    In total, Disney overpaid for repurchases of its own stock in excess of $30.3 million because its stock prices at each time were artificially overinflated.

208.    It was during this time period that the Individual Defendants caused Disney to misrepresent and fail to disclose to investors that its Disney+ subscriber goals were unrealistic and that it was sacrificing other lucrative avenues of profit and dipping into unprofitable markets to make it look like Disney+'s growth was on track.  By concealing Disney+'s runaway costs, declining subscription growth rates, and churn, the Individual Defendants enabled the Company to prop up its stock prices.

209.    Despite the Director Defendants' knowledge of the true facts about the Company's business and financial prospects, these Defendants nevertheless authorized and executed the Company's purchases of its own stock at artificially inflated prices. The Director Defendants' decisions were not the product of a valid business judgment because the Board knew that the Company's stock was significantly inflated during the repurchase period due to the false and misleading statements set forth in this Complaint. The artificial inflation of Disney shares was both financially beneficial to the Individual Defendants, as numerous Individual Defendants' compensation was tied to the Company's financial performance, and helped mask Disney+'s runaway costs, declining subscription growth rates, and churn.  Because the price of the Company's shares was artificially inflated by the misrepresentations of Defendants alleged herein, the Company materially overpaid for its own stock.

210.    Disney repurchased stock relying on the false and misleading statements of the Individual Defendants, either directly or through the "fraud on the market" doctrine.

211.    At all relevant times, the market for Disney common stock was an efficient market, for many reasons.  Disney stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient and automated market.

Hundreds of thousands of shares of Disney stock are traded on a daily basis, demonstrating a very active and broad market for Disney stock, and permitting a very strong presumption of an efficient market. As a regulated issuer, Disney filed periodic public reports with the SEC and the NYSE. Disney regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services. Finally, Disney was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

212. As a result of the foregoing, the market for Disney common stock promptly digested current information regarding Disney from all publicly available sources and reflected such information in the price of Disney common stock. In addition, the Company's repurchasing of shares artificially inflated its financial metrics such as earnings per share, as the repurchases resulted in fewer outstanding shares. Under these circumstances, all purchasers of Disney common stock during the Relevant Period suffered similar injury through their purchase of Disney common stock at artificially inflated prices, and a presumption of reliance thus applies.

213. Moreover, the repurchases falsely signaled to the Company's stockholders and the public that: (i) the purchase of Disney stock at those prices was the best use of the Company's cash; (ii) the purchases of the stock at the market price prevailing at that time represented a good value for the Company; and (iii) the Company's shares were trading at a discount, which caused investors to purchase shares and thereby drive the price up. In truth, the Company's expenditures on its own stock were so recklessly improvident as to constitute corporate waste. The repurchases were not designed to serve a legitimate corporate interest. Rather, they were designed to help conceal the

true facts concerning Defendants' misrepresentations and omissions through an inflated stock price.

### 12.    The Truth Gradually Emerges

214.  On November 8, 2022, Disney issued a press release reporting the Company's financial results for its fourth quarter and fiscal year ended October 1, 2022.

215.  Disney missed analyst estimates by wide margins on both the top and bottom lines.  Revenue in the quarter grew just 9% to $20.15 billion, below estimates at $21.36 billion.  Sales, at $20.2 billion, fell about $1 billion short of analysts' projections.  Earnings, excluding certain items, fell to $0.30 per share, missing the average estimate of $0.51 per share from analysts surveyed by Bloomberg.

216.  The Company's DTC segment, which includes streaming services Disney+, ESPN+, Hulu, and Hotstar, reported a monumental operating loss of $1.47 billion compared to a $630 million loss in the same quarter the year prior.  Revenue in the segment increased just 8% to $4.9 billion.  The Company also reported a decline in ARPU for its Disney+ subscriber, as more customers subscribed through a discounted bundle with the Company's other services.  Notably, the bundled offering made up about 40% of domestic subscribers, confirming that Disney was relying on short-term promotional efforts to boost subscriber growth while impairing the platform's long-term profitability.

217.  In response to this news, the price of Disney common stock collapsed $13.15 per share, or more than 13%, on a single day on November 9, 2022 with an abnormally high volume of over 62 million shares traded.

218.  Less than two weeks later, and only five months after the Board voted to extend Defendant Chapek's employment contract, the Company announced on November 20, 2022, that the Board had terminated Defendant Chapek and replaced him with Defendant Iger.  Defendant Daniel was shown the door within 24 hours thereafter.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

219. On November 21, 2022, *The Wall Street Journal* reported on some of the behind-the-scenes disputes and issues that ultimately led to Defendant Chapek's dismissal, whose position at the Company had reportedly "been shaky for months." Significantly, the report also included information concerning a previously undisclosed cost-shifting scheme employed by the Individual Defendants to hide certain expenses that should have been attributed to Disney+ so that the streaming service would appear closer to profitability than in fact was the case.

220. Not only did the Individual Defendants know about this strategy and intentionally employ it to deceive investors, but reportedly Defendant McCarthy had internally expressed her concerns about its propriety. *The Wall Street Journal* report stated, in pertinent part, as follows:

> Disney is moving some shows that were supposed to be Disney+ originals and air them first on other networks including the Disney Channel, people familiar with the matter said. By doing so, the costs of production and marketing of the shows— which included mystery show "The Mysterious Benedict Society" and medical drama "Doogie Kameāloha, M.D."— would be shifted away from the streaming service, making its financial performance look better, they said.

> Ms. McCarthy was concerned about this strategy, the people said.

221. Other news outlets thereafter similarly reported that "Disney Discovered Bob Chapek Was 'Cooking the Books' to Hide Massive Losses in Revenue," and that "Bob Chapek Shifted Budgets to Disguise Disney+'s Massive Monetary Losses."

222. On February 8, 2023, the Company reported financial results for its first quarter fiscal year 2023, ended December 31, 2022. Disney reported that Disney+ lost 2.4 million subscribers, and the DTC business reported an increase in operating loss from $0.5 billion to $1.1 billion due in part to a higher loss at Disney+, which reflected higher programming and production costs.

223. On a conference call that same day to discuss the results, Defendant Iger announced a broad restructuring of the Company aimed at putting the Company's streaming business on a path to both profitability and growth, stating, in relevant part, as follows:

In 2019, Disney+ launched, with nearly 500 films and 7,500 episodes of television from across the world of Disney. Three years later, its meteoric rise is considered one of the most successful results in the history of the media business. Now it's time for another transformation[,] one that rationalizes our enviable streaming business and puts it on a path to sustained growth and profitability [] while also reducing expenses to improve margins and returns [] and better positioning us to weather future disruption, increased competition, and global economic challenges. We must also return creativity to the center of the company, increase accountability, improve results, and ensure the quality of our content and experiences.

224.   Defendant Iger made clear that an important component of restoring the Company's success was returning power to the Company's creative executives, including distribution decisions, which Defendant Chapek had taken away as part of his October 2020 restructuring, stating, in relevant part, as follows:

Now the details. Our company is fueled by storytelling and creativity. And virtually every dollar we earn[,] every transaction[,] every interaction with our consumers emanates from something creative. And I've always believed that the best way to spur great creativity is to make sure that people who are managing the creative process feel empowered.

Therefore, our new structure is aimed at returning greater authority to our creative leaders, and making them accountable for how their content performs financially. Our former structure severed that link and it must be restored. Moving forward, our creative teams will determine what content we're making, how it is distributed and monetized, and how it gets marketed.

225.   Defendant Iger additionally announced that the Company would be reorganized into three core business segments from which creative executives would purportedly be able to maximize revenue and growth, stating, in pertinent, part as follows:

Managing costs, maximizing revenue and driving growth from the content being produced will be their responsibility. Under our strategic reorganization, there will be three core business segments[:] Disney Entertainment, ESPN, and Disney Parks, Experiences and Products.

Alan Bergman and Dana Walden will be Co-Chairman of Disney Entertainment, which will include the Company's full portfolio of entertainment media and content businesses globally, including streaming. Jimmy Pitaro will continue to serve as Chairman of ESPN, which will include ESPN Networks, ESPN+ and our international sports channels. And Josh D'Amaro will continue to be Chairman of Disney Parks, Experiences and Products, which will include our theme parks,

resort destinations and cruise line, as well as Disney's consumer products, games, and publishing businesses.

These organizational changes will be implemented immediately, and we will begin reporting under the new business structure by the end of the fiscal year. This reorganization will result in a more cost-effective, coordinated and streamlined approach to our operations, and we are committed to running our businesses more efficiently, especially in a challenging economic environment.

