# EXHIBIT A



Murray House
40 Powder Springs Street
Marietta, Georgia 30064
Tel: 470.632.6000
Fax: 770.200.3101

Michael I. Fistel, Jr.
Direct Dial: 770.200.3104
MichaelF@johnsonfistel.com

February 5, 2024

<u>**VIA OVERNIGHT MAIL**</u>

Chairman of the Board of Directors
The Walt Disney Company
500 South Buena Vista Street
Burbank, California 91521-0931

> **Re:    Demand for Inspection of Books and Records of The Walt Disney Company Pursuant to 8 Del. C. § 220**

Dear Members of the Board of Directors:

Johnson Fistel, LLP ("Johnson Fistel") represents Balraj Paul (the "Stockholder"), beneficial holder of shares of common stock in The Walt Disney Company ("Disney" or the "Company"), a Delaware corporation. Enclosed herewith are: (i) true and correct copies of a recent brokerage statement confirming that the Stockholder is a stockholder of the Company, as well as a power of attorney authorizing Johnson Fistel to make this demand on his behalf; and (ii) a verification executed by Stockholder confirming under oath that the statements in this letter are true and correct to the best of the Stockholder's knowledge, information, and belief.

As more fully described below, the conduct being investigated by Stockholder pertains to the events, circumstances, and statements concerning (i) whether Disney+ was suffering decelerating subscriber growth, losses, and cost overruns; (ii) the true costs incurred in connection with Disney+, including whether the Company debut of certain content intended for Disney+ initially on Disney's legacy distribution channels and then making the shows available on Disney+ thereafter in order to shift costs out of the Disney+ segment; (iii) whether Disney Media and Entertainment Distribution ("DMED") had made platform distribution decisions based not on consumer preference, consumer behavior, or the desire to maximize the size of the audience for the content as represented, but based on the desire to hide the full costs of building Disney+'s content library; and (iv) whether the Company was on track to achieve its 2024 Disney+ paid global subscriber and profitability targets, including whether such targets were achievable, and that such estimates had a reasonable basis in fact (the "Wrongful Conduct").

The Walt Disney Company
February 5, 2024
Page 2 of 28

Stockholder also seeks to investigate whether, for items (i)-(iv) above, the Company's directors and officers materially misrepresented the actual performance of Disney+, the sustainability of Disney+'s historical growth trends, the profitability of Disney+, and the likelihood that Disney could achieve its 2024 Disney+ subscriber and profitability targets (the "False Statements").

Further, Stockholder seeks to investigate whether certain Company insiders used material, non-public information while trading in the Company's securities.

Finally, Stockholder seeks to investigate whether the impairment charges related to the Company's DTC services are a result of the Wrongful Conduct and related False Statements.

Publicly available information shows that the mismanagement and wrongdoings described herein relating to the Wrongful Conduct and the False Statements are more than likely the product of breaches of fiduciary duty by members of the Company's Board of Directors (the "Board") and/or officers, including Robert Chapek ("Chapek"), Christine M. McCarthy ("McCarthy"), and Kareem Daniel ("Daniel").  As detailed herein, the investigation of breaches of fiduciary duty and/or corporate wrongdoing and/or non-disclosure—including in the context of a transformative restructuring of the Company—is a proper purpose under 8 Del. C. § 220 of the Delaware General Corporation Law ("Section 220").

As discussed further below, the Stockholder seeks to investigate the Wrongful Conduct and the False Statements in order to: (i) investigate possible breaches of fiduciary duty, mismanagement, self-dealing, corporate waste, and other violations of law by members of the Company's Board and management, including the Company's senior officers; (ii) consider any remedies to be sought in respect to the aforementioned conduct; (iii) investigate the ensuing response (including investigation, if any) to the aforementioned conduct; (iv) determine the impact, if any, the aforementioned conduct had on the value of Stockholder's equity holdings in the Company; (v) prevent further corporate trauma, lawsuits, government intervention, and loss of the Company's goodwill and reputation; (vi) use information obtained through inspection of the Company's books and records to evaluate possible litigation or other corrective measures with respect to some or all of these matters; and (vii) evaluate the independence, disinterestedness, and suitability for office of the Company's Board.

Pursuant to Section 220, the Stockholder demands the right (by the Stockholder's attorneys, consultants, or other agents), during the usual hours of business, to inspect the specified books and records of the Company and to make copies or extracts therefrom.  In the alternative, the Company may deliver copies of such records to the attention of the undersigned.

## I.    BALRAJ PAUL IS A CURRENT STOCKHOLDER OF DISNEY

The Stockholder is a current Disney stockholder that has the right to inspect the books and records requested herein.  As evidence of the Stockholder's beneficial ownership of Disney common stock, annexed hereto as **Exhibit A**, is the Verification and Authorization of Stockholder

The Walt Disney Company
February 5, 2024
Page 3 of 28

(the "Verification"), attesting to his ownership of shares of Disney common stock and his intention to continue to hold shares at least through the conclusion of the Section 220 proceedings contemplated in this Demand. The Verification is accompanied by documentary evidence of the Stockholder's beneficial ownership of stock, which Stockholder verifies to be accurate, annexed hereto as **Exhibit A-1**. Annexed hereto as **Exhibit B**, is a notarized Power of Attorney executed by the Stockholder granting Johnson Fistel, LLP, the authority to initiate, pursue, and act on his behalf in connection with this Demand for the inspection of books and records.

## II.    FACTUAL BACKGROUND[1]

### A.    Disney's Business

Since its inception in 1923, Disney has evolved into the global leader in the entertainment industry. Generally, the Company, along with its various subsidiaries, is engaged in the production and distribution of film and episodic content through a multitude of television networks, such as ABC, Disney, ESPN, Freeform, FX, Fox, National Geographic, and Star, and productions studies, such as Walt Disney Pictures, 20th Century Studios, Marvel, Lucasfilm, Pixar, and Searchlight Pictures. In addition to the Company's legacy distribution platforms, in recent years, the Company has turned to offering Direct-to-Consumer ("DTC" or "D2C") services through platforms like Disney+, Disney+ Hotstar (available in India), ESPN+, Hulu, and Star+.

Utilizing the Company's media powerhouse, the Company also owns and manages a variety of theme parks and resorts, including Walt Disney World Resort in Florida, Disneyland Resort in California, Disneyland Paris, Hong Kong Disneyland Resort, and Shanghai Disney Report. In addition to the Company's theme parks and resorts business, the Company's vacation businesses include Disney Cruise Line, Disney Vacation Club, National Geographic Expeditions, and Adventures by Disney, as well as Aulani, a specialized resort and spa in Hawaii.

Even further, Disney extends its brand through licensing agreements with a third party who owns and operates Tokyo Disney and further monetizes the Company's vast intellectual property portfolio through the licensing of trade names, characters, and other forms of intellectual property for merchandise, published content, and games. Moreover, the Company maintains a direct-to-home satellite distribution network, offers branded merchandise through various physical and digital retail channels, and is active in the publishing sector through publication of books, comics, and magazines.

### B.    Chapek Replaced Disney's Longtime Chief Executive Officer, Robert Iger

In February 2020, the Company announced that Robert Iger ("Iger"), its then-Chief Executive Officer ("CEO") with an illustrious 15-year tenure, would be relinquishing his role and transitioning to the position of Executive Chairman of the Board. In his new role, Iger was tasked

---

[1]  Unless otherwise indicated, all emphasis is added and all internal citations are omitted.

The Walt Disney Company
February 5, 2024
Page 4 of 28

with steering the Company's creative ventures, presiding over the Board, and offering his expertise and leadership until the conclusion of contract on December 31, 2021.

Iger is said to have personally selected Chapek, a long-serving subordinate with over a decade of experience working for Iger, as his successor. Regarding the timing of the transition, Iger stated, "[w]ith the successful launch of Disney's direct-to-consumer businesses and the integration of Twenty-First Century Fox well underway, I believe this is the optimal time to transition to a new CEO." Iger also remarked about Chapek that, "I have the utmost confidence in [Chapek] and look forward to working closely with him over the next 22 months as he assumes this new role and delves deeper into Disney's multifaceted global businesses and operations, while I continue to focus on the Company's creative endeavors."

### C. COVID-19 Is Declared a Pandemic

A mere month following Chapek's ascension to CEO, infection rates of COVID-19 ("COVID") intensified globally, leading the World Health Organization to officially designate the virus a pandemic in March 2020. In response, numerous countries implemented a variety of lockdown protocols to limit citizen mobility and work activities, in an effort to mitigate the virus's spread.

The pandemic, along with the associated countermeasures, had a direct and detrimental effect on Disney's operations. The Company was compelled to close its theme parks, resorts, and cruise operations. Additionally, movie distribution, traditionally one of the Company's most lucrative methods for distributing the content the Company creates, essentially came to a screeching halt, as did live sports broadcasts, a principal content source for Disney's television networks.

The financial repercussions for Disney were immediate and pronounced. In May 2020, the Company declared the suspension of its dividend payouts. By August 2020, the Company posted its first quarterly loss in almost two decades, and, by November 2020, the Company announced its first annual loss in more than four decades.