226.    Defendant Iger also provided important details regarding the Company's efforts to rein in costs, indicating that Disney would be cutting $5.5 billion in costs with $2.5 billion in non-content cuts (including 7,000 jobs) and $3 billion in content savings over the next few years, stating, in relevant part, as follows:

In that regard, we are targeting $5.5 billion of cost savings across the company. First, reductions to our non-content costs will total roughly $2.5 billion, not adjusted for inflation. $1 billion in savings is already underway, and Christine will provide more details, but in general, the savings will come from reductions in SG&A and other operating costs across the company.

To help achieve this, we will be reducing our workforce by approximately 7,000 jobs. While this is necessary to address the challenges we're facing today, I do not make this decision lightly. I have enormous respect and appreciation for the talent and dedication of our employees worldwide, and I'm mindful of the personal impact of these changes.

On the content side, we expect to deliver approximately $3 billion in savings over the next few years, excluding sports, and Christine will be providing more details during the call.

Turning to our streaming businesses[.] I'm proud of what we've been able to achieve since the launch of Disney+ just 3 years ago. We are delivering more content [] with greater quality [] in more ways[,] in more places [] and to larger audiences.

227.    Additionally, Defendant Iger stated that the Company would no longer be providing long-term subscriber guidance for Disney+, stating, in relevant part, as follows:

Like many of our peers, we will no longer be providing long-term subscriber guidance in order to move beyond an emphasis on short-term quarterly metrics – although we will provide color on relevant drivers. Instead, our priority is the enduring growth and profitability of our streaming business.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

228.    Then, on May 10, 2023, the Company reported financial results for its second quarter fiscal year 2023, ended April 1, 2023.  Disney reported that Disney+ had lost subscribers for the second quarter in a row, further confirming that the 2024 Disney+ targets had never been achievable.  During the quarter, ***Disney+ had lost 4 million paid subscribers from the prior quarter***, which shocked analysts who had ***expected the service to add 1.7 million subscribers***.  Streaming revenue increased 12% from a year earlier in part due to recent price hikes necessitated by the streaming service's horrendous losses.

229.    On a conference call that same day to discuss the results, Defendant Iger again acknowledged that Disney's streaming business needed to rebalance its streaming business model in order to have a chance to reach profitability, stating that "it's critical we rationalize the volume of content we're creating and what we're spending to produce our content."  He further announced that Disney was planning another price increase, at least for the Disney+ ad-free tier, risking even further subscriber losses.

230.    In response to this news, the price of Disney common stock declined $8.83 per share, or more than 8% in a single day on May 11, 2023 on abnormally high volume of over 57 million shares traded.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

██████████████████████████████████████████████

████████████████████████

## V.    **INSIDER TRADING**

232.    While many of Disney's stockholders lost considerable sums when the truth emerged, the Insider Selling Defendants were able to sell their shares at artificially high prices and avoid the staggering losses suffered by the Company's other stockholders.    While Disney and the Individual Defendants were touting subscriber growth and positive financial forecast, the Insider Selling Defendants elected to sell shares of their Disney stock.

233.    For a few months, from January 2021 to June 2021, Disney's stock was soaring amidst the scheme and Defendant Iger took full advantage, selling 2,227,767 shares of his Disney stock for an eye popping $409,124,607.84 in proceeds.

234.    The following chart reflects Defendant Iger's insider transactions during this time period:

| Date | Shares Sold | Avg. $/Share | Proceeds |
|---|---|---|---|
| 6/1/2021 | 13,266 | $179.7573 | $2,384,660.34 |
| 6/1/2021 | 537,304 | $179.1980 | $96,283,802.19 |
| 3/8/2021 | 71,554 | $200.3747 | $14,337,611.28 |
| 3/8/2021 | 49,392 | $201.1293 | $9,934,178.39 |
| 2/24/2021 | 196,158 | $200.1369 | $39,258,454.03 |
| 2/23/2021 | 220,000 | $195.3877 | $42,985,294.00 |
| 2/8/2021 | 220,000 | $190.1203 | $41,826,466.00 |
| 2/2/2021 | 55,979 | $175.2390 | $9,809,703.98 |
| 2/2/2021 | 181,157 | $176.2762 | $31,933,667.56 |

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

| 1/22/2021 | 15,640 | $175.0066 | $2,737,103.22 |
| 1/21/2021 | 1,300 | $175.0000 | $227,500.00 |
| 1/20/2021 | 260,454 | $175.2983 | $45,657,143.43 |
| 1/20/2021 | 145,109 | $176.3955 | $25,596,574.61 |
| 1/20/2021 | 260,454 | $177.2000 | $46,152,448.80 |

235.   Defendant Iger's stock sales raised red flags due to their abrupt timing and substantial value.  For two years preceding these trades, Defendant Iger's Disney stock remained untouched.   However, the moment the alleged scheme began artificially inflating Disney's stock price, Defendant Iger initiated a massive and rapid sell-off, unloading over $409 million worth of stock.  This sudden flurry of activity commenced almost immediately after Defendants Chapek and McCarthy unveiled Disney+'s inflated subscriber targets, which Defendant Iger himself acknowledged were excessive, and shortly after the DMED reorganization, which he later considered a "mistake."

236.   Notably, Defendant Iger's trading abruptly ceased just before the truth began to surface, providing a reasonable inference that he was aware of the scheme. Defendant Iger would subsequently refrain from trading again until 2024.

237.   Similarly, Defendant McCarthy sold 122,014 shares of Disney stock on material, non-public information, for which she received $17,101,572.86 in proceeds. Specifically:

| **Date** | **Shares Sold** | **Avg. $/Share** | **Proceeds** |
|---|---|---|---|
| 1/12/2023 | 42,533 | $98.4600 | $4,187,799.18 |
| 1/18/2022 | 15,342 | $151.5400 | $2,324,926.68 |
| 1/14/2022 | 10,000 | $152.0600 | $1,520,600.00 |

| 1/13/2022 | 10,000 | $158.0000 | $1,580,000.00 |
| 1/12/2022 | 10,000 | $158.6000 | $1,586,000.00 |
| 1/25/2021 | 25,000 | $172.0000 | $4,300,000.00 |
| 1/20/2021 | 5,000 | $177.2400 | $886,200.00 |
| 1/15/2021 | 4,139 | $173.0000 | $716,047.00 |

238.   Defendant Arnold also engaged in a large, highly suspect transaction where she sold 8,400 shares of Disney stock on June 2, 2021 at $177.75 per share for proceeds of $1,493,058.  This was her only transaction during the Relevant Period and represented a significant portion of the 41,498 shares she held at the time.

239.   As a result of the false and misleading disclosures and failures to disclose as set forth above, these insider stock sales conducted by the Insider Selling Defendants occurred at artificially inflated share prices not truly reflective of the Company's value, which the Insider Selling Defendants knew when they were making those sales.

## VI.   **DAMAGES TO THE COMPANY**

240.   As a direct and proximate result of the Individual Defendants' misconduct, Disney has been seriously harmed and will continue to be.  Such harm includes, but is not limited to: (i) legal costs incurred in connection with the defense of the Securities Class Action and related litigation; (ii) accounting, regulatory, and other costs due to an increased scrutiny of the Company's statements concerning its projections and business outlook; (iii) any funds paid to settle or fund a judgment entered in the Securities Class Action; (iv) costs incurred in connection with the Company's repurchases of its common stock at artificially inflated prices as a result of the material misstatements and omissions detailed herein; and (v) costs incurred from compensation and benefits paid to the defendants who have breached their duties to Disney.

241.   In addition, Disney's business, goodwill, and reputation with its business partners, regulators, and its stockholders have been gravely impaired.  The Company's failure to disclose problems that it knew or should have known that it had with subscriber retention, business expansion, subscription account sharing and financial outlook,  and  the specter of inside trading have irrevocably diminished the Company.

242.   For at least the foreseeable future, Disney will suffer from what is known as the "liar's discount," a term applied to the stock of companies who have been implicated in misleading the investing public, such that Disney's ability to raise equity capital or debt on favorable terms in the future is now and will continue to be impaired. The Company stands to incur higher marginal costs of capital and debt because of the misconduct alleged herein.

243.   For example, on May 10, 2023, the Company filed with the SEC, on Form 10-Q, its quarterly report (the "May 10, 2023 10-Q").  In the May 10, 2023 10-Q, the Company disclosed it will incur an impairment charge related to its DTC services, as follows:

> The Company is also in the process of reviewing content, primarily on our DTC services, for alignment with a strategic change in our approach to content curation and, as a result, will remove certain content from our platforms.  We currently expect to take an impairment charge of approximately $1.5 billion to $1.8 billion, which will largely be recognized in the third quarter of fiscal 2023 as we complete the review and remove the content.