### D. While in Control of the Company, Chapek Reorganizes the Company's Reporting Segments Around Its New Streaming Service—Disney+

While the majority of Disney's ventures endured significant hardship due to the COVID pandemic, its nascent streaming service Disney+ saw an unexpected surge in subscriptions.

Initially launched in the United States in November 2019—prior to Chapek's tenure—the Company had set a subscriber target of between 60 and 90 million by the conclusion of the fiscal year 2024. However, once the COVID lockdowns came into full force, Disney+ subscriptions surpassed all expectations, amassing over 50 million subscribers by April 2020, and nearly 74 million within its inaugural year. Consequently, the thriving Disney+ DTC service emerged as the singular bright spot in an otherwise gloomy commencement to Chapek's role as CEO.

The Walt Disney Company
February 5, 2024
Page 5 of 28

Looking to capitalize on the timing of the surge in subscribers to provide cover for the Company's falling financial health, Chapek caused the Company to announce a comprehensive reorganization of its media and entertainment segments. The new configuration aimed to expedite the Company's focus on DTC strategies and, in turn, how the Company reported its financial results. Chapek explained in an interview with CNBC that the restructuring was formulated to "accelerate our transition to a real direct-to-consumer priority company," elaborating that, "[w]e believe that we've got the opportunity to build upon the success of Disney+, which by almost any measure has been far and above anybody's expectations and really use this to catalyze our growth and increase shareholder wealth."

In addition, the Company issued a press release, which echoed Chapek's sentiment, stating:

In light of the tremendous success achieved to date in the Company's direct-to-consumer business and to further accelerate its DTC strategy, [Disney] today announced a strategic reorganization of its media and entertainment businesses. Under the new structure, Disney's world-class creative engines will focus on developing and producing original content for the Company's streaming services, as well as for legacy platforms, while distribution and commercialization activities will be centralized into a single, global Media and Entertainment Distribution organization. ***The new Media and Entertainment Distribution group will be responsible for all monetization of content—both distribution and ad sales—and will oversee operations of the Company's streaming services. It will also have sole P&L accountability for Disney's media and entertainment businesses.***

Disney's October 12, 2020 Press Release, *available at* https://thewaltdisneycompany.com/the-walt-disney-company-announces-strategic-reorganization-of-its-media-and-entertainment-businesses/ (last accessed on September 20, 2023).

The restructuring represented a profound shift from Disney's traditional organizational framework and incited significant controversy within the Company. This was primarily because it decentralized authority from creative content-focused executives, consolidating it within a new organization entity headed by Daniel, who in turn reported directly to Chapek. Prior to this change, the Company had been divided into four (4) primary reporting segments, each rationally related to a segment of the Company's business: (i) Media Networks; (ii) Parks, Experiences and Products; (iii) Studio Entertainment; and (iv) Direct-to-Consumer & International. Post-reorganization, these segments were whittled down to just two (2) divisions: (i) Disney Media and Entertainment Distribution ("DMED"); and (ii) Disney Parks, Experiences and Products.

Ultimately, as Chapek's goal for the reorganization, the DMED segment was vested with the task of monetizing all Disney content on a global scale, encompassing both distribution and advertising sales. Moreover, DMED was conferred with the authority to decide the platforms on which Disney's content would make its debut—be it streaming, television, or conventional cinematic releases. In implementing this reorganization, Chapek stripped the leaders of Disney's

The Walt Disney Company
February 5, 2024
Page 6 of 28

content creation divisions of their financial and distribution responsibilities and reallocated these duties to DMED's inaugural leader-Daniel.  In essence, Daniel assumed a comprehensive role, overseeing the profit and loss management, distribution, operations, sales, advertising, data, and technology functions for all of the Company's content worldwide.  Daniel, in turn, reported directly to Chapek, his long-standing mentor.

This reorganization enabled both Daniel and Chapek to wield near-complete managerial authority over the Company's content-related strategic decisions.  The reallocation of authority to decide where Disney's content would be made available—be it streaming services, television, or conventional movie theaters—was purportedly, as described by Chapek, a response to "a seismic shift happening in the marketplace, and you can either lead or follow and we chose to lead."  In this regard, Chapek proclaimed that the primary consideration for the distribution of Disney's content remained "what platform is best to meet those consumer needs," explaining that "[g]iven the incredible success of Disney+ and our plans to accelerate our direct-to-consumer business, we are strategically positioning our Company to more effectively support our growth strategy and increase shareholder value."  Chapek continued to explain the rationale behind the structural changes:

> Managing content creation distinct from distribution will allow us to be more effective and nimble in making the content consumers want most, delivered in the way they prefer to consume it. Our creative teams will concentrate on what they do best – making world-class franchise-based content – while our newly centralized global distribution team will focus on delivering and monetizing that content in the most optimal way across all platforms, including Disney+, Hulu, ESPN+ and the coming Star International streaming service.

### E.  The False and Misleading Statements and Omissions

  i.   <u>Disney's 2020 Investor Day and Related Statements</u>

On December 10, 2020, Disney hosted its 2020 Investor Day event, broadcasting from the Company' headquarters in Burbank, California.  The presentation aimed to provide stockholders with a comprehensive update on the Company's diverse business operations, structural reorganization, and particularly its DTC initiatives.  Chapek, McCarthy, and Daniel took the stage to deliver scripted comments, with Chapek and McCarthy also participating in an analyst Q&A session.  Subsequent to the event's conclusion, Disney uploaded a replay of the presentation, along with presentation slides, onto the Company's official website.

At the commencement of his 2020 Investor Day remarks, Chapek triumphantly claimed that the Company had already surpassed it preliminary subscriber projections for Disney+, stating in relevant part the following:

> Disney+ has exceeded our wildest expectations, with 86.8 million subscribers as of December 2nd. That's quite an achievement! This success has bolstered our

The Walt Disney Company
February 5, 2024
Page 7 of 28

confidence in our continued acceleration towards a DTC-first business model, and more importantly, it's launched [Disney] into a new era of delivering consumers truly exceptional entertainment build around our world-renowned brands and franchises.

Chapek then detailed how the Company's new distribution and commercialization segment (*i.e.*, DMED) would distribute Disney's content onto the platform most beneficial to consumers, explaining in relevant part the following:

Our unique access to an incredible number of consumer touch points across our businesses gives us a clear advantage. Based on insights gained from this wealth of data, our distribution and commercialization team is able to better inform our creatives of consumer preferences. And the creative teams are empowered to make the high-quality branded entertainment they believe will resonate with audiences. This new organization also gives us maximum flexibility in determining when – and on which platform – content will be available. And this is especially important now given consumers' rapidly changing consumption behaviors, and the prolonged uncertainty due to the pandemic.

As circumstances change, we will continue to consider these and other critical factors when determining what steps we may take to most effectively distribute our programming. Our goal is always to serve consumers in the best way possible.

During the presentation, Daniels also emphasized and corroborated Chapek's previous statements that the Company would distribute Disney's content on the platform most beneficial to consumers, stating in relevant part the following:

As a company, we were set up to achieve success in an increasingly dynamic environment. And as Bob mentioned, consumer behavior really does drive our decision-making. While we have always valued the data gained through our numerous consumer touch points, the rapid growth of our portfolio of DTC services provides us with an even greater opportunity to understand their preferences, and we are using these insights to help determine how to optimally engage with our audiences. In fact, our team uses all of the information available to us when determining how best to allocate our creative content budgets across all platforms, with the goal to maximize both audience engagement and commercial impact. And we share this budgetary framework and critical insights with our creative partners, as part of a truly collaborative planning process that delivers high-quality, branded entertainment, to achieve our established growth objectives for all of our platforms: from direct-to-consumer, to linear networks, to theatrical exhibition.

The Walt Disney Company
February 5, 2024
Page 8 of 28

This exchange of information is a key pillar to our organization's overall strategy, which also relies on the increased flexibility provided by our mix of distribution options, including, in no particular order:

- Releasing content though traditional windows – such as theaters and linear networks before it is made available on our direct-to-consumer services, particularly recognizing the actual exhibition's ability to help establish major franchises that are at the heart of our Disney flywheel;
- Providing our creative output simultaneously day-and-date on both traditional and DTC platforms, in concert with our [p]remier [a]ccess commercialization strategy for the DTC component;
- And exclusively distributing our content on our streaming services, providing a constant flow of new titles for subscriber acquisition and to minimize churn.

Of course, regardless of where it originates, all of our films and episodic series will inevitably end up as part of our incredibly rich and increasingly robust library of content on our DTC platforms.

Since streaming has quickly become a preferred method of consumption, we are prioritizing our DTC platforms – both in terms of how we distribute our content and also through an increased investment in our original programming for Disney+, Hulu, ESPN+ and the upcoming Star-branded international general entertainment offering.

\*        \*        \*

One of the primary benefits of our new organizational structure is our ability to quickly re-evaluate and adjust our plans in light of changes in the marketplace. And we will continue to shift and optimize our mix of window theatrical, day-and-date, and DTC exclusive offerings according to what is best for the consumer and our business.