244.   On June 2, 2023, the Company filed with the SEC, on Form 8-K, a discloser of material change concerning a material impairment to the value of the Company's assets (the "June 2, 2023 8-K").  In relevant part, the Company's June 2, 2023 8-K stated:

> As previously announced, [the Company] is in the process of reviewing content, primarily on its direct-to-consumer ("DTC") services, for alignment with a strategic change in approach to content curation and as a result is removing certain content from its platforms. On May 26, 2023, the Company removed certain produced content from its DTC services. As a result, the Company will record a $1.5 billion impairment charge in its fiscal third quarter financial statements to adjust the carrying value of these content assets to fair value. The Company is continuing its review and currently anticipates additional produced content will be removed

from its DTC and other platforms, largely during the remainder of its third fiscal quarter. As a result, the Company currently estimates it may incur further impairment charges of up to approximately $0.4 billion related to produced content. The Company does not expect any material cash expenditures in connection with the impairment charges related to produced content. In addition, the Company may terminate certain license agreements for the right to use content on its platforms, which would result in the removal of licensed content from its platforms and lead to impairment and/or contract termination charges as well as cash payments. The Company currently expects that any such charges and payments related to licensed content would be meaningfully less than the impairment charges related to produced content.

245.    The significant impairment charge ultimately recorded is a direct manifestation of the very problems the Company failed to disclose—namely, issues with content performance, subscriber retention, and an inflated financial outlook that necessitated a drastic strategic recalibration.  It is a painful correction to the overvalued content assets that had been maintained on the Company's books, masking the true financial health and underlying content strategy issues that had been brewing.

246.    On August 9, 2023, the Company filed with the SEC, on Form 10-Q, its quarterly report (the "August 9, 2023 10-Q").  Along with the filing of its August 9, 2023 10-Q, the Company filed with the SEC, on Form 8-K, a press release concerning the results of the Company's operations and financial condition.  In the press release, the Company revealed the following concerning the impairment charge:

In the current quarter, the Company recorded charges of [$2.44 billion] related to the removal of content from our DTC services and the termination of certain third party license agreements for the right to use content primarily on our DTC platforms (Content Impairment Charge) and $210 million of severance.

247.    Defendants Iger, McCarthy, and Arnold did not fare so poorly.  While the Company's stock price was artificially inflated, Iger, McCarthy, and Arnold sold 2,227,767, 122,014 and 8,400 shares, respectively, of the Company's stock with knowledge of material non-public information because of their positions with the Company.  Together, the Insider Selling Defendants captured more than *$428 million* while the Company's stock price was propped up.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

## VII.    DUTIES OF THE INDIVIDUAL DEFENDANTS

### A.    Fiduciary Duties

248.   By reason of their positions as officers and/or directors of Disney and because of their responsibility to control the business and corporate affairs of the Company, the Individual Defendants owed, and owe, the Company and its stockholders the fiduciary obligations of good faith, loyalty, due care, and candor and were, and are, required to use their utmost ability to control and manage the Company in a just, honest, fair, and equitable manner.

249.   Each Individual Defendant owed, and owes, the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company, as well as the highest obligations of fair dealing and not to act in furtherance of their personal interest or benefit.

250.   In *Gantler v. Stephens*, 965 A.2d 695, 708–09 (Del. 2009), the Delaware Supreme Court concluded that the "officers of Delaware corporations, like directors, owe fiduciary duties of care and loyalty, and that the fiduciary duties of officers are the same as those of directors."  The officers of a Delaware corporation are "expected to pursue the best interests of the company in good faith (*i.e.*, to fulfill their duty of loyalty) and to use the amount of care that a reasonably prudent person would use in similar circumstances (*i.e.*, to fulfill their duty of care)."  *Hampshire Grp., Ltd. v. Kuttner*, No. CIV.A. No. 3607-VCS, 2010 WL 2739995, at *11 (Del. Ch. July 12, 2010).

251.   Because of their positions of control and authority as officers and/or directors of Disney, the Individual Defendants were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Disney, each of the Individual Defendants had knowledge of material, non-public information regarding the Company.  In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful

information regarding the Company's business, operations, and prospects so that the market price of the Company's stock would be based on truthful and accurate information.

252.  At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Disney, and each was at all times acting within the course and scope of such agency.

253.  To discharge their duties, the officers and directors of Disney were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of Disney were required to, among other things:

      (a)   Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

      (b)   Exercise good faith to ensure that the Company operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

      (c)   Maintain and implement an adequate, functioning system of internal controls, such that the affairs and operations of Disney are conducted in accordance with all applicable laws, rules, and regulations;

      (d)   When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence;

      (e)   Maintain and implement an adequate, functioning system of internal controls, such that the affairs and operations of Disney are

1    conducted in accordance with all applicable laws, rules, and

2    regulations; and

3    (f)    Truthfully and accurately inform and guide investors and analysts

4    with respect to the business operations of the Company.

5    254.   Additionally, as a part of their duties of care and loyalty, the Individual

6    Defendants had a fiduciary duty to disclose all material information whenever they

7    voluntarily chose to speak to Disney stockholders, or the market generally, about the

8    business of the corporation.  *Pfeffer v. Redstone*, 965 A.2d 676, 684 (Del. 2009)

9    ("Corporate fiduciaries can breach their duty of disclosure under Delaware law . . . by

10   making a materially false statement, by omitting a material fact, or by making a partial

11   disclosure that is materially misleading.") (citation omitted); *Malone v. Brincat*, 722

12   A.2d 5, 9 (Del. 1998) ("directors who knowingly disseminate false information that

13   results in corporate injury or damage to an individual stockholder violate their fiduciary

14   duty, and may be held accountable in a manner appropriate to the circumstances"); *Zirn*

15   *v. VLI Corp.*, 681 A.2d 1050, 1056 (Del. 1996) ("[D]irectors are under a fiduciary

16   obligation to avoid misleading partial disclosures.  The law of partial disclosure is

17   likewise clear: 'Once defendants travel[] down the road of partial disclosure . . . they .

18   . . [have] an obligation to provide the stockholders with an accurate, full, and fair

19   characterization of those historic events.'") (citation omitted); *Lynch v. Vickers Energy*

20   *Corp.*, 383 A.2d 278, 282 (Del. 1977) (holding the defendants breached their fiduciary

21   duty of candor when they failed to disclose material information to minority

22   stockholders to whom they owed a fiduciary duty).

23   255.   As the Delaware Supreme Court explained in *In re Tyson Foods, Inc.,* No.

24   CIV.A. 1106-CC, 2007 WL 2351071, at *4 (Del. Ch. Aug. 15, 2007), "[w]hen . . .

25   directors communicate with shareholders, they also must do so with complete

26   candor"[:]

27   Loyalty.  Good faith.  Independence.  Candor.  These are words pregnant
     with obligation.  The Supreme Court did not adorn them with half-hearted
28   adjectives.  Directors should not take a seat at the board table prepared to

77

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

offer only conditional loyalty, tolerable good faith, reasonable disinterest or formalistic candor.

### B.   Disney's Code of Business and Ethics for Directors

256.   Disney's Code of Business and Ethics for Directors (the "Disney Code") applies to all Disney directors.  The "Introductory Statement" to the Disney Code opens with the following:

> The Walt Disney Company is committed to conducting business in accordance with the highest standards of business ethics and complying with applicable laws, rules and regulations. In furtherance of this commitment, the Board of Directors (the "Board") promotes ethical behavior, and has adopted this Code of Business Conduct and Ethics for Directors ("Code").
>
> Every Director must:
>
> (i) represent the interests of the shareholders of The Walt Disney Company;
>
> (ii) exhibit high standards of integrity, commitment and independence of thought and judgment;
>
> (iii) dedicate sufficient time, energy and attention to ensure the diligent performance of his or her duties;
>
> (iv) and comply with every provision of this Code.

257.   Under the heading "Conflicts of Interest," the Disney Code states: "Directors must avoid conflicts of interest…Directors should also be mindful of, and seek to avoid, conduct which could reasonably be construed as creating an appearance of a conflict of interest."

258.   In the section titled "Use of Corporate Information, Opportunities and Assets," the Disney Code further states that directors "may not . . . use opportunities that are discovered through the use of Company property, Company information or position, for their personal benefit or the benefit of persons or entities outside the Company." Directors are also prohibited from "improperly us[ing] or wast[ing] any Company asset."

259.   The Disney Code makes it clear under the "Compliance with Laws, Rules and Regulations" section that directors are required to maintain "strict compliance"

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

with "applicable laws, rules and regulations."  The Disney Code further specifies that the laws directors are required to comply with include "federal and other securities laws, including insider trading laws, and the Company's insider trading compliance policies."

260.    Additionally, in a section titled "Accountability," the Disney Code provides:

> The Code referred to herein is mandatory and applies to all Directors, who are accountable for compliance with the Code.
>
> Directors should communicate any suspected violations of this Code promptly to the Chairman of the Governance and Nominating Committee and the Chairman of the Board. Suspected violations will be investigated by or at the direction of the Board or the Governance and Nominating Committee, and appropriate action will be taken in the event that a violation is confirmed.