During McCarthy's presentation, she provided profitability and subscriber estimates for Disney+, along with related foreign streaming services such as Disney+ Hotstar, stating in pertinent part as follows:

Today, I'm going to provide guidance across our services for fiscal 2024, to be consistent with the timeframe we guided to at our last investor day. Let me start with Disney+ which, as you heard earlier today, had 86.8 million total paid subscribers as of December 2nd, approximately 30% of which were Disney+ Hotstar subscribers.

The Walt Disney Company
February 5, 2024
Page 9 of 28

*    *    *

If you recall, last year, we said that we expected Disney+ to have between 60 million and 90 million subscribers by the end of fiscal 2024. But as you know, our subscriber growth-to-date is well ahead of our original expectations – and we have an incredible and growing slate of high-quality content that will capture a broader global audience and further fuel Disney+, making it, what we believe, is an even more compelling product.

These factors along with the addition of our Star general entertainment offering in various markets, and the growth of Disney+ Hotstar, give us an even greater optimism about our future. And they enable us to significantly increase our subscriber guidance. We now expect that by the end of fiscal 2024, we will have between 230 million and 260 million total paid Disney+ subscribers globally compared to the 60 million to 90 million we shared last year. I'll note that our prior outlook did not anticipate the launch of Disney+ Hotstar, which we now expect could be between 30% and 40% of our subscriber base by the end of fiscal 2024.

*    *    *

Given the value of growing our subscriber base, as you've seen today, we plan to reinvest revenue generated from our better-than-expected subscriber growth back into content investment. Thus we continue to expect Disney+ to achieve profitability in fiscal 2024. Again, I'll note that this guidance includes Disney+, Star, Star+ and Disney+ Hotstar.

The presentation slides utilized during the 2020 Investor Day event echoed the Company's projections that, by the close of the fiscal year 2024, Disney+ would not only be profitable but would also boast a subscriber base ranging from 230 to 260 million paid global users. Of this subscriber base, the materials provided that 30-40% would be attributed to Disney+ Hotstar. Remarkably, these revised figures signified a nearly threefold increase in comparison to previous forecasts, without any diminishment in the anticipated profitability for this particular business segment.

During the 2020 Investor Day's Q&A session, in response to a question from a Morgan Stanley analyst, defendant Chapek explained the decision-making process that went into determining when and on which platform or platforms Disney's content would be distributed, stating in relevant part as follows:

So to me, it's really about over—of the 100 titles that we announced today, 80% of them are going first to Disney+, which I think says something about our pivot over to Disney+. But at the same time, we had $13 billion of box office last year. And that's obviously not something to sneeze at. And we know as [Disney] who've got this plethora of franchises that we just showed you today, that we build those

The Walt Disney Company
February 5, 2024
Page 10 of 28

franchises through the theatrical exhibition window and we did $13 billion back in '19. So for us, it's about balance. And it's about following the consumer as they make that transition.

And so part of why we did the reorganization that we did is to ensure that we've got an organization that's flexible to read all the cues, whether it's the cessation of COVID or it's changing consumer behavior so that we can very nimbly make decisions as we go forward. And that 80% direct-to-consumer is not just Disney+, obviously, but that includes Hulu and Star as well.

The 2020 Investor Day had an impact on the market. Following the event, analyst reports heralded the remarkable claims of rapid and profitable Disney+ growth. For example, a Barclays analyst report proclaimed that "DTC guidance blows past consensus expectations"; a Wolfe Research report trumpeted "Expectations Blown Away"; a Morgan Stanley report cheered "To Infinity & Beyond"; and an RBC Capital Market Reports figuratively burst into song: "Disney, Disney, Disney, Can't You See? Sometimes Your Words Just Hypnotize Me." Some analysts even predicted that Disney+ might surpass Netflix as the most widely adopted paid streaming service in the world. The representations made at Disney's 2020 Investor Day had their intended effect, pushing the price of Disney common stock to all-time highs of over $180 per share by the end of December 2020.

Subsequent statements reiterated and emphasized the statements made at the 2020 Investor Day. Specifically, on the Company's February 11, 2021 earnings call for its first fiscal quarter of 2021, McCarthy confirmed that Disney+ was expected to reach profitability in fiscal 2024, stating in pertinent part as follows:

Okay. Thanks, Brett. You're absolutely right. Peak losses, we expect in this fiscal year. We said at our Investor Day, which wasn't too long ago, that we expected to reach profitability in fiscal 2024. We're not going to change that at this point, although we are very pleased with the results that we just announced. But we are also – given the value of growing our sub base, we are continuing to invest in high-quality content. We believe that content is the single biggest driver to not only acquiring subs, but retaining them.

On the Company's May 13, 2021 earnings call for its second fiscal quarter of 2021, Chapek reiterated that Disney was on track to achieve its Disney+ 2024 paid global subscriber estimate, stating in relevant part as follows:

We are uniquely positioned with the most compelling brands and franchises in entertainment, and we continue to deliver the high-quality, one-of-a-kind content that consumers want. That's clearly reflected in the success of Disney+, which amassed nearly 104 million paid subscribers as of the end of the second fiscal

The Walt Disney Company
February 5, 2024
Page 11 of 28

quarter. We are on track to achieve our guidance of 230 million to 260 million subscribers by the end of fiscal 2024.

During the same call, McCarthy likewise stated: "As [Chapek] mentioned earlier, we remain right on track to reach our fiscal 2024 guidance of 230 to 260 million subs, powered by the addition of 30 million paid Disney+ subs in the first half of the year."

ii. Goldman Sachs Communacopia Conference and Related Statements

On September 21, 2021, the Company and Chapek gave a virtual presentation at the Goldman Sachs Communacopia Conference. During the presentation, Chapek acknowledged that Disney+ subscriber growth had slowed in the fourth quarter of the fiscal year ended October 2, 2021: "In Q4, I think what you can expect to see is that our global paid subs will increase by low single-digit millions of subscribers versus Q3."

This new information concerning the number of global paid Disney+ subscribers failed to meet the market's expectations. Prior to the market's close that day, CNBC reported the disappointing news in pertinent part as follows:

Disney's CEO [Chapek] said Tuesday his company's streaming service growth has "hit some headwinds" related to coronavirus, causing shares to close lower for the day. Disney expects to add "low single-digit millions" of streaming subscribers in the fourth quarter, Chapek said. Disney shares ended the session down 4.1% after Chapek's comments at the virtual Goldman Sachs Communacopia Conference.

Chapek said "mobilizing partners" in Latin America to push Disney's new Star+ streaming service, the Covid-related suspension of the India Premier League—whose games air on Disney's Hotstar—and production delays from the delta variant have all hurt subscriber numbers in the fourth quarter.

"We are going to see a little bit more noise than maybe the Street projects quarter to quarter," Chapek said. "The resurgence of Covid and delta did impact some of our productions."

Chapek's forecast is significantly lower than some analyst estimates. Deutsche Bank analyst Bryan Kraft had projected Disney+ net adds of about 13 million in the quarter.

Global production delays will be "very short term," Chapek said. But he acknowledged there won't be as much new programming in the fourth quarter "than we might have expected," which will affect subscriber growth.

Disney has projected 230 million to 260 million Disney+ subscribers by 2024. Disney said in August it had 116 million Disney+ subscribers.

The Walt Disney Company
February 5, 2024
Page 12 of 28

Chapek cautioned investors that quarter-to-quarter growth "is not linear" and some choppiness is expected. Still, he remained confident in Disney's long-term growth outlook.

In response to the news, the price of Disney common stock closed down $7.44 per share, or more than 4%, from the prior day's close of $178.61 on September 20, 2021, on abnormally high volume of over 23 million shares traded.

Despite these revelations, the price of Disney common stock remained artificially inflated because of the failure of the Company's directors and officers to disclose the full truth. The directors and officers continued to make materially false and misleading statements which continued to artificially inflate the price of Disney common stock. For example, during the Goldman Sachs Communacopia Conference presentation, Chapek stated: "We're very confident about our long-term sub growth as we have been."

### iii.  3Q'21 Financials and Related Statements

On August 12, 2021, Disney released its Fiscal Q3 2021 Form 10-Q and McCarthy and Chapek participated in an earnings call with analysts. During the conference call, Chapek reported that "Disney+ . . . performed incredibly well with 116 million" subscribers. McCarthy stated: "As Bob mentioned earlier, we ended the third quarter with 116 million global paid subscribers to Disney+, up from approximately 104 million in the second quarter." McCarthy added that "subscriber growth was also solid at our core Disney+ markets, excluding Disney+ Hotstar, with total quarter-over-quarter net adds in those markets consistent with net adds from Q2." Disney's Fiscal Q3 2021 Form 10-Q also reported that there were 116 million paid Disney+ subscribers as of Fiscal Q3 2021.

### iv.  Fiscal Year 2021 & 4Q'21 Financials and Related Statements

After the market closed on November 10, 2021, Disney issued a press release, which was also filed with the Securities and Exchange Commission (the "SEC") that day as an exhibit to a Form 8-K, reporting the Company's financial results for its fourth quarter and fiscal year ended October 2, 2021.