261.    While the Disney Code does allow directors to waive provisions of the Disney Code, directors may only do so with the permission of either the Board or the Governance and Nominating Committee.  Any waiver "must be promptly disclosed to the Company's stockholders as required by applicable law or securities exchange regulations."

### C.    Disney's Standards of Business Conduct

262.    The Company also maintains "The Walt Disney Company and Affiliated Companies Standards of Business Conduct" (the "Disney Standards").  Under the section titled "Speak Up," the Disney Standards state:

> **The Guideline**
>
> is a resource for employees and Cast Members to 1) report questionable activities – including questionable accounting or auditing matters; 2) report complaints regarding the Company's accounting, internal accounting controls or auditing matters; 3) ask for guidance on any business conduct-related issue; or 4) make the Company aware of any suspected unethical or illegal conduct, or violation of our Standards of Business Conduct or of any other Company policies.

263.    The "Integrity: Our Standards" section of the Disney Standards emphasizes the Company's commitment to "do what's right and take responsibility for

[its] actions to protect [its] guests, [its] audiences, [its] consumers and [its] shareholders." Regarding the purpose of the Disney Standards, they state, in relevant part:

**Why We Have Standards of Business Conduct**

*       *       *

We recognize that our continued success depends upon a commitment to conduct business with honesty, integrity and in compliance with the law everywhere we operate.

If you are a supervisor, you have a greater level of responsibility. We look to you to model ethical behavior and promote a workplace where Cast Members and employees feel comfortable coming forward with concerns and questions…

264. In the "Honesty: Our Commitment to the Company and Our Shareholders" section of the Disney Standards, the Company represents that "[p]rotecting [Disney's] reputation requires a commitment to truth and high standards in everything [the Company] do[es]." On a similar note, regarding "Conflicts of Interest," the Disney Standards state the following:

**Conflicts of Interest**

Our business is built on public trust and confidence and an expectation by guests and customers that they can depend on our products and services. To deliver our very best, each of us has an obligation to make objective decisions on behalf of the Company and avoid situations where a conflict (or apparent conflict) exists between the Company's interests and our own, personal interests.

265. The "Honesty: Our Commitment to the Company and Our Shareholders" section of the Disney Standards also emphasizes the important of accurate financial reporting by stating:

**Accurate Recordkeeping and Financial Reporting and Complaints Regarding Accounting and Auditing Matters**

Accurate and complete recordkeeping is essential to the successful operation of our Company, as well as to our ability to meet our legal and regulatory obligations. You have a responsibility to be accurate, complete and honest in what you report and record to meet regulatory requirements, as well as in all Company documents . . . .

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

266.   In the "Play by the Rules" section of the Disney Standards, the Company states that it is "committed to comply[ing] with the law everywhere in the world [the Company] operates[.]"  The section further states, in relevant part:

**Inside Information and Securities Trading**

As a Cast Member or employee, your job may expose you to material, nonpublic (or "inside") information about our Company or companies with which we do business. Material inside information is information about a company that is not available to the public but, if it were, might influence someone's investment decision about that company. Examples of material inside information include: information about mergers or acquisitions, financial performance, changes in executive management, significant transactions or new projects contemplated.

You may not trade in Company stock or other securities based on material inside information you have about our Company, and you may not trade in the stock of companies we work with if your job exposes you to inside information about those companies. Passing along a "tip" is also a form of insider trading and strictly prohibited. Keep in mind, even the appearance of an improper transaction must be avoided.

### D.    Disney's Corporate Governance Guidelines

267.   The Company also maintains Corporate Governance Guidelines (the "Disney Guidelines"), the first section of which is entitled "Composition of the Board of Directors."  Under this section, the Company, in part, states:

It is the policy of the Board that the Board at all times reflect the following characteristics.

Each Director shall at all times represent the interests of the shareholders of the Company.

Each Director shall at all times exhibit high standards of integrity, commitment and independence of thought and judgment.

268.   Under the "Board Conduct and Review" section, the Disney Guidelines, in relevant part, state:

Members of the Board shall act at all times in accordance with the requirements of the Company's Code of Business Conduct and Ethics for Directors. This obligation shall at all times include, without limitation, strict adherence to the Company's policies with respect to conflicts of interest, confidentiality, protection of the Company's assets, ethical conduct in all business dealings and respect for and compliance with applicable law. Any waiver of the requirements of the Code of Business Conduct and Ethics for Directors with respect to any individual Director shall be reported to, and be subject to the approval of, the Board.

The Board shall conduct an annual review and evaluation of its conduct and performance based upon participation by all Directors in an evaluation that includes, among other things, an assessment of:

a. the Board's composition and independence;

b. the Board's access to and review of information from management, and the quality of such information;

c. the Board's responsiveness to shareholder concerns;

d. maintenance and implementation of the Company's standards of conduct; and

e. maintenance and implementation of these Guidelines.

### E.     Audit Committee Duties

269.    In addition to the duties discussed above with respect to all of the Individual Defendants, the Audit Committee Defendants, Defendants Catz, deSouza, McDonald, and Rice, owed specific duties to Disney under the Audit Committee Charter ("Audit Charter").

270.    Disney's Audit Charter opens with the reaffirmation of the responsibilities of the Board, which the Company states "include oversight of the Company's systems of internal control, preparation and presentation of financial reports and compliance with applicable laws, regulations and Company policies."  The Audit Charter provides the responsibilities delegated to the Audit Committee to assure the Board fulfills "its duties to the Company and its shareholders" and further stipulates that the "Committee shall be given the resources and assistance necessary to discharge its responsibilities, including appropriate funding" and "unrestricted access to Company personnel and documents and the Company's independent auditors."

271.    The Audit Charter states that the purpose of the Audit Committee "is to assist the Board in its oversight of" the following:

a.  the integrity of the Company's financial statements;

b.  the adequacy of the Company's system of internal controls;

c.  the Company's compliance with legal and regulatory requirements;

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

d. the qualifications and independence of the Company's independent auditors;

e. the performance of the Company's independent auditors and of the Company's internal audit functions . . . ; and

f. to prepare an audit committee report as required by the Securities and Exchange Commission . . . to be included in the Company's annual proxy statement.

272. The Audit Charter further states that the Audit Committee shall take the following actions, among others, with respect to the Company's financial reporting processes:

- review the accounting and reporting treatment of significant transactions outside the Company's ordinary operations;
- review with management and the Company's independent auditors significant changes to the Company's accounting principles or their application as reflected in the financial reports; and
- review draft quarterly and annual financial statements and discuss their appropriateness with management and the Company's independent auditors, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the matters required to be discussed by the applicable requirements of the PCAOB and the SEC.

273. Disney's Audit Charter also states that the Audit Committee shall have responsibility for overseeing management's implementation of an effective system of internal controls that "helps promote the reliability of financial and operating information and compliance with applicable laws, regulations and Company policies, including those related to risk management, ethics and conflicts of interest." The Audit Committee is to take the following actions with respect to the Company's internal control processes:

- inquire of management, management auditors and the Company's independent auditors concerning any deficiencies in the Company's policies and procedures that could adversely affect the adequacy of internal controls and the financial reporting process and review any special audit steps adopted in light of any material control deficiencies and the timeliness and reasonableness of proposed corrective actions;
- review significant management audit findings and recommendations;
- review the Company's policies and practices with respect to risk assessment and risk management; and
- review the Company's policies and practices related to compliance with laws, ethical conduct and conflicts of interest . . . .

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

274. The Audit Charter also requires the Audit Committee to establish procedures for the receipt of complaints. The Audit Committee is required to receive, retain, and treat the complaints received by the Company "regarding accounting, internal accounting controls and auditing matters." Any complaints received are required to stay "confidential" and "anonymous."

275. Finally, Disney's Audit Charter requires that the Audit Committee "conduct an annual evaluation of its performance in carrying out its responsibilities."

276. In violation of the Disney Code, Disney Standards, Disney Guidelines, and Audit Charter, the Defendants conducted little, if any, oversight of the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including, but not limited to, breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. Also, in violation of Disney's corporate governance documents, the Defendants failed to maintain the accuracy of Disney's records and reports, failed to maintain internal controls, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Disney Code.

## VIII. <u>CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION</u>

277. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct alleged herein giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

278. During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did, among other things, deceive the investing public including stockholders of Disney. In furtherance

1  of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively
2  and individually, took the actions set forth herein.

3    279.  The Individual Defendants engaged in a conspiracy, common enterprise,
4  and/or common course of conduct.    During this time, the Individual Defendants
5  caused and/or allowed the improper conduct described herein.