Disney posted quarterly results that missed Wall Street's already diminished expectations as the Company saw a dramatic slowdown in Disney+ subscribers. The Company added just 2.1 million customers during the quarter (the smallest quarterly gain since the service's launch two years prior), revenue of $18.53 billion, and adjusted earnings per share of 37 cents—all of which were below consensus estimates of 119.6 million subscribers, $18.78 billion in revenues, and adjusted earnings per share of 49 cents, as compiled by Bloomberg.

In response to this news, the price of Disney common stock closed down $12.34 per share, or more than 7%, on November 11, 2021 on abnormally high volume of over 62 million shares traded. Despite these revelations, the price of Disney common stock remained artificially inflated

The Walt Disney Company
February 5, 2024
Page 13 of 28

because of the failure of the Company's directors and officers to disclose the full truth. In addition, the Company's directors and officers continued to make materially false and misleading statements which continued to artificially inflate the price of Disney common stock as detailed below.

On the Company's earnings call after the market closed on November 10, 2021, Chapek doubled down on the Company's prior forecast that the streaming service would reach profitability and have between 230 million and 260 million paid global Disney+ subscribers by the end of fiscal 2024, stating in pertinent part as follows:

> I want to reiterate that we remain focused on managing our DTC business for the long term, not quarter-to-quarter, and we're confident we are on the right trajectory to achieve the guidance that we provided at last year's Investor Day – reaching between 230 million and 260 million paid Disney+ subscribers globally by the end of fiscal year 2024, and with Disney+ achieving profitability that same year.

McCarthy also reiterated the Company's prior subscriber growth and profitability forecast, stating in pertinent part as follows:

> As Bob mentioned, we are increasing our overall long-term content expense for Disney+, and we are well positioned to achieve the subscriber target of 230 to 260 million by fiscal 2024 that we laid out at last year's Investor's Day, and we also remain confident in our expectation that Disney+ will achieve profitability in fiscal 2024.

v.  1Q'2022 Financials and Related Statements

On February 9, 2022, Disney released its Fiscal Q1 2022 10-Q and Chapek and McCarthy participated in an earnings call with analysts. During the call, Chapek reported that "11.8 million Disney+ subscribers" were added in Q1 2022. McCarthy likewise stated, "[w]e ended the quarter with nearly 130 million global paid Disney+ subscribers, reflecting over 11 million net additions from Q4." She also stated that "[o]verall, we are pleased with Disney+ subscriber growth in the quarter and are looking forward to new market launches and a strong content slate later this year." Disney's Fiscal Q1 2022 Form 10-Q also reported that there were 129.8 million paid Disney+ subscribers as of Fiscal Q1 2022.

vi.  2Q'2022 Financials and Related Statements

On May 11, 2022, Disney released its Fiscal Q2 2022 10-Q, and McCarthy and Chapek participated in an earnings call with analysts. During the call, Chapek informed investors that Disney ended the quarter with an additional "7.9 million Disney+ subscribers, keeping us on track to reach 230 million to 260 million Disney+ subscribers by fiscal '24. The growth of the platform since its launch reinforces its unique nature." On the same call, McCarthy stated: "[w]e ended the quarter with nearly 138 million global paid Disney+ subscribers, reflecting close to 8 million net

The Walt Disney Company
February 5, 2024
Page 14 of 28

additions from Q1." Disney's Fiscal Q2 2022 10-Q also reported that there were 137.7 million paid Disney+ subscribers as of Fiscal Q2 2022.

vii. <u>3Q'2022 Financials and Related Statements</u>

On August 10, 2022, Disney issued a press release, which was also filed with the SEC as an exhibit to a Form 8-K, reporting the Company's results for the third fiscal quarter of 2022 ended July 2, 2022. Disney also held an earnings call to discuss its results at that time. During the call, McCarthy lowered the Company's 2024 guidance for Disney+ by only 15 million on both the low end and high end—still far above the actual performance of the platform—and reaffirmed the 2024 profitability estimate, stating in relevant part as follows:

> Finally, before we move to Q&A, I want to spend some time sharing a few updates on our fiscal 2024 guidance for Disney+. We are providing more detail on subscriber targets by separating our guidance into two categories: core Disney+ and Disney+ Hotstar. Excluding the impact of any significant future macro headwinds, our core Disney+ subscriber target range is 135 million to 165 million by the end of fiscal 2024 – largely consistent with previously provided guidance that non-Hotstar Disney+ subscribers in 2024 would approximate 60%–70% of the expected 230 to 260 million total subscriber base.

> We are, however, updating subscriber guidance for Disney+ Hotstar, to up to 80 million subscribers by the end of fiscal 2024. We intend to refine this target over time, as subscriber visibility in India will be clearer once the [International Cricket Council] and [Board of Control for Cricket in India] cricket rights sales processes are completed. As you may know, we recently made the disciplined decision to not proceed with the Indian Premier League digital rights, and [we] will evaluate these rights with that same discipline.

> As we sit here today, we remain confident that Disney+ will achieve profitability in fiscal 2024. And look forward to several upcoming catalysts including: reaching a steady state of tentpole original content releases, delivery of premium general entertainment and international local originals, and the upcoming launch of our ad supported tier, alongside the new pricing structure announced earlier today.

**F.  The Truth Is Revealed**

On November 8, 2022, Disney issued a press release reporting the Company's financial results for its fourth quarter and fiscal year ended October 1, 2022.

Disney missed analyst estimates by wide margins on both the top and bottom lines. Revenue in the quarter grew just 9% to $20.15 billion, below estimates at $21.36 billion. Sales, at $20.2 billion, fell about $1 billion short of analysts' projections. Earnings, excluding certain items, fell to 30 cents a share, missing the average estimate of 51 cents from analysts surveyed by

The Walt Disney Company
February 5, 2024
Page 15 of 28

Bloomberg.  The Company's DTC segment, which includes streaming services Disney+, ESPN+, Hulu, and Hotstar, reported a monumental operating loss of $1.47 billion compared to a $630 million loss in the same quarter the year prior.  Revenue in the segment increased just 8% to $4.9 billion.  The Company also reported a decline in its average revenue per Disney+ subscriber, as more customers subscribed through a discounted bundle with the Company's other services.  Notably, the bundled offering made up about 40% of domestic subscribers, confirming that Disney was relying on short-term promotional efforts to boost subscriber growth while impairing the platform's long-term profitability.

In response to this news, the price of Disney common stock collapsed $13.15 per share, or more than 13%, in a single day on November 9, 2022 on abnormally high volume of over 62 million shares traded.

Less than two (2) weeks later, and only five (5) months after the Board voted to extend Chapek's employment contract, the Company announced on November 20, 2022, that the Board had terminated Chapek and replaced him with Iger.  Defendant Daniel was let go within 24 hours thereafter.

On November 21, 2022, *The Wall Street Journal* reported on some of the behind-the-scenes disputes and issues that ultimately led to Chapek's dismissal, whose position at the Company had reportedly "been shaky for months."  Significantly, the report also included information concerning a previously undisclosed cost-shifting scheme employed by defendants to hide certain expenses that should have been attributed to Disney+ so that the streaming service would appear closer to profitability than in fact was the case.  Not only did the Individual Defendants know about this strategy and intentionally employ it to deceive investors, but reportedly defendant McCarthy had internally expressed her concerns about its propriety.  The report stated in pertinent part as follows:

> Disney is moving some shows that were supposed to be Disney+ originals and air them first on other networks including the Disney Channel, people familiar with the matter said. By doing so, the costs of production and marketing of the shows—which included mystery show "The Mysterious Benedict Society" and medical drama "Doogie Kameāloha, M.D."—would be shifted away from the streaming service, making its financial performance look better, they said.

> Ms. McCarthy was concerned about this strategy, the people said.

Other news outlets thereafter similarly reported that "Disney Discovered Bob Chapek Was 'Cooking the Books' to Hide Massive Losses in Revenue," and that "Bob Chapek Shifted Budgets to Disguise Disney+'s Massive Monetary Losses."

On February 8, 2023, the Company reported financial results for its first quarter fiscal year 2023, ended December 31, 2022.  Disney reported that Disney+ lost 2.4 million subscribers and

The Walt Disney Company
February 5, 2024
Page 16 of 28

the DTC business reported an increase in operating loss from $0.5 billion to $1.1 billion due in part to a higher loss at Disney+ which reflected higher programming and production costs.

On a conference call that same day to discuss the results, Iger announced a broad restructuring of the Company aimed at putting the Company's streaming business on a path to both profitability and growth, stating in relevant part as follows:

In 2019, Disney+ launched, with nearly 500 films and 7,500 episodes of television from across the world of Disney. Three years later, its meteoric rise is considered one of the most successful results in the history of the media business.

Now it's time for another transformation[,] one that rationalizes our enviable streaming business and puts it on a path to sustained growth and profitability [] while also reducing expenses to improve margins and returns [] and better positioning us to weather future disruption, increased competition, and global economic challenges. We must also return creativity to the center of the company, increase accountability, improve results, and ensure the quality of our content and experiences.