6    280.  The purpose and effect of the Individual Defendants' conspiracy,
7  common enterprise, and/or common course of conduct was, among other things, to
8  disguise the Individual Defendants' violations of state and federal law, breaches of
9  fiduciary duty, waste of corporate assets, unjust enrichment, and to conceal adverse
10  information concerning the Company's business, operations, and future prospects.

11    281.  The Individual Defendants accomplished their conspiracy, common
12  enterprise, and/or common course of conduct by causing the Company to purposefully
13  or recklessly engage in the improper conduct described herein.  Because the Individual
14  Defendants' actions occurred under the authority of the Board, each Individual
15  Defendant was a direct, necessary, and substantial participant in the conspiracy,
16  common enterprise, and/or common course of conduct complained of herein.

17    282.  Each Individual Defendant aided and abetted and rendered substantial
18  assistance in the wrongs complained of herein.  In taking such actions to substantially
19  assist the commission of the wrongdoing complained of herein, each Individual
20  Defendant acted with knowledge of the primary wrongdoing, substantially assisted in
21  the accomplishment of that wrongdoing, and was aware of his or her overall
22  contribution to and furtherance of the wrongdoing.

23    **IX.  DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

24    283.  Plaintiffs bring this action derivatively in the right and for the benefit of
25  Disney to redress injuries suffered, and to be suffered, by Disney as a direct result of
26  violations of Sections 14(a), 10(b), 20(a), and 20A of the Exchange Act, as well as
27  associated breaches of fiduciary duty.  Disney is named as a nominal defendant solely
28  in a derivative capacity.

1    284.    Plaintiffs will adequately and fairly represent the interests of Disney in

2    enforcing and prosecuting its rights.

3    285.    Plaintiffs have continuously been stockholders of Disney at times relevant

4    to the wrongdoing complained of and are current Disney stockholders.

5    286.    Disney's current Board consists of ten members: Defendants Iger, Barra,

6    Chang, Everson, Froman, Lagomasino, McDonald, and Rice, and Non-Defendants

7    Gorman and Darroch.    As shown above, despite having knowledge of facts and

8    information which rendered its SEC filings and public statements false and/or

9    misleading, Disney and at least half of the Board failed to correct the same in a timely

10   manner.    Further, as set forth above, numerous insiders, with knowledge that the

11   SEC filings and public statements described above were false and/or misleading, traded

12   in Disney stock at an inflated share price in dereliction of their duties of care and loyalty

13   to Disney stockholders.

14   287.    Plaintiffs have not made any demand on the Board to institute this action

15   because, for the reasons set forth herein, such a demand would be a futile and useless

16   act.

17   **A.    Demand Is Excused as to Defendant Iger Because of His Employment**

18   **at Disney**

19   288.    Defendant Iger falls under the NYSE definition of directors who are not

20   independent.    According to the NYSE's rules, an executive officer of an issuer whose

21   securities are listed on an Exchange cannot qualify as an independent director of the

22   Company.

23   289.    Because Defendant Iger is Disney's current CEO, he is not independent.

24   Furthermore, Defendant Iger's principal occupation is with Disney, rendering him not

25   independent.

26   ████████████████████████████████████████████████

27   █████████████████████

28

86

291. As Disney's current CEO, former CEO from 2005-2020, and Executive Chairman through 2021, Defendant Iger received significant compensation from the Company as described herein. Accordingly, Defendant Iger lacks independence from the other members of the Board due to his interest in maintaining his executive position.

292. Additionally, Defendant Iger is named as a defendant in the Securities Class Action and making a demand on him amounts to Defendant Iger investigating himself for his own alleged wrongdoing.

293. Defendant Iger is also directly interested based on his challenged, illicit insider sales, pursuant to which he received a direct financial benefit not shared with all other Disney stockholders. Defendant Iger is also not disinterred based on a substantial likelihood of liability for breaching his fiduciary duties of loyalty and good faith, and unjust enrichment as a result of his challenged stock sales.

294. This lack of independence renders Defendant Iger incapable of impartially considering a demand to commence and vigorously prosecute this action. As a result, any demand on Defendant Iger should be excused as a useless and futile act.

**B.    Demand Is Excused as to Defendants Barra, Chang, Froman, Lagomasino, McDonald, and Rice for Unanimously Voting to Extend Defendant Chapek's CEO Contract**

295. Halfway through 2022 and in the midst of the Disney+ scheme, Defendant Chapek's short-leash CEO contract was nearing its expiration. When Disney renewed Defendant Chapek's contract on June 28, 2022, it did so by expressing confidence in Defendant Chapek's leadership and the purported success of the Disney+ subscriber growth plan. Disney filed a Form 8-K including a press release announcing the contract renewal that stated: "THE WALT DISNEY COMPANY BOARD OF DIRECTORS UNANIMOUSLY VOTES TO EXTEND BOB CHAPEK'S CONTRACT AS CEO FOR THREE YEARS."

296. In the press release, Defendant Arnold stated: "Disney was dealt a tough hand by the pandemic, yet with Bob at the helm, our businesses – from parks to

streaming – not only weathered the storm, but emerged in a position of strength." Defendant Arnold also stated: "In this important time of growth and transformation, the Board is committed to keeping Disney on the successful path it is on today, and Bob [Chapek]'s leadership is key to achieving that goal.  Bob [Chapek] is the right leader at the right time for The Walt Disney Company, and the Board has full confidence in him and his leadership team."  Despite this, a Disney insider disclosed that Defendant Arnold and the rest of Disney's Board were well aware that Disney was struggling under Defendant Chapek's leadership.

297.   According to *The Hollywood Reporte*r, "when the board discussed Chapek's contract at the end of that month, some wanted to extend it for only two years. However, Defendant Arnold argued that would undercut Defendant Chapek too severely.   A seeming compromise was reached: the Board extended Defendant Chapek's contract three years, but backdated it, leaving a bit more than two years on his deal.  With regard to the timing of the renewal, the same report stated: "top industry executives rolled their eyes. 'You let the CEO get within a year of his contract being up,' one industry power player said at the time. 'That by itself is a statement of non-support. A vote of confidence is nonsense.'"

298.   Indeed, the Board's unanimous decision ignored warnings that Defendant Chapek's house of cards was about to collapse.  In fact, *The Wall Street Journal* later reported, "[t]wo directors, Mr. Parker and Mary Barra, General Motors Co. CEO, had been reluctant to go along.  Others persuaded them that support of the full board would boost Mr. Chapek's confidence and shore up his performance."  *The Hollywood Reporter*, in a November 21, 2022 article, stated "sources with ties to the company say discontent among some board members had been building to the point that there was discussion about replacing Chapek as far back as the directors' late June meeting in Florida.  At that time, sources say, some on the board wanted to replace Chapek and appoint one of their own."

299.    According to *Fortune*, "almost immediately after Disney renewed the contract of embattled CEO Bob Chapek in June, a mutiny began . . . senior figures with the company's top brass including finance chief Christine McCarthy started to warn boardroom directors over the summer that the entertainment giant was heading in the wrong direction and campaigned for him to go."

300.    Nonetheless, Defendants Barra, Chang, Froman, Lagomasino, McDonald, and Rice caused Defendant Chapek's CEO contract to be extended and pay him an additional $20 million.  Not only did Defendants Barra, Chang, Froman, Lagomasino, McDonald, and Rice allow the Disney+ scheme to continue, they also endorsed the misrepresentations made by Defendants Chapek and McCarthy in connection with the scheme.

301.    Only five months later, Defendants Barra, Chang, Froman, Lagomasino, McDonald, and Rice would conduct a complete about-face and terminate Defendant Chapek.  Despite allowing Defendants Chapek and McCarthy to make numerous false and misleading statements about Disney+'s growth and the Company's operation in connection with its SVOD platform, the Board was quick to toss Defendant Chapek and immediately replace him with Defendant Iger, who was CEO when Defendants Barra, Chang, Froman, Lagomasino, McDonald, and Rice joined the Board.  Ultimately, Defendant Chapek would serve as a convenient scapegoat and the blame was publicly shifted to his feet.

302.    Many of the statements made by Defendants Chapek and McCarthy were pleaded in the Securities Class Action as to have been knowingly false when made, and on February 19, 2025, this Court held that Chapek, McCarthy, and Disney made material misstatements or omissions under SEC Rule 10b-5(b).  As a result, Defendants Barra, Chang, Froman, Lagomasino, McDonald, and Rice face a substantial likelihood of liability for endorsing and extending Defendant Chapek for his scheme.  Even when Defendant Barra knew Disney was in trouble, she eventually acquiesced and went

along with the rest of the Board instead of voting against Defendant Chapek's contract extension.