Iger made clear that an important component of restoring the Company's success was returning power to the Company's creative executives, including distribution decisions, which Chapek had taken away as part of his October 2020 restructuring, stating in relevant part as follows:

Now the details. Our company is fueled by storytelling and creativity. And virtually every dollar we earn[,] every transaction[,] every interaction with our consumers emanates from something creative. And I've always believed that the best way to spur great creativity is to make sure that people who are managing the creative process feel empowered.

Therefore, our new structure is aimed at returning greater authority to our creative leaders, and making them accountable for how their content performs financially. Our former structure severed that link and it must be restored. Moving forward, our creative teams will determine what content we're making, how it is distributed and monetized, and how it gets marketed.

Iger additionally announced that the Company would be reorganized into three core business segments from which creative executives would purportedly be able to maximize revenue and growth, stating in pertinent part as follows:

Managing costs, maximizing revenue and driving growth from the content being produced will be their responsibility. Under our strategic reorganization, there will be three core business segments[:] Disney Entertainment, ESPN, and Disney Parks, Experiences and Products.

The Walt Disney Company
February 5, 2024
Page 17 of 28

Alan Bergman and Dana Walden will be Co-Chairman of Disney Entertainment, which will include the Company's full portfolio of entertainment media and content businesses globally, including streaming. Jimmy Pitaro will continue to serve as Chairman of ESPN, which will include ESPN Networks, ESPN+ and our international sports channels. And Josh D'Amaro will continue to be Chairman of Disney Parks, Experiences and Products, which will include our theme parks, resort destinations and cruise line, as well as Disney's consumer products, games, and publishing businesses.

These organizational changes will be implemented immediately, and we will begin reporting under the new business structure by the end of the fiscal year. This reorganization will result in a more cost-effective, coordinated and streamlined approach to our operations, and we are committed to running our businesses more efficiently, especially in a challenging economic environment.

Iger also provided important details regarding the Company's efforts to rein in costs, indicating that Disney would be cutting $5.5 billion in costs with $2.5 billion in non-content cuts (including 7,000 jobs) and $3 billion in content savings over the next few years, stating in relevant part as follows:

In that regard, we are targeting $5.5 billion of cost savings across the company. First, reductions to our non-content costs will total roughly $2.5 billion, not adjusted for inflation. $1 billion in savings is already underway, and Christine will provide more details, but in general, the savings will come from reductions in SG&A and other operating costs across the company.

To help achieve this, we will be reducing our workforce by approximately 7,000 jobs. While this is necessary to address the challenges we're facing today, I do not make this decision lightly. I have enormous respect and appreciation for the talent and dedication of our employees worldwide, and I'm mindful of the personal impact of these changes.

On the content side, we expect to deliver approximately $3 billion in savings over the next few years, excluding sports, and Christine will be providing more details during the call.

Turning to our streaming businesses[.] I'm proud of what we've been able to achieve since the launch of Disney+ just 3 years ago.  We are delivering more content [] with greater quality [] in more ways[,] in more places [] and to larger audiences.

Additionally, Iger stated that the Company would no longer be providing long-term subscriber guidance for Disney+, stating in relevant part as follows:

The Walt Disney Company
February 5, 2024
Page 18 of 28

Like many of our peers, we will no longer be providing long-term subscriber guidance in order to move beyond an emphasis on short-term quarterly metrics – although we will provide color on relevant drivers. Instead, our priority is the enduring growth and profitability of our streaming business.

Then, on May 10, 2023, the Company reported financial results for its second quarter fiscal year 2023, ended April 1, 2023.  Disney reported that Disney+ had lost subscribers for the second quarter in a row, further confirming that the 2024 Disney+ targets had never been achievable. During the quarter Disney+ had lost **4 million paid subscribers** from the prior quarter, which shocked analysts who had expected the service to **add** 1.7 million subscribers.  Streaming revenue increased 12% from a year earlier in part due to recent price hikes necessitated by the streaming service's horrendous losses.  On a conference call that same day to discuss the results, Iger again acknowledged that Disney's streaming business needed to rebalance its streaming business model in order to have a chance to reach profitability, stating that "it's critical we rationalize the volume of content we're creating and what we're spending to produce our content."  He further announced that Disney was planning another price increase, at least for the Disney+ ad-free tier, risking even further subscriber losses.

In response to this news, the price of Disney common stock declined $8.83 per share, or more than 8% in a single day on May 11, 2023 on abnormally high volume of over 57 million shares traded.

### G.  The Fraudulent Scheme

Based on the presently available information, it appears that the Company's directors and officers harmed the Company by concealing the true performance of the Disney+ platform and by misleading stockholders through false and/or misleading statements.

Specifically, the Company's directors and officers likely obscured the true costs associated with Disney+'s operation, downplayed the challenges and costs involving in sustaining a high rate of Disney+ subscriber growth, and asserted that Disney+ was on a course to reach profitability, along with achieving 230 to 260 million paid global subscribers by the close of fiscal year 2024.

In furtherance of the Wrongful Conduct, the Company's directors and officers made and/or allowed these representations to be made despite the reality that the initial surge in Disney+ subscriptions had been artificially and unsustainably inflated due to a low introductory price of $6.99, a series of short-term, low-cost promotional offerings, and the unique circumstances of a largely homebound audience as a result of the COVID pandemic public safety measures. Moreover, the Company's directors and officers concealed from stockholders that Disney+ was incurring substantial costs in content creation, a necessary endeavor to lure a massive subscriber base amidst the fiercely competitive landscape of the streaming industry, which included formidable rivals like Netflix, Apple TV+, Amazon Prime, Paramount+, HBO Max, YouTube, and Peacock.

The Walt Disney Company
February 5, 2024
Page 19 of 28

In reality, Disney+ was not proceeding according to the optimistic projections conveyed by the Company's directors and officers about profitability and subscriber counts, and these projections lacked a creditable factual basis at the time they were made.

The Company's directors and officers knew and/or were grossly negligent in not knowing that the Disney+ projections lacked creditability because, *inter alia*, the Company's directors and officers utilized the newly formed DMED to inappropriately transfer costs away from the Disney+ platform and onto legacy platforms. Specifically, under the authority of Chapek and Daniel, and with McCarthy's knowledge, DMED debuted content originally intended for Disney+ on legacy platforms, like Disney Channel, thereby shifting the marketing and production costs of that content to those legacy platforms and away from Disney+. This, in turn, decreased the overall costs associated with Disney+.

The Company's directors and officers had authority to issue the Company's SEC filings and public statements. Furthermore, in the course of their duties and responsibilities to the Company, the Company's directors and officers were provided with the filings and statements prior to, or shortly after, their issuance and would have the ability to prevent their issuance or cause them to be corrected.

Throughout the relevant period, the Company's directors and officers made or caused the Company to make false and misleading statements and omissions that failed to disclose their breaches of fiduciary duties, and they failed to correct false and misleading statements and omissions concerning the Disney+ projections. As a result, the Company's public statements regarding Disney were materially false and misleading at all relevant times.

## H. Corporate Trauma

As a result of the conduct described above, including the false and misleading statements described, the Company has suffered and is suffering significant corporate trauma, including ongoing lawsuits. The Company has been named as a defendant in *Local 272 Labor-Management Pension Fund v. The Walt Disney Company, et al.*, No. 2:23-cv-03661 (C.D. Cal.) (the "Securities Class Action") (Stockholder incorporates by reference the allegations contained therein as part of the putative class's initial filing or any subsequent amended pleadings) alleging substantially similar allegations as those that the Stockholder seeks to investigate. The Securities Class Action complaint also names Chapek, McCarthy, and Daniel as defendants.

Before the revelation of the Wrongful Conduct and associated False Statements (*i.e.*, while the Company's stock price was artificially inflated), Chapek and McCarthy sold 10,587 and 107,875 shares, respectively, of the Company's stock with knowledge of material nonpublic information because of their positions with the Company.

Further, on May 10, 2023, the Company filed with the SEC, on Form 10-Q, its quarterly report (the "May 10, 2023 10-Q"). In the May 10, 2023 10-Q, the Company disclosed it will incur an impairment charge related to its DTC services, as follows:

The Walt Disney Company
February 5, 2024
Page 20 of 28

The Company is also in the process of reviewing content, primarily on our DTC services, for alignment with a strategic change in our approach to content curation and, as a result, will remove certain content from our platforms. We currently expect to take an impairment charge of approximately $1.5 billion to $1.8 billion, which will largely be recognized in the third quarter of fiscal 2023 as we complete the review and remove the content.