303. Defendants Barra, Chang, Froman, Lagomasino, McDonald, and Rice are unable to pursue the Company's claims against themselves and the Officer Defendants. Given that the Board was required to be regularly informed concerning the Company's public reporting, outlook, controls, and employment decisions with respect to the Company's most senior officers, any effort by the Board to hold the Officer Defendants liable would lead the Officer Defendants to defend on the ground that their own conduct was consistent with corporate policy and practice, as established by and known to the Board.

304. As a result, demand is excused as to Defendants Barra, Chang, Froman, Lagomasino, McDonald, and Rice for voting to extend Defendant Chapek's CEO contract despite warnings from senior Disney executives, including the Company's CFO.

**C.    Demand Is Excused as to Defendants Barra, Chang, Everson, Froman, Iger, Lagomasino, McDonald, and Rice Because They Solicited Re-Election to the Board on the Basis of Materially False Statements and Omissions in the 2023 Proxy Statement**

305. As discussed above, on February 6, 2023, the Company filed the 2023 Proxy Statement with the SEC. Defendants Barra, Chang, Everson, Froman, Iger, Lagomasino, McDonald, and Rice caused the issuance of materially misleading written statements to stockholders that were contained in the 2023 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act.

306. The 2023 Proxy Statement discussed "Fiscal 2022 Compensation Decisions," where the Compensation Committee reviewed the annual performance-based bonus program and chose to evaluate performance on, among other things, "Collaboration on strategic priorities." The first metric celebrated that the Company "[s]uccessfully increased subscribers at Disney+ (+39%), Hulu (+8%) and ESPN+

(+42%) during fiscal 2022, while launching DTC platforms in several key international markets, including 154 different countries and territories."

307.    These statements in the 2023 Proxy Statement failed to disclose the persistent deceleration of Disney+ subscriber growth, the Company's issues with subscriber churn, and obfuscated that it had pursued low quality subscribers into unprofitable markets.    It was only two days later that the Company reported that Disney+ lost 2.4 million subscribers, and the DTC business reported an increase in operating loss from $0.5 billion to $1.1 billion due in part to a higher loss at Disney+ which reflected higher programming and production costs.    Consequently, the public statements within the 2023 Proxy Statement, like its predecessors, were materially false and misleading, devoid of a reasonable basis at all relevant times.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████

309.    On February 8, 2023, only 48 hours after the 2023 Proxy Statement was filed, Defendant Iger stated that the Company would no longer be providing long-term subscriber guidance for Disney+, stating, in relevant part, as follows:

> Like many of our peers, we will no longer be providing long-term subscriber guidance in order to move beyond an emphasis on short-term quarterly metrics – although we will provide color on relevant drivers. Instead, our priority is the enduring growth and profitability of our streaming business.

310.    The 2023 Proxy statement also touted Disney+'s launch into international markets to boost subscriber numbers—an echo of Defendant Chapek's Disney+

scheme—but as Defendant Iger later revealed, Disney had recklessly "launched Disney+ in many, many markets around the world, including many very low ARPU markets," investing heavily in marketing and local content without regard for profitability. Defendant Iger even suggested a potential retreat from certain markets, stating "not all markets are created equal," a stark contrast to the narrative of unbridled global expansion previously peddled by Defendant Chapek. Even though Defendant Chapek was gone, Defendants Barra, Chang, Everson, Froman, Iger, Lagomasino, McDonald, and Rice still used parts of the Disney+ scheme to solicit proxy votes and continue their ongoing breaches of fiduciary duty.

311. Nonetheless, Defendants Barra, Chang, Everson, Froman, Iger, Lagomasino, McDonald, and Rice were all re-elected to the Board. As such, making a demand on Defendants Barra, Chang, Everson, Froman, Iger, Lagomasino, McDonald, and Rice would be futile.

**D.    Demand Is Excused as to Defendants Rice and McDonald as Members of the Audit Committee**

312. Defendants Rice and McDonald served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations.

313. The Audit Committee Defendants, at all relevant times, had specifically defined duties to properly oversee: (i) the integrity of the Company's publicly reported financial statements, press releases, and guidance; (ii) its system of internal, financial, and administrative controls; and (iii) the Company's compliance with legal and regulatory requirements, including risk management policies and consumer privacy violation risks. Thus, the Audit Committee Defendants were responsible for knowingly or recklessly allowing and failing to correct the improper conduct detailed herein.

314.   Thus, Defendants Rice and McDonald breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

**E.    Demand Is Excused as to Defendants Barra, Chang, Everson, Froman, Iger, Lagomasino, McDonald, and Rice for Failing to Correct the Defalcations of Their Co-Fiduciaries**

315.   Disney has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors Defendants have not filed any lawsuits against themselves or any others who were responsible for that wrongful conduct to attempt to recover for Disney any part of the damages it suffered and will continue to suffer thereby.  Thus, any demand upon the Board would be futile.

316.   The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct.  Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's Charter (to the extent such a provision exists).  As a majority of the Board faces a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the stockholders of the Company.  Accordingly, demand is excused as being futile.

317.   The acts complained of herein constitute violations of fiduciary duties owed by Disney's officers and directors, and these acts are incapable of ratification. Despite having knowledge of the claims and causes of action raised by Plaintiffs, the Board has failed and refused to seek to recover on behalf of the Company for any of the wrongdoing alleged by Plaintiffs herein

318.   Thus, for all of the reasons set forth above, a majority of the Board cannot consider a demand with disinterestedness and independence.  Consequently, a demand upon the Board is excused as futile.

## X.　　CLAIMS FOR RELIEF

### COUNT I

### Violations of Section 14(a) of the Exchange Act

### (Against the Director Defendants)

319.　Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

320.　Section 14(a) of the Exchange Act makes it unlawful to solicit shareholder approval by using a proxy statement that does not comply with the rules and regulations of the SEC.  15 U.S.C. § 78n.  In turn, regulation 14a–9 prohibits proxy statements that are false or misleading with regard to any material facts at the time they are issued and in light of the circumstances under which they are made.  17 C.F.R. § 240.14a–9. Collectively, these provisions "disallow the solicitation of a proxy by a statement that contains either (1) a false or misleading declaration of material fact, or (2) an omission of material fact that makes any portion of the statement misleading." *Desaigoudar v. Meyercord*, 223 F.3d 1020, 1022 (9th Cir. 2000).

321.　The statements in the 2022 and 2023 Proxy Statements alleged herein, more fully described above, were materially false or misleading because Director Defendants failed to disclose, *inter alia*: (i) though the Company claimed its officers and directors adhered to the Disney Standards and Disney Code, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (ii) contrary to the 2022 and 2023 Proxy Statements' descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

322.　The statements in the 2022 and 2023 Proxy Statements alleged herein, more fully described above, were also materially false or misleading because they also failed to disclose, *inter alia*, that: (i) Disney+ was experiencing decelerating subscriber growth, losses, and cost overruns; (ii) by debuting certain content intended for Disney+

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

initially on Disney's legacy distribution channels and then making the shows available on Disney+ thereafter, Disney executives were able to conceal the true costs incurred in connection with Disney+ and improperly shift costs out of the Disney+ segment; (iii) DMED's motive to conceal the complete costs of constructing Disney+'s content library led them to make platform distribution decisions based on factors other than consumer preference, consumer behavior, or the goal of maximizing the content's audience; (iv) the Company's Disney+ global subscriber and profitability targets were not achievable and lacked a reasonable basis in fact, and, as such, Disney was not on track to achieve these targets; and (v) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

323.   By misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2022 and 2023 Proxy Statements alleged herein, and more fully described above, were materially false and misleading.  The misrepresentations and omissions were material to stockholders in voting on the matters set forth for stockholder determination in the 2022 and 2023 Proxy Statements, including, but not limited to, the election of the Company's directors.

324.   As a result of the material misstatements and omissions contained in the 2022 Proxy Statement, Company stockholders elected Defendants Arnold, Barra, Catz, Chang, deSouza, Froman, Iger, Lagomasino, McDonald, Parker, and Rice to the Board, allowing them to continue breaching their fiduciary duties to Disney.

325.   As a result of the material misstatements and omissions contained in the 2023 Proxy Statement, Company stockholders elected Defendants Barra, Catz, Chang, deSouza, Everson, Froman, Iger, Lagomasino, McDonald, Parker, and Rice, allowing them to continue breaching their fiduciary duties to Disney.

326.   No adequate remedy at law exists for Plaintiffs by and on behalf of the Company.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

## COUNT II

**Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5**

**Promulgated Thereunder**

**(Against the Individual Defendants)**

327.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

328.   During the Relevant Period, in connection with the Company's repurchases of Disney stock, the Director Defendants disseminated or approved false or misleading statements about the Company specified above, which they knew, or recklessly disregarded, were false or misleading and were intended to deceive, manipulate, or defraud.   Those false or misleading statements and Individual Defendants' course of conduct were designed to artificially inflate the price of the Company's common stock.