On June 2, 2023, the Company filed with the SEC, on Form 8-K, a discloser of material change concerning a material impairment to the value of the Company's assets (the "June 2, 2023 8-K"). In relevant part, the June 2, 2023 8-K stated:

As previously announced, [the Company] is in the process of reviewing content, primarily on its direct-to-consumer ("DTC") services, for alignment with a strategic change in approach to content curation and as a result is removing certain content from its platforms. ***On May 26, 2023, the Company removed certain produced content from its DTC services. As a result, the Company will record a $1.5 billion impairment charge in its fiscal third quarter financial statements to adjust the carrying value of these content assets to fair value.*** The Company is continuing its review and currently anticipates additional produced content will be removed from its DTC and other platforms, largely during the remainder of its third fiscal quarter. ***As a result, the Company currently estimates it may incur further impairment charges of up to approximately $0.4 billion related to produced content.*** The Company does not expect any material cash expenditures in connection with the impairment charges related to produced content. ***In addition, the Company may terminate certain license agreements for the right to use content on its platforms, which would result in the removal of licensed content from its platforms and lead to impairment and/or contract termination charges as well as cash payments.*** The Company currently expects that any such charges and payments related to licensed content would be meaningfully less than the impairment charges related to produced content.

On August 9, 2023, the Company filed with the SEC, on Form 10-Q, its quarterly report (the "August 9, 2023 10-Q"). Along with the filing of the August 9, 2023 10-Q, the Company filed with the SEC, on Form 8-K, a press release concerning the results of the Company's operations and financial condition. In the press release, the Company revealed the following concerning the impairment charge:

In the current quarter, the Company recorded charges of [$2.44 billion] related to the removal of content from our DTC services and the termination of certain third party license agreements for the right to use content primarily on our DTC platforms (Content Impairment Charge) and $210 million of severance.

The Walt Disney Company
February 5, 2024
Page 21 of 28

### III.  **PROPER PURPOSE**

As is a stockholder's right under Section 220, Stockholder wishes to investigate the Wrongful Conduct and False Statements.

"The paramount factor in determining whether a stockholder is entitled to inspection of corporate books and records is the propriety of the stockholder's purpose in seeking such inspection."  *CM & M Grp., Inc. v. Carroll*, 453 A.2d 788, 792 (Del. 1982).  In the language of the statute, "[a] proper purpose shall mean a purpose reasonably related to such person's interest as a stockholder."    Section 220; *see also Lebanon Cnty. Employees' Ret. Fund v. Amerisourcebergen Corp.*, C.A. No. 2019-0527-JTL, 2020 WL 132752, at *6 (Del. Ch. Jan. 13, 2020), *aff'd*, 243 A.3d 417 (Del. 2020) ("*Amerisourcebergen*") (quoting 8 Del. C. § 220(b)).

"There is no shortage of proper purposes under Delaware law . . . ."  *Melzer v. CNET Networks, Inc.*, 934 A.2d 912, 917 (Del. Ch. 2007); s*ee also Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 121 (Del. 2006); *Amerisourcebergen*, 2020 WL 132752, at *6–*7.

"It is well established that a stockholder's desire to investigate wrongdoing or mismanagement is a 'proper purpose.'"  *Seinfeld*, 909 A.2d at 121.

One of the most traditional proper purposes for a § 220 demand is the investigation of possible wrongdoing by management. When a stockholder has made a colorable showing of potential wrongdoing, inspecting the company's books and records can help the stockholder to ferret out whether that wrongdoing is real and then possibly file a lawsuit if appropriate.

*KT4 P'rs LLC v. Palantir Techs. Inc.*, 203 A.3d 738, 758 (Del. 2019).

To meet their burden, the stockholder needs only establish by a preponderance of the evidence that there is a credible basis from which the court can infer a possibility of wrongdoing. *Seinfeld*, 909 A.2d at 123 ("A stockholder is not required to prove by a preponderance of the evidence that [wrongdoing] and mismanagement are actually occurring."); *accord City of Westland Police & Fire Ret. Sys. v. Axcelis Techs., Inc.*, 1 A.3d 281, 286–87 (Del. 2010) ("Such evidence need not prove that wrongdoing, in fact, occurred."); *Sec. First Corp. v. U.S. Die Casting & Dev. Co.*, 687 A.2d 563, 565 (Del. 1997) ("The stockholder need not actually prove the wrongdoing itself by a preponderance of the evidence."); *Thomas & Betts Corp. v. Leviton Mfg. Co. Inc.*, 681 A.2d 1026, 1031 (Del. 1996) ("[Stockholders] are not required to prove by a preponderance of the evidence that waste and [mis]management are actually occurring.").

Furthermore, the "credible basis" standard is "the lowest possible burden of proof." *Seinfeld*, 909 A.2d at 123.

A stockholder may meet their burden by making "a credible showing, through documents, logic, testimony or otherwise, that there are legitimate issues of wrongdoing."  *Id*.; *accord Sec. First*, 687 A.2d at 568.  In doing so, the stockholder may rely on circumstantial evidence.  *Wal-*

The Walt Disney Company
February 5, 2024
Page 22 of 28

*Mart Stores, Inc. v. Ind. Elec. Workers Pension Tr. Fund IBEW*, 95 A.3d 1264, 1273 (Del. 2014). The stockholder also may rely on hearsay, as long as it is sufficiently reliable. *See Thomas & Betts*, 681 A.2d at 1032–33; *Marmon v. Arbinet-Thexchange, Inc.*, No. Civ.A.20092, 2004 WL 936512, at *4 (Del. Ch. Apr. 28, 2004); *Skoglund v. Ormand Indus., Inc.*, 372 A.2d 204, 208–13 (Del. Ch. 1976).

In short, "when there is a credible basis to suspect that a corporation has been violating positive law or failing to comply with the applicable regulations, and when those potential violations appear to have contributed to a corporate trauma, it is likely that some level of investigation will be warranted." *Amerisourcebergen*, 2020 WL 132752, at *9.

Therefore, the Stockholder makes this Section 220 request for the following proper purposes:

1.     To investigate possible breaches of fiduciary duty, mismanagement, self-dealing, corporate waste, and other violations of law by members of the Company's Board of Directors and management, including the Company's senior officers, in connection with: (i) whether that Disney+ was suffering decelerating subscriber growth, losses, and cost overruns; (ii) the true costs incurred in connection with Disney+, including whether the Company debut certain content intended for Disney+ initially on Disney's legacy distribution channels and then making the shows available on Disney+ thereafter in order to shift costs out of the Disney+ segment; (iii) whether DMED had made platform distribution decisions based not on consumer preference, consumer behavior, or the desire to maximize the size of the audience for the content as represented, but based on the desire to hide the full costs of building Disney+'s content library; (iv) whether the Company was on track to achieve its 2024 Disney+ paid global subscriber and profitability targets, including whether such targets were achievable, and that such estimates had a reasonable basis in fact; (v) whether, for items (i)-(iv) above, the Company's directors and officers materially misrepresented the actual performance of Disney+, the sustainability of Disney+'s historical growth trends, the profitability of Disney+, and the likelihood that Disney could achieve its 2024 Disney+ subscriber and profitability targets; (vi) the impairment charges related to the Company's DTC services.

2.     To consider any remedies to be sought in respect to the aforementioned conduct.

3.     To investigate the ensuing response (including investigation, if any) to the aforementioned conduct.

The Walt Disney Company
February 5, 2024
Page 23 of 28

4.      To determine the impact, if any, the aforementioned conduct had on the value of Stockholder's equity holdings in the Company.

5.      To prevent further corporate trauma, lawsuits, government intervention, and loss of the Company's goodwill and reputation.

6.      To determine whether certain Company insiders used material, non-public information while trading in the Company's securities.

7.      To use information obtained through inspection of the Company's books and records to evaluate possible litigation or other corrective measures with respect to some or all of these matters.

8.      To evaluate the independence, disinterestedness, and suitability for office of the Company's Board of Directors.

This Demand to inspect the Company's books and records is undertaken in good faith and pertains to the Stockholder's interests in investigating whether there has been any wrongdoing or corporate mismanagement on the part of the Company's officers or members of the Board. Under Section 220, Delaware courts uniformly hold that stockholders' demands to inspect records for the foregoing reasons are proper purposes. *See, e.g., King v. VeriFone Holdings, Inc.*, 12 A.3d 1140, 1145 (Del. 2011) ("a 'proper purpose' is defined as 'a purpose reasonably related to such person's interest as a stockholder.' To cite one example, investigating corporate mismanagement . . . .").

The demands below are necessary and essential to effectuate the Stockholder's foregoing purposes.

## IV.    THE SCOPE OF THE INSPECTION

A stockholder should receive "access to all of the documents in the corporation's possession, custody or control, that are necessary to satisfy [the plaintiff's] proper purpose." *Amerisourcebergen* at *24 (*quoting Saito v. McKesson HBOC, Inc.*, 806 A.2d 113, 114–15 (Del. 2002)). Because a stockholder has "shown evidence of wide-ranging mismanagement or waste, a more wide-ranging inspection may be justified." *Freund v. Lucent Techs., Inc.*, No. Civ.A. 18893, 2003 WL 139766, at *5 (Del. Ch. Jan. 9, 2003); *accord Skoglund*, 372 A.2d at 211.

Similarly, "where a § 220 claim is based on alleged corporate wrongdoing, and assuming the allegation is meritorious, the stockholder should be given enough information to effectively address the problem, either through derivative litigation or through direct contact with the corporation's directors and/or stockholders." *Saito*, 806 A.2d at 114–15. "The source of the documents and the manner in which they were obtained by the corporation have little or no bearing on a stockholder's inspection rights. The issue is whether the documents are necessary and essential to satisfy the stockholder's proper purpose." *Id.* at 118.