329.   At the same time that the price of the Company's common stock was inflated due to the false or misleading statements made by the Individual Defendants, these Defendants caused the Company to repurchase millions of shares of its own common stock at prices that were artificially inflated due to the Individual Defendants' false or misleading statements.   The Individual Defendants engaged in a scheme to defraud Disney by causing the Company to spend at least $78.7 million purchasing shares of Disney stock at artificially inflated prices during this period, overpaying by $30.3 million.

330.   The Individual Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Disney in connection with the Company's stock repurchase during this period.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

331.   The Individual Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce or of the United States mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon the Company; made various false or misleading statements of material facts and omitted material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of Disney stock, which were intended to, and did: (i) deceive Disney regarding, among other things, the Disney+ scheme alleged herein, the Company's internal controls, and the Company's financial statements; (ii) artificially inflate and maintain the market price of Disney stock; and (iii) cause Disney to purchase the Company's stock at artificially inflated prices, and suffer losses when the true facts became known.

332.   At the time the statements alleged above were made, the Individual Defendants were in possession of the material, adverse, non-public information that, *inter alia*: (i) the Company was engaging in the Disney+ scheme alleged herein, violating Disney revenue recognition policies and U.S. Generally Accepted Accounting Principles; (ii) the Company had inadequate corporate financial-reporting resources; (iii) the Company inadequately assessed the risks associated with the Company's financial reporting; (iv) Disney failed to maintain effective internal controls over financial reporting; and (v) as a result of the foregoing, Disney's public statements, made or caused to be made by the Individual Defendants, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

333.   The Individual Defendants were among the senior management and the directors of the Company, and were, therefore, directly responsible, and are liable for all materially false or misleading statements made during the Relevant Period, as alleged above.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

334.    As described above, the Individual Defendants acted with scienter throughout the Relevant Period, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness.  The misstatements and omissions of material facts set forth in this Complaint were either known to the Individual Defendants or were so obvious that these Defendants should have been aware of them. Throughout the Relevant Period, the Individual Defendants also had a duty to disclose new information that came to their attention and rendered their prior statements to the market materially false or misleading.

335.    The false or misleading statements of the Individual Defendants were made in connection with the Company's purchase or sale of the Company's stock.

336.    As a result of the misconduct alleged herein of the Individual Defendants, Disney has, and will continue to, suffer damages in that it paid artificially inflated prices for Disney common stock purchased as part of the repurchase program and suffered losses when the previously undisclosed facts relating to the Disney+ scheme were fully disclosed.  Had Disney known of the material adverse information not disclosed by the Individual Defendants, or been aware of the truth behind the material misstatements, the Company would not have repurchased Disney stock at the artificially inflated prices caused by the false or misleading statements of the Individual Defendants.

337.    As a direct and proximate result of the wrongful conduct of the Individual Defendants, the Company suffered damages in connection with its purchases of Disney stock during the Relevant Period.   By reason of such conduct, the Individual Defendants are liable to the Company pursuant to Section 10(b) of the Exchange Act and SEC Rule 10b-5.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## COUNT III

### Violations of Section 20(a) of the Exchange Act

### (Against the Individual Defendants)

338.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

339.   The Individual Defendants, by virtue of their positions with Disney and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Disney and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act.  The Individual Defendants had the power and influence and exercised the same to cause Disney to engage in the illegal conduct and practices complained of herein

340.   Plaintiffs, on behalf of Disney, have no adequate remedy at law.

## COUNT IV

### Breaches of Fiduciary Duties

### (Against the Director Defendants)

341.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

342.   The Director Defendants owed and owe Disney fiduciary obligations.   By reason of their fiduciary relationships, the Director Defendants specifically owed and owe Disney the highest obligation of good faith, fair dealing, loyalty, and due care in the administration of the affairs of the Company, including, without limitation, the oversight of the Company's compliance with state and federal privacy laws, rules, and regulations, as well as the duty of candor and truthful disclosure with respect to their public statements.

343.   The Director Defendants also owed and owe Disney fiduciary duties under Delaware corporation law, which impose broad obligations on Defendants vis-a-vis the corporation and its individual stockholders.

344.  In addition, the Director Defendants have specific fiduciary duties as defined by the Company's corporate governance documents, and the Charters of various Board committees, and principles that, had they been discharged in accordance with the Director Defendants' obligations, would have prevented the misconduct and the consequent harm to the Company.

345.  Each Director Defendant violated his or her fiduciary duties by consciously causing or consciously failing to prevent the Company from engaging in, the improper acts complained of herein.

346.  The Director Defendants consciously breached their fiduciary duties and violated their corporate responsibilities in at least the following ways:

a.  Failing to maintain an adequate system of oversight, accounting controls and procedures, disclosure controls, and other internal controls, which were necessary to prevent or promptly correct the improper statements made on the Company's behalf;

b.  Affirmatively making, allowing to be made, and/or failing to correct improper statements in SEC filings relating to the Company's operations and financial outlook;

c.  Failing to ensure the Company's compliance with relevant legal and regulatory requirements, including, but not limited to, requirements imposed under privacy laws as well as state and federal securities laws;

d.  Awarding Disney's senior executives lavish compensation packages, and paying the Officer Defendants substantial sums, despite their responsibility for the Company's willful misconduct.

e.  Causing Disney to purchase millions of dollars of its own stock at prices artificially inflated by Defendants' conduct; and

f.  Reappointing the same Audit Committee Defendants who had failed in their duties to the Audit Committee.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

347.  As a direct and proximate result of the Director Defendants' breaches of their fiduciary obligations, Disney has sustained significant damages. Accordingly, the Director Defendants are liable to the Company.

348.  No adequate remedy at law exists for Plaintiffs by and on behalf of the Company.

### COUNT V

### Breaches of Fiduciary Duties

### (Against the Officer Defendants)

349.  Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

350.  The Officer Defendants owed fiduciary duties to Disney and its stockholders.    Because of their positions as fiduciaries to the Company, the Officer Defendants owed duties of good faith, loyalty, candor, and truthful disclosure.    In addition, the Officer Defendants have specific fiduciary duties as defined by the Company's corporate governance documents, including its Code of Business Conduct and Ethics, and principles that, had they been discharged in accordance with the Officer Defendants' obligations, would have prevented the misconduct alleged herein and the consequent harm to the Company.

351.  The Officer Defendants violated these duties by issuing, causing to be issued, or otherwise allowing the material omissions and misrepresentations described herein.

352.  The Officer Defendants consciously breached their fiduciary duties and violated their corporate responsibilities in at least the following ways: affirmatively making, allowing to be made, and/or failing to correct improper statements in SEC filings relating to the Company's operations and financial outlook.

353.  As a direct and proximate result of the Officer Defendants' breaches of their fiduciary obligations, Disney has sustained and continues to sustain significant damages, including direct monetary damages, exposure to liability in the

Securities Class Action, and a loss of goodwill in the capital markets. As a result of the misconduct alleged herein, these defendants are liable to the Company.

354. In breach of their fiduciary duties owed to Disney, the Individual Defendants willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

355. Plaintiffs, on behalf of Disney, have no adequate remedy at law.

## COUNT VI

### Unjust Enrichment

### (Against the Individual Defendants)

356. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

357. By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Disney. The Individual Defendants were unjustly enriched as a result of the compensation and officer and director remuneration they received while breaching their fiduciary duties.

358. Plaintiffs, as stockholders and representatives of Disney, seek restitution from these defendants, and each of them, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

359. Plaintiffs, on behalf of Disney, have no adequate remedy at law.

## COUNT VII

### Contribution Pursuant to Section 21D of the Exchange Act for Violations of Section 10(b)

### (Against Defendants Chapek, Iger, McCarthy, and Daniel)

360. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

361.    Defendants Chapek, Iger, McCarthy, and Daniel are named as defendants in the Securities Class Action, which alleges that they violated Sections 10(b) and 20(a) of the Exchange Act by affirmatively making false and/or misleading statements and caused class members of the Securities Class Action to purchase Disney's securities at an inflated price.

362.    The conduct of Defendants Chapek, Iger, McCarthy, and Daniel, as described herein, has exposed the Company to significant liability under various federal and state securities laws by their disloyal acts.