The Walt Disney Company
February 5, 2024
Page 24 of 28

## V.    THE DEMAND FOR INSPECTION

### A.  The Relevant Time Period Covered by the Demand

Based on the foregoing, Stockholder has proved that an inspection covering the time period beginning August 2020 and ongoing through the present (the "Relevant Period"), is appropriately tailored to the scope of the alleged wrongdoing.

### B.  The Categories of Documents and Topics Covered by the Demand

From the start of the Relevant Period through the date of production, the Stockholder requests documents concerning the following categories of documents and topics covered by the Demand be made available for inspection by his attorneys at Johnson Fistel:

1. Information the Company's directors and officers relied upon when making and/or authorizing the False Statements explained *supra*, covering the following topics:

     (i)     whether that Disney+ was suffering decelerating subscriber growth, losses, and cost overruns;

     (ii)    the true costs incurred in connection with Disney+, including whether the Company debut of certain content intended for Disney+ initially on Disney's legacy distribution channels and then making the shows available on Disney+ thereafter in order to shift costs out of the Disney+ segment;

     (iii)   whether DMED had made platform distribution decisions based not on consumer preference, consumer behavior, or the desire to maximize the size of the audience for the content as represented, but based on the desire to hide the full costs of building Disney+'s content library;

     (iv)    whether the Company was on track to achieve its 2024 Disney+ paid global subscriber and profitability targets, including whether such targets were achievable, and that such estimates had a reasonable basis in fact;

     (v)     whether, for items (i)-(iv) above, the Company's directors and officers materially misrepresented the actual performance of Disney+, the sustainability of Disney+'s historical growth trends, the profitability of Disney+, and the likelihood that Disney could achieve its 2024 Disney+ subscriber and profitability targets; and

     (vi)    the impairment charges related to the Company's DTC services.

2. Agenda and minutes of all meetings, all materials provided, and presentations made (whether retained in the minute books) to the Board concerning the False Statements explained *supra*, covering the following topics:

     (i)     whether that Disney+ was suffering decelerating subscriber growth, losses, and cost overruns;

     (ii)    the true costs incurred in connection with Disney+, including whether the

The Walt Disney Company
February 5, 2024
Page 25 of 28

Company debut of certain content intended for Disney+ initially on Disney's legacy distribution channels and then making the shows available on Disney+ thereafter in order to shift costs out of the Disney+ segment;

(iii)    whether DMED had made platform distribution decisions based not on consumer preference, consumer behavior, or the desire to maximize the size of the audience for the content as represented, but based on the desire to hide the full costs of building Disney+'s content library;

(iv)    whether the Company was on track to achieve its 2024 Disney+ paid global subscriber and profitability targets, including whether such targets were achievable, and that such estimates had a reasonable basis in fact;

(v)    whether, for items (i)-(iv) above, the Company's directors and officers materially misrepresented the actual performance of Disney+, the sustainability of Disney+'s historical growth trends, the profitability of Disney+, and the likelihood that Disney could achieve its 2024 Disney+ subscriber and profitability targets; and

(vi)    the impairment charges related to the Company's DTC services.

3.    Agenda and minutes of all meetings, all materials provided, and presentations made (whether retained in the minute books) to the Board concerning the following topics:

(i)    the Company's reorganization of its media and entertainment businesses, described herein as the Wrongful Conduct, along with the associated False Statements;

(ii)    the Company's value and subscriber projections concerning the Disney+ platform;

(iii)    the Company's share price increase associated with the Wrongful Conduct and the False Statements;

(iv)    the Company's share price decline upon the revelation of the Wrongful Conduct and the associated False Statements; and

(v)    the impairment charges related to the Company's DTC services.

4.    Internal and external investigations and/or remedial actions concerning the Wrongful Conduct and/or the False Statements.

5.    The Company's governance, operations, prospects, performance metrics (including but not limited to inventory levels), and financial reporting concerning the Wrongful Conduct and/or the False Statements.

6.    The Company's internal controls to avoid errors in the Company's financial reporting and any proposal, whether formal or informal, to change or modify the Company's internal controls with respect to preventing errors in the Company's financial reporting or the Wrongful Conduct, along with the associated False Statements.

7.    Processes, policies, procedures, and controls for the Company's press releases, SEC filings,

The Walt Disney Company
February 5, 2024
Page 26 of 28

and other public statements concerning the Wrongful Conduct and/or the False Statements.

8.      Any books and records concerning insider trading.

9.      Director and officer questionnaires, including those for the Company's Form 10-Ks and proxy statements.

10.     Any books and records already produced (or that will be produced) to other stockholders of the Company, including any stockholder, officer, and director correspondence) related to any books and records demands, books and records actions, derivative actions, class actions, and government investigations and actions, concerning the Wrongful Conduct and/or the False Statements, including but not limited to the Securities Class Action.

### C.  The Types of Documents Covered by the Demand

For each of the foregoing demanded category and topic, the Demand seeks "Board Materials," which are defined as documents that were provided at, considered at, discussed at, or prepared or disseminated, in draft or final form, in connection with, in anticipation of, or as a result of any meeting of the Company's Board or any regular or specially created committee thereof.  *See AmerisourceBergen Corp. v. Lebanon Cnty Employees' Ret. Fund*, 243 A.3d 417, 439 (Del. 2020). Accordingly, Stockholder demands that the following types of documents be produced in response to the Demand, as they are necessary and essential to satisfy Stockholder's demonstrated proper purposes: (i) Formal Board Materials; (ii) Informal Board Materials; and (iii) Officer-Level Materials.

The term "Formal Board Materials" as used herein means all documents provided at, considered at, discussed at, or prepared or disseminated, in draft or final form, in connection with, in anticipation of, or as a result of any meeting of the Company's Board or any regular or specially created committee thereof, including, without limitation, all presentations, Board packages, recordings, agendas, summaries, memoranda, charts, transcripts, notes, minutes of meetings, drafts of minutes of meetings, exhibits distributed at meetings, summaries of meetings, or resolutions. *See Woods v. Sahara Enters., Inc.*, 238 A.3d 879, 897 (Del. Ch. 2020); *AmerisourceBergen Corp.*, 243 A.3d at 439.  Significantly, as Vice Chancellor Laster noted, "[a] corporation should be able to collect and provide its Formal Board Materials ***promptly and with minimal burden***.  In many organizations, the corporate secretary maintains a central file for each board meeting in either paper or electronic form that contains the minutes and other Formal Board Materials for that meeting." *Amerisourcebergen*, 2020 WL 132752, at *24.

Moreover, the term "Informal Board Materials" comprises documents that "evidence the directors' deliberations, the information that they received, and the decisions they reached[.]" *Woods*, 238 A.3d at 897.  These informal materials should include "communications between directors and the corporation's officers and senior employees, such as information distributed to the directors outside of formal channels, in between formal meetings, or in connection with other types of board gatherings." *Id.*  They also include "emails and other types of communication sent

The Walt Disney Company
February 5, 2024
Page 27 of 28

among directors themselves, even if the directors used noncorporate accounts." *Id.* at 897–98.  In *KT4 Partners*, the court held that when Formal Board Materials are insufficient to accomplish the plaintiff's purpose, the court may order the production of Informal Board Materials.  203 A.3d at 753, 757; *see AmerisourceBergen Corp.*, 243 A.3d at 439 (Demand properly sought Informal Board Materials by requesting "documents prepared or disseminated, in draft or final form" and because the phrases "in connection with," "in anticipation of," and "as a result of" are broad enough to extend beyond documents formally reviewed during an official meeting.).

The term "Officer-Level Materials" as used herein means all documents that were shared among or reviewed by officers and employees of the Company.  *See Woods*, 238 A.3d at 898.  Officer-Level Materials should be produced that are necessary and essential to determining "to what extent mismanagement occurred and what information was transmitted to [the Company's] directors and officers."  *Wal-Mart Stores*, 95 A.3d at 1273 (finding that Officer-Level Materials are not limited to those communications between officers and directors); *see AmerisourceBergen Corp.*, 243 A.3d at 439 (Demand properly requested Officer-Level Materials because officers and other employees could have prepared documents in connection with, in anticipation of, or as a result of a board meeting.).

Finally, the term "Documents" as used herein is to be construed as broadly as possible under the Rules of the Delaware Court of Chancery, including all correspondence related to a given category, and all electronically created and retained directories, files, documents, spreadsheets, graphical renderings, and emails with their attachments.

## VI.    **CONDITIONS OF PRODUCTION**

We will agree to a reasonable confidentiality agreement as to documents that legitimately warrant confidential treatment in order to review and properly use the information requested in this Demand, provided, that agreement can be reached on any proposed conditions of production, including: (i) incorporation-by-reference condition; (ii) forum-selection condition; (iii) redaction of privileged and non-responsive material conditions; (iv) and electronically stored information ("ESI") protocol conditions proposed by the parties.