363.    Disney is named as a defendant in the Securities Class Action that alleges and asserts claims arising under § 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.  On February 19, 2025, this Court found that the plaintiffs in the Securities Class Action sufficiently pleaded that Defendants Chapek, McCarthy, and Daniel made material misstatements and omissions pursuant to SEC Rule 10b-5(b).  If Disney is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of all or some of the Defendants as alleged herein, who have caused the Company to suffer substantial harm through their disloyal acts.  The Company is entitled to contribution and indemnification from these Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

364.    As officers, directors, and otherwise, Defendants Chapek, Iger, McCarthy, and Daniel had the power or ability to, and did, control or influence, either directly or indirectly, Disney's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated § 10(b) of the Exchange Act and SEC Rule 10b-5.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

365.   Defendants Chapek, Iger, McCarthy, and Daniel are liable under § 21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

366.   Defendants Chapek, Iger, McCarthy, and Daniel have damaged the Company and are liable to the Company for contribution.

367.   No adequate remedy at law exists for Plaintiffs by and on behalf of the Company.

## COUNT VIII

### For Contribution and Indemnification Under Delaware Law
### (Against the Individual Defendants)

368.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

369.   This claim is brought derivatively on behalf of the Company for contribution and indemnification against the Individual Defendants.

370.   Disney is named as a defendant in the Securities Class Action.  If Disney is ultimately found liable for violating federal securities laws, the Company's liability will arise, in whole or in part, from the intentional, knowing, or reckless acts or omissions of some or all of the Individual Defendants as alleged herein.

371.   Accordingly, Disney is entitled to all appropriate contribution and/or indemnification from the Individual Defendants, who are responsible for exposing Disney to liability under Delaware contribution and indemnification law.

372.   Plaintiffs, on behalf of Disney, have no adequate remedy at law.

## COUNT IX

### For Insider Selling Under *Brophy*
### (Against the Insider Selling Defendants)

373.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

374.    From December 10, 2020 to May 11, 2023, the Insider Selling Defendants held positions with the Company that provided them access to confidential, proprietary information concerning the Company's financial condition and future business prospects.  Notwithstanding their duty to refrain from trading in Disney's common stock under the circumstances, the Insider Selling Defendants sold their holdings in the Company at artificially inflated prices prior to the disclosure of the true state of the Company's finances and future prospects.

375.    These sales, as detailed above, were not part of any regular pattern of sales for the Insider Selling Defendants and were suspicious in terms of timing and amount.

376.    The information described above was proprietary, non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants misappropriated to their own benefit when they sold Disney stock.

377.    At the time of their stock sales, the Insider Selling Defendants were aware that the Company's business and prospects were declining, which when disclosed to the market would cause the inflated price of the Company's common stock to significantly decrease.  The Insider Selling Defendants' sales of stock while in possession and control of this material, adverse, and non-public information was a breach of their fiduciary duties of loyalty and good faith.

378.    As a result of their misconduct, the Insider Selling Defendants are liable to the Company.

379.    Plaintiffs, on behalf of Disney, have no adequate remedy at law.

## COUNT X

### For Violations of Section 20A of the Exchange Act

### (Against the Insider Selling Defendants)

380.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

381.   The Insider Selling Defendants, by reason of their relationships with the Company as officers and directors, had access, directly or indirectly, to material information about the Company not available to the public.

382.   The Insider Selling Defendants knowingly traded on this material, non-public information about the Company.  The Insider Selling Defendants sold Disney securities with actual knowledge that the value of these securities was inflated as a result of Defendants' false and misleading statements and other fraudulent activities detailed in this Complaint.

383.   As part of Disney's publicly disclosed share repurchase program, Disney was a contemporaneous purchaser of Disney securities, pursuant to Section 20A of the Exchange Act, when the Insider Selling Defendants sold Disney securities contemporaneously with the purchases as described above.

384.   As a contemporaneous purchaser, Disney was damaged by the actions of the Insider Selling Defendants, as alleged in this Complaint, in that: (i) in reliance on the integrity of the market, the Company paid artificially inflated prices as a result of the violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5; and (ii) the Company would not have purchased the securities at the prices it paid, or at all, had it been aware that the market prices had been artificially inflated by Defendants' false or misleading statements.  At the time of the purchase of the securities by the Company, the fair and true market value of the securities was substantially less than the price paid by the Company.

385.   Plaintiffs, on behalf of Disney, have no adequate remedy at law.

## XI.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of Disney, demand judgment as follows:

A.   Finding that a stockholder demand on the Board would have been a futile and useless act and Plaintiffs may maintain this action on behalf of Disney and that Plaintiffs are adequate representative of the Company;

B.      Finding that the Individual Defendants violated the federal securities laws, breached their fiduciary duties to the Company, and were unjustly enriched;

C.      Finding against all of the Individual Defendants and in favor of the Company for damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and unjust enrichment;

D.      Directing Disney to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Disney and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.      a proposal to appropriately test, and then strengthen, the Company's internal operational control functions and the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

2.      a proposal to develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

3.      a proposal to appropriately test, and then strengthen, the Company's disclosure controls to ensure that all material information is adequately and timely disclosed to the SEC and public;

4.      a proposal to control insider selling and conflicts of interest;

5.      a proposal to enhance and/or augment the audit, risk and compliance committees of the Board to oversee internal controls and compliance processes;

6.      a proposal to ensure that the Chief Compliance, Risk and Legal Officer(s) and other company leadership have: (a) necessary subject matter and regulatory expertise; (b) direct reporting authority to the Board; and (c) adequate autonomy and resources to carry out their responsibilities;

107
VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

7.    a proposal to review and implement revised codes of conduct, policies and procedures, training, integrity hotlines, and auditing and monitoring processes and procedures;

8.    a proposal to review and implement the confidential reporting structure and investigative process of complaints within the company; and

9.    a provision to permit the stockholders of Disney to nominate at least three new candidates for election to the Board.

E.    Finding against each of the Individual Defendants in favor of Disney for the amount of damages sustained by Disney, jointly and severally, in an amount to be determined at trial, together with pre- and post-judgment interest at the maximum legal rate allowable by law;

F.    Awarding to Disney restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by these defendants;

G.    Directing the Individual Defendants to establish, maintain, and fully fund effective corporate governance and compliance programs to ensure that Disney's directors, officers, and employees do not engage in wrongful or illegal practices;

H.    Granting appropriate equitable and/or injunctive relief to remedy the Individual Defendants' misconduct, as permitted by law;

I.    Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

J.    Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Dated: November 14, 2025

/s/ Brett M. Middleton
Brett M. Middleton

**JOHNSON FISTEL, PLLP**
Frank J. Johnson (SBN 174882)
Brett M. Middleton (SBN 199427)
Jonathan M. Scott, Esq. (SBN 323322)
501 West Broadway, Suite 800
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856
FrankJ@johnsonfistel.com
BrettM@johnsonfistel.com
JonathanS@johnsonfistel.com

**JOHNSON FISTEL, PLLP**
Michael I. Fistel, Jr.
40 Powder Springs Street
Marietta, GA 30064
Telephone: (470) 632-6000
Facsimile: (770) 200-3101
MichaelF@johnsonfistel.com

*Attorneys for Plaintiff Balraj Paul*

**ROBBINS LLP**
Brian J. Robbins
Kevin A. Seely
Maria L. Mansur
5060 Shoreham Place, Suite 300
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
brobbins@robbinsllp.com
kseely@robbinsllp.com
mmansur@robbinsllp.com
*Attorneys for Plaintiffs Montini Family Trust, and Dorothy Keto*

---

109
VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>VERIFICATION</u>

I, Balraj Paul, am a plaintiff in this action.   I have reviewed the allegations made in the foregoing Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing.   To those allegations of which I have personal knowledge, I believe those allegations to be true.   As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this  3    day of November, 2025.


Signed by:

_____
1AC0B8E336764B9...
BALRAJ PAUL

VERIFICATION OF BALRAJ PAUL

1

## <u>VERIFICATION</u>

2   I, Samuel Montini, am the Trustee of the Montini Family Trust. a plaintiff in

3 this action. I have reviewed the allegations made in the foregoing Verified

4 Stockholder Derivative Complaint, know the contents thereof, and authorize its filing.

5 To those allegations of which I have personal knowledge, I believe those allegations

6 to be true. As to those allegations of which I do not have personal knowledge, I rely

7 upon my counsel and their investigation and believe them to be true.

8   I declare under penalty of perjury that the foregoing is true and correct.

9   Executed on this 3rd day of November, 2025.

10

11               SAMUEL MONTINI

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **<u>VERIFICATION</u>**

2        I, **Dorothy Keto, am** a plaintiff in this action.    I have reviewed the allegations

3    made in the foregoing Verified Stockholder Derivative Complaint, know the contents

4    thereof, and authorize its filing.    To those allegations of which I have personal

5    knowledge, I believe those allegations to be true.    As to those allegations of which I

6    do not have personal knowledge, I rely upon my counsel and their investigation and

7    believe them to be true.

8        I declare under penalty of perjury that the foregoing is true and correct.

9        Executed on this <u>11/1/2025</u> day of November, 2025.

10

11                                DOROTHY KETO

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28