Further, to more effectively meet the burden of making "specific and discrete identification, with rifled precision, of the documents sought[,]" *Brehm v. Eisner*, 746 A.2d 244, 266 (Del. 2000), and avoid any unwanted scenarios where the corporation may use "its own choice of medium to keep shareholders in the dark about the substantive information to which § 220 entitles them[,]" *KT4 Partners*, 203 A.3d at 742, the Stockholder requests the following with respect to the production of electronically stored information ("ESI"):

1.    To help this Demand (and any subsequent action) maintain its summary-style proceedings, all documents produced should be in electronically

The Walt Disney Company
February 5, 2024
Page 28 of 28

searchable format, whether this be by optical character recognition or some
other means.

2.     Documents must be accompanied by their metadata, as this contains
information that is essential to fulfill the Stockholder's stated proper
purpose.  Particularly, this includes embedded metadata, email metadata,
application data related to the ESI being produced, document metadata, and
then user-added and vendor-added metadata.

3.     Where a document's native format is necessary to properly understand it
and its accompanying metadata, (*e.g.*, Microsoft Excel files), that these be
produced in their native format.  It is reasonable and necessary that these
requirements are met in producing documents, as doing so will enable the
Stockholder to access "essential information [that] is unavailable from
another source."  *Espinoza v. Hewlett-Packard Co.*, 32 A.3d 365, 371–72
(Del. 2011).

Pursuant to Section 220(c), a response to this Demand is required within five (5) business
days.  If any inspection request or condition of production is objected to by the Company, it is
imperative that the objection be specified in writing which includes the specific issue to which the
Company objects and the reason for the objection.  A failure by the Company to specify in writing
its objections to any inspection request or condition of production will likely result in the
expenditure of unnecessary time and resources by both the Stockholder and the Company.

Please know that in the event this Demand is not complied with, we intend to seek
immediate judicial relief.

We look forward to your prompt response.

Sincerely,

Michael I. Fistel, Jr.

JOHNSON FISTEL, LLP

cc:    Mary Ellen Conner, Esq.
       Enoch P. Hicks, Esq.

Enclosures

# EXHIBIT A

## VERIFICATION AND AUTHORIZATION

STATE OF OHIO            )
                         )      ss:
COUNTY OF CUYAHOGA       )

    I, Balraj Paul, being duly sworn, depose and say that I am a stockholder of The Walt Disney Company, as evidenced by my brokerage statement, a true and correct copy of which is enclosed herewith.

    I have read a substantially final form of the inspection demand letter made pursuant to § 220 of the Delaware General Corporation Law addressed to the Board of Directors of the Walt Disney Company, and the facts and statements in that inspection demand are true and correct to the best of my knowledge, information and belief.

    I declare under penalty of perjury that the foregoing statements are true and correct.

    Executed on this 02 day of February 2024, in Parma, Ohio.


_____
Name: Balraj Paul

    SWORN TO AND SUBSCRIBED before me, a Notary Public in the State and County aforesaid, this 02 day of February, 2024.


_____
Notary Public
My Commission Expires: _____

DEBORAH L. KWATIA
NOTARY PUBLIC, STATE OF OHIO
My Commission Expires Oct. 11, 2026

# EXHIBIT A-1



| DIS | $95.231 | +$5.56 | -$153.18 | $1,428.46 | 0.24% | 15 | $1,581.64 |
| DISNEY WALT CO COM | +$0.371 | +0.39% | -9.69% | | | | $105.44 / Share |

## DISNEY WALT CO COM

 **Buy**   **Sell**   Set Exit Plan

**Purchase History**   Research

| Acquired | Term | $ Total Gain/Loss | % Total Gain/Loss | Current Value | Quantity | Average Cost Basis | Cost |
|----------|------|-------------------|-------------------|---------------|----------|--------------------|------|
| 2023-08-24 | Short | +$12.31 | +14.85% | $95.23 | 1 | $82.92 | |
| 2023-08-02 | Short | +$16.08 | +9.22% | $190.46 | 2 | $87.19 | |
| 2023-07-26 | Short | +$9.48 | +11.06% | $95.23 | 1 | $85.75 | |
| 2020-06-11 | Long | -$191.05 | -15.42% | $1,047.54 | 11 | $112.60 | |



BALRAJ S PAUL

▲

MR_CE_BPRPTCBBBFTCK_BBBBB 20231229



MR_CE_BPRPTCBBBFTCK_BBBBB 20231229
P.

**Fidelity** INVESTMENTS®

INVESTMENT REPORT
**December 1, 2023 - December 31, 2023**

## Account Summary

**BALRAJ S PAUL - INDIVIDUAL - TOD**

▲

MR_CE_BPRPTCBBBFTCK_BBBBB 20231229    P

INVESTMENT REPORT
**December 1, 2023 - December 31, 2023**

**BALRAJ S PAUL - INDIVIDUAL - TOD**

► In an effort to streamline and enhance statement viewability, we're removing the Core Account Cash Flow table from statements beginning in October 2023.    1106074.1.0

## Holdings



## Holdings

**BALRAJ S PAUL - INDIVIDUAL - TOD**

Stocks (continued)

| Description | Beginning Market Value Dec 1, 2023 | Quantity Dec 31, 2023 | Price Per Unit Dec 31, 2023 | Ending Market Value Dec 31, 2023 | Total Cost Basis | Unrealized Gain/Loss Dec 31, 2023 | EAI ($) / EY (%) |
|---|---|---|---|---|---|---|---|
| **DISNEY WALT CO COM** (DIS) | 1,390.35 | 15.000 | 90.2900 | 1,354.35 | 1,581.64 | -227.29 | 9.00 0.660 |

MR_CE_BPRPTCBBBFTCK_BBBBB 20231229



# Holdings

**BALRAJ S PAUL   INDIVIDUAL - TOD**

Stocks (continued)

## Activity

**BALRAJ S PAUL - INDIVIDUAL - TOD**



INVESTMENT REPORT
**December 1, 2023 - December 31, 2023**

## Activity

**BALRAJ S PAUL - INDIVIDUAL - TOD**

MR_CE _BRPPTCBBBFTCK_BBBBB 20231229

MR_CE_BPRPTCBBBFTCK_BBBBB 20231229



INVESTMENT REPORT
**December 1, 2023 - December 31, 2023**

**BALRAJ S PAUL - INDIVIDUAL - TOD**

MR_CE_BPRPTCBBBFTCK_BBBBB 20231229



**BALRAJ S PAUL - ROLLOVER IRA**

▲

▶

▶

MR_CE_BPRPTCBBBFTCK_BBBBB 20231229



INVESTMENT REPORT
**December 1, 2023 - December 31, 2023**

**BALRAJ S PAUL - ROLLOVER IRA**

MR_CE_BPRPTCBBBFTCK_BBBBB 20231229

P

INVESTMENT REPORT
**December 1, 2023 - December 31, 2023**

**BALRAJ S PAUL - ROLLOVER IRA**

MR_CE_BPRPTCBBBFTCK_BBBBB 20231229



INVESTMENT REPORT
**December 1, 2023 - December 31, 2023**

MR_CE_BPRPTCBBBFTCK_BBBBB 20231229    P

INVESTMENT REPORT
**December 1, 2023 - December 31, 2023**

**BALRAJ S PAUL - ROTH IRA**

▲

►

►





INVESTMENT REPORT
**December 1, 2023 - December 31, 2023**

**BALRAJ S PAUL - ROTH IRA**

P.

MR_CE_BPRPTCBBBFTCK_BBBBB 20231229

**BALRAJ S PAUL - ROTH IRA**

*e*

P

MR_CE_BPRPTCBBBFTCK_BBBBB 20231229

▶

**BALRAJ S PAUL - ROTH IRA**

►

►

INVESTMENT REPORT
**December 1, 2023 - December 31, 2023**

**BALRAJ S PAUL - ROTH IRA**

▶

MR_CE_BPRPTCBBBFTCK_BBBBB 20231229

P



This page intentionally left blank

# EXHIBIT B

## LIMITED POWER OF ATTORNEY

STATE OF OHIO                    )
                                )    ss:
COUNTY OF CUYAHOGA               )

      KNOW ALL PERSONS BY THESE PRESENTS, that I, Balraj Paul, do hereby make, constitute and appoint the law firm of Johnson Fistel, LLP and any persons designated by the firms, to act as my true and lawful attorneys in fact, in my name, place and stead, in all matters regarding the examination of books and records of The Walt Disney Company, giving and granting unto said attorneys full power to do and perform all and every act and thing whatsoever requisite, necessary and proper to be done in and without the premises, as fully, to all intents and purposes as it might or could do, with full power of substitution and revocation, hereby ratifying and confirming all that my attorneys or the substitute shall lawfully do or cause to be done.

      Executed on this 02 day of February 2024, in Parma, Ohio.

Name: Balraj Paul

      SWORN TO AND SUBSCRIBED before me, a Notary Public in the State and County aforesaid, this 02 day of February , 2024.

Notary Public
My Commission Expires: _____



DEBORAH L. KWATIA
NOTARY PUBLIC, STATE OF OHIO
My Commission Expires Oct. 11, 2026